**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

─────────────────────────────x

UNITED STATES OF AMERICA and
the STATE OF ALASKA,
the STATE OF CALIFORNIA,
the STATE OF CONNECTICUT,
the STATE OF FLORIDA,
the STATE OF ILLINOIS,
the STATE OF LOUISIANA,
the STATE OF MICHIGAN,
the STATE OF MONTANA,
the STATE OF NEW JERSEY,
the STATE OF NEW MEXICO,
the STATE OF NEW YORK,
the STATE OF NORTH CAROLINA,
the STATE OF OKLAHOMA,
the STATE OF TENNESSEE,
the STATE OF TEXAS, and
the STATE OF WASHINGTON,

*ex rel.* SW CHALLENGER, LLC,
JANE DOE 1, and
JANE DOE 2,

                    Plaintiffs,

      vs.

EVICORE HEALTHCARE MSI, LLC,

                    Defendant.

─────────────────────────────x

Case No. 19-2501

<u>JURY TRIAL DEMANDED</u>

**SECOND AMENDED COMPLAINT
FOR VIOLATIONS OF THE
FEDERAL FALSE CLAIMS ACT, 31
U.S.C. § 3729, *ET SEQ.*, AND STATE
LAW COUNTERPARTS**

## TABLE OF CONTENTS

**Page**

I.     SUMMARY OF FACTUAL ALLEGATIONS ............................................................... 1

II.    JURISDICTION AND VENUE ................................................................................... 9

III.   PARTIES .................................................................................................................... 10

     A.    Plaintiffs ........................................................................................................ 10

     B.    Defendant eviCore ........................................................................................ 12

IV.   LEGAL AND REGULATORY FRAMEWORK ....................................................... 14

     A.    The False Claims Act .................................................................................... 14

     B.    Medicare Advantage ..................................................................................... 15

     C.    Medicaid ....................................................................................................... 16

V.    EVICORE'S FRAUDULENT CONDUCT ............................................................... 21

     A.    Background on eviCore's Operations and Participation in Government
          Healthcare Programs ..................................................................................... 21

     B.    eviCore's Scheme – In Detail ...................................................................... 22

          1.    Proper Prior Authorization Approvals and Denials ................................... 22

          2.    Directives to Manually Auto-Approve ...................................................... 24

          3.    CorePath and Image One ............................................................................ 27

     C.    eviCore's Attempts to Whitewash its Auto-Approval Schemes ........................... 30

     D.    eviCore's Fraudulent Scheme Caused the Submission of False Claims and
          Loss to Federal and State Governments ....................................................... 31

     E.    Jane Doe 1's and Jane Doe 2's attempts to investigate and reform eviCore ........ 32

          1.    Jane Doe 1 ................................................................................................... 33

          2.    Jane Doe 2 ................................................................................................... 36

COUNT I VIOLATION OF THE FEDERAL FALSE CLAIMS ACT, 31 U.S.C. §
     3729(a)(1)(A) ............................................................................................................ 38

COUNT II VIOLATION OF FEDERAL FALSE CLAIMS ACT, 31 U.S.C. § 3729(a)(1)(B) ................................................................................39

COUNT III VIOLATION OF FEDERAL FALSE CLAIMS ACT, 31 U.S.C. § 3729(a)(1)(G) ................................................................................40

COUNT IV VIOLATION OF FEDERAL FALSE CLAIMS ACT, 31 U.S.C § 3729(A)(1)(C) ................................................................................42

COUNT V VIOLATION OF ALASKA MEDICAL ASSISTANCE FALSE CLAIMS AND REPORTING ACT ................................................................................41

COUNT VI VIOLATION OF CALIFORNIA FALSE CLAIMS ACT ....................................43

COUNT VII VIOLATION OF CONNECTICUT FALSE CLAIMS ACT................................45

COUNT VIII VIOLATION OF FLORIDA FALSE CLAIMS ACT ............................................46

COUNT IX VIOLATION OF ILLINOIS FALSE CLAIMS ACT ............................................48

COUNT X VIOLATION OF THE MICHIGAN MEDICAID FALSE CLAIMS ACT ..............49

COUNT XI VIOLATION OF NEW JERSEY FALSE CLAIMS ACT ....................................52

COUNT XII VIOLATION OF NEW YORK FALSE CLAIMS ACT ......................................53

COUNT XIII VIOLATION OF LOUISIANA MEDICAL ASSISTANCE PROGRAMS INTEGRITY LAW ................................................................................55

COUNT XIV VIOLATION OF MONTANA FALSE CLAIMS ACT ........................................56

COUNT XV VIOLATION OF NEW MEXICO MEDICAID FALSE CLAIMS ACT................58

COUNT XVI VIOLATION OF NORTH CAROLINA FALSE CLAIMS ACT ..........................60

COUNT XVII VIOLATION OF OKLAHOMA MEDICAID FALSE CLAIMS ACT................61

COUNT XVIII VIOLATION OF TENNESSEE FALSE CLAIMS ACT ....................................63

COUNT XIX VIOLATION OF TEXAS MEDICAID FRAUD PREVENTION ACT ................65

COUNT XX VIOLATION OF WASHINGTON MEDICAID FRAUD FALSE CLAIMS ACT ................................................................................66

COUNT XI VIOLATION OF FALSE CLAIMS ACT, 31 U.S.C. § 3730(h) - JANE DOE 1 ................................................................................70

COUNT XII VIOLATION OF FALSE CLAIMS ACT, 31 U.S.C. § 3730(h) - JANE DOE 2 ................................................................................70

PRAYER FOR RELIEF ................................................................................................71

JURY TRIAL DEMAND ............................................................................................79

Plaintiff, SW Challenger, LLC ("SW Challenger"), on behalf of the United States of America (the "United States") and the States of Alaska, California, Connecticut, Florida, Illinois, Louisiana, Michigan, Montana, New Jersey, New Mexico, New York, North Carolina, Oklahoma, Tennessee, Texas, and Washington, (collectively, the "Qui Tam States"), bring this action pursuant to the Qui Tam provisions of the Federal False Claims Act, 31 U.S.C. §§ 3729, *et seq.*, as amended (the "Federal False Claims Act"), and the Qui Tam States' statutes as enumerated below, against eviCore Healthcare MSI, LLC ("eviCore").  Jane Doe 1 and Jane Doe 2 are members of SW Challenger and bring their own claims under 31 U.S.C. § 3730(h) for retaliation suffered from defendant eviCore.[1]  In support thereof, Relators allege as follows:

## I.    SUMMARY OF FACTUAL ALLEGATIONS

1.     This is an action to recover damages and civil penalties on behalf of the United States and the various Qui Tam States arising from false and/or fraudulent records, statements and claims made, used or presented and/or caused to be made, used or presented by Defendant and/or its agents or employees under the Federal False Claims Act.

2.     Under the Medicare Part C Program, known as Medicare Advantage, the federal agency that administers the Medicare program — the Centers for Medicare and Medicaid Services ("CMS") — contracts with private health-insurance companies (known as managed care organizations ("MCOs")), such as WellCare Health Plans, Inc. ("WellCare"), Passport, Blue Cross Blue Shield ("BCBS"), the Health Care Service Corporation ("HCSC"), Health Alliance Medical Plan ("HAMP"), and Moda Health, that operate health-insurance plans (known as "Medicare Advantage Plans") that cover Medicare beneficiaries.  In sum, Medicare Advantage Plans are a

---

[1] Please note that while Jane Doe 1 and Jane Doe 2's identities are being masked for purposes of this public filing, their names will be provided to Defendant eviCore at or shortly after the time of service so that eviCore can undertake a proper defense of the retaliation allegations levied against it.

type of Medicare health plan offered by a private company that contracts with Medicare to provide all of a beneficiary's Part A (Hospital Insurance) and Part B (Medical Insurance) benefits.

3.      In administering government-funded Medicare Advantage Plans, as well as Medicaid Plans, MCOs are required to perform certain functions as set forth in their contractual agreements with CMS or the Qui Tam States, including those related to prior authorization and utilization management and payment processing for outpatient and home health services.

4.      For Medicare Advantage, CMS pays MCOs a capitated (per enrollee) amount to provide all Part A and B benefits. In addition, CMS makes a separate payment to MCOs for providing prescription drug benefits under Medicare Part D. Payments to MCOs are adjusted for enrollees' health status and other factors.

5.      MCOs then share those payments with their sub-contractors and contracted medical providers.

6.      CMS may terminate an MCO's Medicare Advantage contract for, among other things, the MCO carrying out its contract with CMS in a manner that is inconsistent with the effective and efficient implementation of the Medicare Advantage program, and if the MCO commits or participates in fraudulent or abusive activities affecting the Medicare program including the submission of fraudulent data.  42 CFR § 422.504(h)(1); 42 CFR § 422.510(a)(4)(i).

7.      Similar rules and regulations apply to the contracts between MCOs and the Qui Tam States for Medicaid Plans.

8.      All contracts between CMS and MCOs specify that any subcontractor who is delegated part of the MCO's functions must comply with all applicable Medicare laws, regulations, and CMS instructions.  42 CFR § 422.504(i)(4)(v).

9.     CMS further requires that MCO executives certify that the patient data that they submit to CMS is true and accurate.  CMS requires these signed certifications as a condition of payment.  If a subcontractor generates the data, the subcontractor also must certify that its patient data is true and accurate.  42 CFR § 422.504(l)(3).

10.     Defendant eviCore is purportedly in the business of providing utilization management services for Medicare Advantage Plans and Medicaid Plans for outpatient and home health services.  Defendant eviCore contracts with MCOs to provide utilization management services and review prior authorization requests.

11.     Utilization management is a core MCO function in the administration of Medicare Advantage and Medicaid plans, making eviCore subject to Medicare Advantage requirements as articulated in Medicare Advantage regulations and related guidance.  *See, e.g.*, Medicare Managed Care Manual Chapter 11 - Medicare Advantage Application Procedures and Contract Requirements 100.5 – Administrative Contracting Requirements, *available at* https://www.cms.gov/Regulations-and-Guidance/Guidance/Manuals/downloads/mc86c11.pdf ("CMS . . . view[s] contracts for. . . utilization management . . . to be administrative contracts subject to MA requirements as articulated in the MA regulation and related guidance.").  As such, eviCore has agreed to comply with all applicable Medicare and Medicaid laws, regulations, and CMS instructions.  *Id.*

12.     One of the primary reasons that MCOs contract with third-parties like eviCore to perform these Government-mandated functions is to ensure that the MCO has in place procedures and systems to determine whether a particular medical procedure is reimbursable under a Medicaid Plan or Medicare Advantage.  *See, e.g.,* 42 U.S.C. § 1395y(a)(1) ("Notwithstanding any other provision of this subchapter, no payment may be made under part A or part B for any expenses

incurred for items or services . . . which . . . are not reasonable and necessary for the diagnosis or treatment of illness or injury or to improve the functioning of a malformed body member"). Provider claims require eviCore's prior authorization number on the claim submitted for payment of services.

13.     The central purpose of this contractual arrangement, whereby eviCore provides sub-contracted medical review services to MCOs for the benefit of CMS or a Qui Tam State, is to ensure that appropriate review procedures are in place and actually followed so as to reduce waste, fraud, and abuse within Medicare Advantage and Medicaid, and thus to ensure that medical procedures which are not reimbursable are denied.

14.     Defendant eviCore knowingly accepted subcontracts from MCOs to take on the responsibility of providing CMS and Qui Tam States with prior authorization and utilization management for outpatient and home health services provided pursuant to Medicare Advantage and Medicaid Plans.  As such, eviCore was required to turn the same square corners in their dealings with MCOs as if they were dealing with the Government itself.

15.     If eviCore agreed to contracts with MCOs to provide certain Government-mandated services, then eviCore's intentional failure to provide such services, or eviCore's use of a recklessly designed system that did not provide these services as called for by the MCOs' contracts with the Government, subjected eviCore to liability under the False Claims Act.

16.     If eviCore failed to provide utilization management services and/or review prior authorization requests as contracted-for, and as a result an MCO approved treatments that were not reimbursable, that could result in patient harm and cost the Government a significant amount of taxpayer money.

17.     Essentially, by entering into these agreements to provide services to MCOs, eviCore agreed to fulfill the role the MCO had in ensuring medically necessary treatments were approved and non-medically necessary treatments were denied under Medicare Advantage and Medicaid Plans.

18.     As relevant here, eviCore's contracts with MCOs include a key timing provision that requires eviCore to approve, partially approve, or deny in a timely fashion each request for prior authorization to deem services to a given beneficiary as reimbursable (each request also referred to as a "case").  In many instances, the turnaround time ("TAT") to process requests for prior authorizations is only 24 to 48 hours.  Failure to meet its prescribed TAT will result in contractual penalties for eviCore.

19.     Defendant eviCore, however, failed to hire sufficient staff to properly service its MCO subcontracts and meet the contractual timing requirements.

20.     Rather, since at least November 2016, eviCore has engaged in fraudulent activities involving its role as the gatekeeper for determining whether requested services are appropriate and reimbursable.  As detailed herein, through independent efforts to keep up with the high volume of prior authorization requests for services and to avoid contractual TAT penalties, eviCore instituted a scheme simply to "auto-approve" hundreds of cases on a daily basis, reflexively deeming those services as reasonable and necessary, even though there had been no appropriate evaluation of those cases, and in some cases, no actual human evaluation of those cases whatsoever.

21.     Thus, to make up for its insufficient staffing, eviCore adopted procedures to automatically approve requested medical procedures without any meaningful clinical review or any limit on the scope of the procedure or the number of procedures approved. In layman's terms, for certain cases eviCore created a swinging gate prior authorization approval process that

approved anything and everything that passed before it.  In these circumstances, eviCore provided worthless services in exchange for its contractual payment to fulfill a necessary Government function that had been outsourced to MCOs and further subcontracted to eviCore.

22.     Defendant eviCore specifically directed its medical personnel, internally called "Clinical Reviewers," including Relators, to "auto-approve" or "approve as requested" services in specific jurisdictions, for specific populations, and/or under specific healthcare plans, before and without any review of the propriety or medical necessity of the services.

23.     These auto-approve directives, as described by eviCore to its reviewers, included, at various times, directives to Clinical Reviewers to "auto-approve" certain categories of services without any review.

24.     Relators have direct personal knowledge of eviCore's conduct as it relates to the auto-approval of physical therapy treatment, but through their interactions with other reviewers working at eviCore, they learned that these procedures were not limited to physical therapy. Rather, eviCore's auto-approval rubber-stamp had a large scope, including but not limited to the auto-approval of certain *radiology services, cardiology procedures, joint surgery, radiation therapy, interventional pain procedures, sleep therapy and laboratory management*.  The risk of significant patient harm for services and procedures that are not medically necessary in these contexts is manifest.

25.     In addition to the directives eviCore provided to its Clinical Reviewers, eviCore took further steps to ensure the approval of certain categories of requests by designing and implementing a data analytics system called "CorePath" that automatically approves certain requests in the absence of any human review.

26.     In many cases, the MCOs were <u>not</u> aware of many of the auto-approval policies that eviCore had independently established.  Rather, these auto-approvals were often established by eviCore solely for its own pecuniary benefit.  For example, due to its lack of appropriate staffing and a desire not to pay for overtime work, eviCore (without MCO knowledge or approval) established "approve as requested" protocols for the first three requests for any course of care. This policy was introduced over the Labor Day Holiday 2018 and continued for 126 dates when queue volumes were high until July 22, 2019.

27.     By entering into these contractual arrangements with MCOs to provide utilization management and prior authorization services for Medicare Advantage and Medicaid Plans, and thereby charging MCOs (acting as agents of CMS) for those services, eviCore was obligated to provide the contracted-for service.  The failure to do so, without the MCOs' knowledge or approval, violates the False Claims Act.

28.     Defendant eviCore's failure to perform its contracted-for utilization management and prior authorization services cost CMS, the Qui Tam States and its MCOs a significant amount of money, and in certain cases, also created the opportunity for patient harm.

29.     A specific example of potential patient harm caused by eviCore's actions includes the following:

      a)     ***Surgical***: for certain Medicare Advantage patients, Dr. Jaimie Clodfelter, D.O., an eviCore Medical Reviewer, told one of the Relators in a telephone call that she is frequently asked to "sign-off" or review surgical requests even though Dr. Clodfelter is not a surgeon and does not have the professional clinical experience necessary to conduct a meaningful review of these requests.

30.     Additionally, a new practice that eviCore has adopted occurs when an MCO provides notice that the MCO will terminate eviCore's services.  In such circumstances, eviCore simply auto-approves everything from that departing MCO to ensure internal cost saving, this violating the contract with the departing MCO and minimizing the utilization review required by the Government, all without disclosing such auto-approvals to the departing MCO.  An example of this scheme was an October 30, 2019 e-mail directive from eviCore's Mary Sue Agostini, who stated that BlueCross BlueShield of Texas' ("BCBS TX") submissions would be approved "as requested" (i.e., auto-approved without proper clinical review) because "it was decided to not increase the touches on our end" since the health plan was terminating its contract with eviCore and management wanted to limit the resources spent handling BCBS TX cases prior to the termination date.

31.     Defendant eviCore failed to satisfy its contractual requirements and thus failed to provide necessary medical review functions for CMS and the Qui Tam States by instituting these auto-approval policies.

32.     As a result of its failure to provide any type of medical review on a large number of the cases that passed before it, Defendant eviCore knowingly provided worthless services of no value to MCOs who stand in the shoes of CMS and the Qui Tam States, thus causing MCOs to submit false claims for payment to the Government based on the assertion that eviCore was complying with the most basic and critical provisions of its subcontract.

33.     Defendant eviCore thus knowingly failed to provide the medical review services that it was subcontracted to perform, thereby causing damages to the Government as CMS and the Qui Tam States were not receiving the benefit of the contracted-for prior authorization and utilization management services that had been outsourced to MCOs and subcontracted to eviCore.

34.     CMS and the Qui Tam States would not have paid the MCOs for prior authorization reviews, a key component of the MCOs' contracts with the Government, if it had known that the MCOs chosen subcontractor, eviCore, was providing worthless services.

35.     One measure of damages in this case is the disgorgement of contractual payments made to Defendant eviCore, as the medical review process that eviCore had fraudulently implemented was not designed to actually perform the contracted-for services.  The "reviews" eviCore did provide, often times automatic approval of anything put before it, were worthless and incapable of determining the propriety of the suggested medical care.

36.      In addition, Jane Doe 1 and Jane Doe 2 bring this action to recover under the anti-retaliation provisions of the federal False Claims Act, 31 U.S.C. § 3730(h).  eviCore took retaliatory action against Jane Doe 1 and Jane Doe 2 because they refused to engage in unlawful activity that would have violated state and federal law.

## II.     <u>JURISDICTION AND VENUE</u>

37.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1345 and 31 U.S.C. §§ 3730 and 3732(a).  The Court has original jurisdiction over the State law claims pursuant to 31 U.S.C. § 3732(b) because this action is brought under State laws for the recovery of funds paid by the Qui Tam States and arises from the same transactions or occurrences brought on behalf of the United States under 31 U.S.C. § 3730.

38.     This Court has personal jurisdiction over the Defendant because, among other things, the Defendant transacts business in this judicial district, and engaged in wrongdoing in this judicial district.

39.     Venue is proper in this judicial district under 31 U.S.C. § 3732(a) and 28 U.S.C. §§ 1391(b) and (c).  Defendant transacts business within this judicial district, and acts proscribed by 31 U.S.C. § 3729 occurred in this judicial district.

40.     Pursuant to 31 U.S.C. § 3730(b)(2), along with its submission of the original complaint in this matter, SW Challenger prepared and has served on the Attorney General of the United States, the United States Attorney for the Southern District of New York, and the Attorneys General of the Qui Tam States written disclosures of all material evidence and information currently in its possession.

41.     This action is not based upon prior public disclosure of allegations or transactions in a federal criminal, civil, or administrative hearing, in which the government or its agent is a party.  Nor have Relators' allegations or transactions herein been publicly disclosed in a congressional, Government Accountability Office, or other federal report, hearing, audit, or investigation; or in news media; or in any other form as the term "publicly disclosed" is defined in 31 U.S.C. § 3730(e)(4)(A).

42.     To the extent there has been a public disclosure unknown to Relators of any of the allegations herein, Relators are the original source of those allegations within the meaning of 31 U.S.C. § 3730(e)(4)(B).

## III.   PARTIES

### A.    Plaintiffs

43.     Relator SW Challenger, a Delaware limited liability company, brings this action on behalf of itself, the United States of America and the Qui Tam States.  Its principal place of business is c/o Seeger Weiss LLP, 55 Challenger Road, Ridgefield Park, NJ 07660.  Among the members of SW Challenger are current and former eviCore employees (referred to herein

collectively as "Relators" and individually as "Relator #1" and "Relator #2") with personal knowledge of the fraudulent scheme alleged in this Complaint.  The Relators possess personal knowledge and experience regarding eviCore's "auto-approve" activities, including personal contact with the employees and executives of eviCore who have planned, initiated and directed the violations of law alleged herein.  The personal knowledge of SW Challenger is not distinct from that of the Relators.

44.     Relators #1 and #2 (also referred to as Jane Doe 1 and Jane Doe 2 for purposes of their personal retaliation claims raised in this Second Amended Complaint) are/were employed by eviCore as Clinical Reviewers, whose primary job responsibilities include reviewing physical therapy and occupational therapy treatment requests in the prior authorization context.

45.     Jane Doe 1 and Jane Doe 2 were wrongfully retaliated against by eviCore after urging reforms to prevent eviCore from engaging in the unlawful activities that resulted in the illegal approval of medical services.  Prior to filing this Complaint, Jane Doe 1 and Jane Doe 2 brought allegations of the wrongdoing described in this Complaint (i.e., those relating to eviCore's auto-approval scheme) to the attention of eviCore's executives and warned them that eviCore's failure to correct the auto-approval policies constituted fraudulent conduct.

46.     Jane Doe 1 and Jane Doe 2 reasonably believed that eviCore's knowing failure to perform a full medical review of all treatment requests intentionally induced the Government to pay claims under false pretenses.

47.     eviCore retaliated and discriminated against Jane Doe 1 and Jane Doe 2 because of their protected conduct under the FCA.

48.     Relators' personal knowledge of Defendants' illegal conduct is supported by their own personal investigation undertaken to further develop and substantiate the allegations set forth in this Complaint.

49.     Plaintiff, the United States of America, acting through the Department of Health and Human Services ("HHS"), and its Centers for Medicare and Medicaid Services, administers the Health Insurance Program for the Aged and Disabled established by Title XVIII of the Social Security Act, 42 U.S.C. §§ 1395, *et seq.* ("Medicare"), which includes the Medicare Advantage component that is the subject of this lawsuit.

50.     Plaintiffs Qui Tam States participate in the Medicaid program and have State False Claims Acts which permit private persons, such as Relators, to sue on their behalf to recover for false and fraudulent claims submitted for payment by Medicaid programs and/or other government healthcare programs.

**B.      Defendant eviCore**

51.     Defendant eviCore is a Tennessee limited liability company with its principal place of business located at 400 Buckwalter Place Boulevard, Bluffton, South Carolina 29910.

52.     eviCore is a direct successor to CareCore National ("CareCore").   In 2014, CareCore merged with MedSolutions, Inc., and the resulting entity rebranded itself as eviCore in 2015.

53.     Between 2007 and 2013, CareCore engaged in Medicaid and Medicare fraud on a national scale, in which, as the Department of Justice reported, CareCore "blindly approved hundreds of thousands of medical procedures over a period of many years, leaving Medicare and

Medicaid to foot the bill."[2]  From 2007 to 2013, CareCore improperly authorized over 200,000 outpatient diagnostic procedures, and, in 2017, paid a $54 million settlement based on that conduct. At least half of eviCore's current executive leadership team, including eviCore's Chief Executive Officer, were also in management positions at CareCore during the period 2007 to 2013.

54.    As set forth in detail below, eviCore has continued its fraudulent scheme to overbill government health care programs.

55.    Like its predecessor CareCore, eviCore contracts with private healthcare insurance companies to provide prior authorization and utilization management services pertaining to home health and outpatient services ordered by treating providers for the insurers' patient-beneficiaries.

56.    Many of eviCore's private insurer clients are also carrier contractors under Medicare Advantage and Medicaid Plans.  Thus, eviCore provides prior authorization for services that are ordered for Medicare Advantage and Medicaid Plans, many of which, as alleged herein, did not qualify as "covered services," yet were ultimately paid for by Medicare Advantage and Medicaid Plans.

57.    MCOs contracted, directly or indirectly, with eviCore.

58.    MCOs delegated to eviCore the duty to make prior authorization decisions on home health and outpatient services, certain of which eviCore and MCOs knew would result in payment/reimbursement by Medicare Advantage and Medicaid Plans for those services that were approved for beneficiaries.

---

[2] Acting U.S. Attorney Announces $54 Million Settlement of Civil Fraud Lawsuit Against Benefits Management Company for Improper Authorization Of Medical Procedures, (2017), https://www.justice.gov/usao-sdny/pr/acting-us-attorney-announces-54-million-settlement-civil-fraud-lawsuit-against-benefits.

## IV.     LEGAL AND REGULATORY FRAMEWORK

### A.     The False Claims Act

59.     The False Claims Act, 31 U.S.C. § 3729, as amended, provides:

> (a)     **Liability for certain acts** –
>
> (1) In general – Subject to paragraph (2), any person who –
>
> (A) knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval; [or]
>
> (B) knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim;
>
> *   *   *
>
> is liable to the United States Government for a civil penalty of not less than $5,000 and not more than $10,000, as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990 (28 U.S.C. 2461 note; Public Law 104-410), plus 3 times the amount of damages which the Government sustains because of the act of that person.

31 U.S.C. § 3729(a)(l).

60.     "Knowingly" is defined by the False Claims Act as "mean[ing] that a person, with respect to information—(i) has actual knowledge of the information; (ii) acts in deliberate ignorance of the truth or falsity of the information; or (iii) acts in reckless disregard of the truth or falsity of the information…." 31 U.S.C. § 3729(b)(1)(A).

61.     Given its remedial purposes, the False Claims Act is interpreted broadly, and is "intended to reach all types of fraud, without qualification, that might result in financial loss to the Government." *United States v. Neifert-White Co.*, 390 U.S. 228, 232 (1968).

62.     The False Claims Act empowers a private person having information regarding a false or fraudulent claim against the Government to bring an action on the Government's behalf and to share in any recovery.  31 U.S.C. § 3730.  The complaint must be filed under seal without

service on the defendant. *Id*. The complaint remains under seal to give the Government an opportunity to conduct an investigation into the allegations and to determine whether to join the action. *Id*.

63.     Pursuant to the federal False Claims Act, and its state law counterparts, the Relators seek to recover, on behalf of the United States and the Qui Tam States, damages and civil penalties arising from the submission of false or fraudulent claims supported by false or misleading statements that Defendant caused to be submitted for payments, and that Defendant knew or should have known were going to be paid ultimately by government healthcare programs, including Medicare Advantage and Medicaid Plans.

**B.     Medicare Advantage**

64.     Title XVIII of the Social Security Act, 42 U.S.C. § 1395, *et seq*., establishes the federal Medicare health insurance program for the elderly and disabled. Medicare operates by authorizing payments for inpatient and outpatient healthcare services to "providers," such as hospitals, skilled nursing facilities, outpatient rehabilitation facilities, and home health agencies. 42 U.S.C. §§ 1395cc(a), 1395x(u).

65.     CMS administers Medicare on behalf of the Secretary.

66.     For all services and items, Medicare coverage is limited to services that are medically "reasonable and necessary." 42 U.S.C. § 1395y(a)(1).

67.     Under the Medicare Part C Program, known as Medicare Advantage, the federal agency that administers the Medicare program — CMS — contracts with private health-insurance companies (known as MCOs), such as WellCare, Passport, BCBS, HCSC, HAMP, and Moda Health, that operate health-insurance plans (known as "Medicare Advantage Plans") that cover Medicare beneficiaries.

68. Pursuant to Section 1874A of the Social Security Act, Medicare may contract with eligible entities, including MCOs, to perform certain functions or parts of those functions (or, to the extent provided in a contract, to secure performance thereof by other entities), *see* 42 U.S.C. § 1395kk-1(a), such as payment functions (including the function of developing local coverage determinations, as defined in section 1395ff(f)(2)(B)), provider services functions, and functions relating to services furnished to individuals entitled to benefits under Medicare. 42 U.S.C. § 1395kk-1(a)(4).

69. Carrier contractors, including MCOs, are obligated to perform functions under the Medicare Integrity Program, 42 U.S.C. § 1395kk-1(a), which include any or all program integrity functions described in 42 C.F.R. § 421.304, which include "(a) [c]onducting medical reviews, utilization reviews, and reviews of potential fraud related to activities of providers of services…" and "(b) [a]uditing, settling and determining cost report payments for providers of services, or other individuals or entities. . . as necessary to help ensure proper Medicare payment." *See also* 42 C.F.R. § 421.200 (specifying carrier contractor functions).

70. Carrier contractors are required to "identify and verify potential errors to produce the greatest protection to the Medicare program." Medicare Program Integrity Manual § 2.1B.

71. In addition, carrier contractors, including MCOs, are "responsible for deterring and detecting fraud and abuse." Centers for Medicare and Medicaid Services Medicare Administrative Contractor Statement of Work § C.5.13.

## C. Medicaid

72. The Medicaid Program, as enacted by Title XIX of the Social Security Act of 1965, 42 U.S.C. § 1396, *et seq.*, is a joint federal-state program that provides health care benefits for certain groups, primarily indigent and disabled individuals.

- 16 -

73.     This cooperative federal-state Medicaid program directs federal funding to participating states to provide medical assistance to "families with dependent children and of aged, blind and disabled individuals, whose income and resources are insufficient to meet the costs of *necessary* medical services."  42 U.S.C. § 1396-1 (emphasis added).

74.     The federal portion of each state's Medicaid payments, known as the Federal Medical Assistance Percentage ("FMAP"), is based on a state's per capita income compared to the national average.  42 U.S.C. § 1396d(b).

75.     The Medicaid statute requires each participating state to implement and administer a state plan for medical assistance services which contains certain specified minimum criteria for coverage and payment of claims.  42 U.S.C. §§ 1396, 1396a(a)(10).

76.     To prevent Medicaid from paying for unnecessary services, 42 U.S.C. § 1396a(a)(30)(A) requires states to maintain "methods and procedures" to "safeguard against unnecessary utilization" of Medicaid care and services.

77.     Although the standard of "medical necessity" is not explicitly denoted in the Medicaid Act, it has become a judicially accepted component of the federal legislative scheme. *See, e.g., Beal v. Doe*, 432 U.S. 438, 444 (1977).

78.     It is consistent with Medicaid objectives "for a State to refuse to fund *unnecessary* – though perhaps desirable – medical services."  *Beal*, 432 U.S. at 444-45 (emphasis in original).

79.     Each state can limit Medicaid services, if it chooses, to meet a state-created definition of medical necessity.  *See* 42 C.F.R. § 440.230(d) ("The [Medicaid] agency may place appropriate limits on a service based on such criteria as medical necessity or on utilization control procedures.").

80.     Many states have further defined medical necessity related to coverage under Medicaid by state statute, code or other regulatory provision.

81.     Further, state Medicaid agencies are required to perform audits to implement a Statewide surveillance and utilization control program:

> The Medicaid agency must implement a statewide surveillance and utilization control program that—
>
> (a) Safeguards against unnecessary or inappropriate use of Medicaid services and against excess payments;
>
> (b)  Assesses the quality of those services;
>
> (c) Provides for the control of the utilization of all services provided under the plan in accordance with subpart B of this part; and
>
> (d)  Provides for the control of the utilization of inpatient services in accordance with subparts C through I of this part.

42 C.F.R. § 456.3.

82.     As with Medicare, state Medicaid agencies can delegate their duties to private insurance carrier contractors, including MCOs, with which they also contract to administer health plans under state Medicaid managed care programs.  *See* 42 C.F.R. § 434.6.  Those delegated duties may include the determination as to whether services requested by a provider are medically necessary and appropriate.

83.     In addition to the above, the Qui Tam States have enacted state Medicaid laws or regulations governing, among other things, medical necessity, program quality assurance/auditing functions of carrier contractors, and subcontractor requirements.  These include:

    a.   Alaska:

        i.   ALASKA STAT. § 21.07.250(18) (medical necessity);

        ii.   ALASKA STAT. § 21.07.020 (required contract provisions for managed care plans).

    b.   California:

    i.   California Title 22 CALIFORNIA CODE OF REGULATIONS (CCR) Section 51303 (medical necessity)

   ii.   Title 22 CCR 53904 (contracting).

c.  Connecticut:

    i.   CONN. GEN. STAT. § 17b-259b (medical necessity);

   ii.   Conn. Gen. Stat. § 17b-28b (contracting);

  iii.   CONN. GEN. STAT. § 17b-267 (quality assurance/auditing).

d.  Florida:

    i.   FLA. ADMIN. CODE ANN. r. 59G-1.010(166) (medical necessity);

   ii.   FLA. ADMIN. CODE ANN. r. 59G-8.100(9) (quality assurance/auditing); and

  iii.   FLA. ADMIN. CODE ANN. r. 59G-8.100(2)(c), Fla. Admin. Code Ann. r. 59G-8.100(13) (subcontractor requirements).

e.  Illinois:

    i.   215 ILL. COMP. STAT. 105/2; ILL. ADMIN. CODE, tit. 89, § 140.2 (medical necessity); and

   ii.   215 ILL. COMP. STAT. 134/80 (quality assurance/auditing).

f.  Louisiana:

    i.   LA. ADMIN. CODE tit. 50, pt. I, § 1101 (medical necessity definition and criteria);

   ii.   LA. REV. STAT. ANN. §§ 40:2211, 40:2221 (contracting); and

  iii.   LA. ADMIN. CODE tit. 50, pt. I, § 3305 (contracting and utilization management).

g.  Michigan:

    i.   MICH. COMP. LAWS ANN. § 400.111a (medical necessity);

   ii.   MICH. COMP. LAWS ANN. § 333.26368.III.A.12 (quality assurance/ auditing as to subcontractors' arrangements with Medicaid managed care companies); and

  iii.   MICH. COMP. LAWS ANN. § 333.26368.IV.H (ability to subcontract duties).

- 19 -

h.  Montana:

    i.  MONT. CODE. ANN. § 53-6-101(9) (necessary medical services); MONT. ADMIN. R. 37.82.102(18) (medically necessary defined); and

    ii.  MONT. CODE ANN. § 53-6-705(8) (quality assurance required of managed care entity); MONT. ADMIN. R. 37.85.410 (designated review organization to determine medical necessity); MONT. ADMIN. R. 37.85.414(3) (designated review organization to perform quality control).

i.  New Jersey:

    i.  N.J. STAT. ANN. § 30:4D-5 (medical necessity);

    ii.  N.J. STAT. ANN. § 30:4D-12; and Contract Template between NJ Department of Human Services and Medicaid Contractor, at p. 48, http://www.nj.gov/humanservices/dmahs/info/resources/care/hmo-contract.pdf. (quality assurance/auditing); and

    iii.  N.J. STAT. ANN. § 30:4D-7(p), (q), (r); N.J. STAT. ANN. § 30:4D-7b - 7c; N.J. STAT. ANN. § 30:4D-8; N.J. STAT. ANN. § 30:4D-9 (ability to subcontract duties).

j.  New Mexico:

    i.  N.M. STAT. ANN. § 27-2-12.6 (medically necessary services); N.M. ADMIN. CODE tit. 8, § 300.1.9 (medically necessary) N.M. ADMIN. CODE tit. 8, § 301.5.9 (insuring recipients receive only necessary services);

    ii.  N.M. ADMIN. CODE tit. 8, § 302.5 (quality control, prior authorization and utilization review); and

    iii.  N.M. ADMIN. CODE tit. 8, § 300.6.9 (administration through contractors); and

    iv.  N.M. ADMIN. CODE tit. 8, § 302.2.10(E) (contractors).

k.  New York:

    i.  N.Y. SOC. SERV. LAW § 365-a (medical necessity);

    ii.  N.Y. SOC. SERV. LAW § 364-j(8), N.Y. COMP. CODES R. & REGS. tit. 10, § 98-1.12 (quality assurance/auditing); and

    iii.  N.Y. COMP. CODES R. & REGS. tit. 10 § 98-1.11 (subcontractor requirements).

l.  North Carolina:

    i.    N.C. GEN. STAT. § 108A-55(a) (necessary medical care); N.C. GEN. STAT. § 108C-7 (medical necessity criteria); N.C. ADMIN. CODE tit. 10A, r. 22F.0104; and

    ii.    N.C. ADMIN. CODE tit. 10A, r. 22A.0101 (fiscal agents under contract are required to conduct utilization reviews).

m.  Oklahoma:

    i.    OKLA. STAT. tit. 56, § 1002(7) (necessary medical services); OKLA. STAT. tit. 56, § 1011.2 (medically necessary services); OKLA. ADMIN. CODE § 317:30-3-1(f) (medical necessity standards); and

    ii.    OKLA. STAT. tit. 56, § 1010.3 (contracting for claims administration).

n.  Tennessee:

    i.    TENN. CODE ANN. § 71-5-144 (medical necessity);

    ii.    TENN. CODE ANN. § 71-5-130 (quality assurance/auditing and the authority to subcontract);

o.  Texas:

    i.    1 TEX. ADMIN. CODE § 353.2(57) (defining medical necessity);

    ii.    TEX. GOV'T CODE ANN. §§ 533.002, 533.005 (contracting); and

    iii.    1 TEX. ADMIN. CODE § 353.417 (managed care quality assessment required).

p.  Washington:

    i.    WASH. REV. CODE § 74.09.010 (10) (necessary medical services); WASH. ADMIN. CODE § 182-500-0085 (prior authorization requirement based upon medical necessity); and

    ii.    WASH. ADMIN. CODE § 182-538-063 (subcontracting).

## V.    EVICORE'S FRAUDULENT CONDUCT

### A.    Background on eviCore's Operations and Participation in Government Healthcare Programs

84.    eviCore marketed, sold, and performed, and continues to market, sell, and perform,

utilization management services to determine whether services that are covered and paid for by

various government health insurance programs, including Medicare Advantage and Medicaid Plans, are medically reasonable and necessary.

85.     eviCore specifically contracts with third-party insurance companies, such as WellCare, to perform utilization management services by providing reimbursement determinations for services ordered by physicians and allied health professionals for hundreds of thousands of covered lives, including Medicare Advantage and Medicaid Plans.

86.     eviCore's Clinical Reviewers are trained in the use of utilization review criteria and rules provided to eviCore by MCOs (sometimes also referred to as the "Administrative Algorithm," an internal eviCore document that summarizes eviCore's interpretation of MCO rules) to assess and to screen requests for prior authorization of evaluation and treatment procedures, which requests may have been processed previously by clerical intake department staff to collect demographic data.  Clinical Reviewers consider the needs of individual patients and characteristics of the local delivery system when applying the clinical criteria.  eviCore's Clinical Reviewers have the authority to certify (*i.e.*, approve) requests when the clinical information provided is consistent with the utilization review criteria and standards of practice.

87.     The various schemes described herein, under which eviCore provided prior authorization for services in certain cases with no review at all, not only violated eviCore's own internal policies and procedures, but, more importantly, resulted in the submission of false claims for payment of services as eviCore was providing worthless services of no value as a subcontractor on a Government-contract.

**B.     eviCore's Scheme – In Detail**

**1.     Proper Prior Authorization Approvals and Denials**

88.     If (1) a treating provider decides that a patient requires services and (2) that patient is a beneficiary of Medicare Advantage or a Medicaid Plan that contracts with an MCO that in turn

contracts with eviCore, then the provider or his/her office must communicate with eviCore to obtain prior authorization for the service in order to ensure that the costs of the services will be covered by Medicare Advantage or a Medicaid Plan.

89.     This communication can be accomplished by telephoning eviCore, faxing eviCore, or using eviCore's website.  Regardless of which method the provider pursues, the information is entered into one of two request management systems maintained by eviCore, called "Image One" and "ISAAC."  The Image One system prompts users – eviCore intake personnel, eviCore Clinical Reviewers, or the providers themselves – to provide some of the points of demographic and clinical information necessary for eviCore to make reimbursement determinations.   The requests are entered into Image One or the alternative system, ISAAC, depending on the nature of the request (i.e., physical therapy, cardiology, radiology, etc.).

90.     In addition to "Image One," eviCore employs a data analytics system called "CorePath" to manage such requests.  CorePath was created to automate prior authorization requests for a wide variety of populations, conditions and diagnoses.

91.     This automation is not based on valid and reliable clinical information and evidence-based clinical guidelines, but rather on criteria that do not meaningfully determine the proper need and scope for services, such as the number of visits at issue.

92.     CorePath was designed to rely on insufficient clinical information in an effort to auto-approve prior authorizations regardless of scope or necessity.

93.     The Image One system contains a "journal" field, which tracks the lifetime of the request in narrative form.  In the context of cases "in auto-approval status," Clinical Reviewers are required to enter information into the journal explaining their approval, that either (i) does not meaningfully analyze whether the request is properly reimbursable, or (ii) is itself fraudulent.

94.     When a provider uses the eviCore website to make a request, the provider himself/herself enters clinical information directly into CorePath.

95.     When a prior authorization request comes in by telephone or fax and contains the information necessary to "build" the request in the CorePath system, the request is routed to intake department personnel.  The intake department personnel, who are non-clinical clerks, use the information provided to "build" the request in the CorePath system in order to enable the system to generate a prior authorization decision.

96.     When a prior authorization request comes in by telephone or fax and does not contain the information necessary to "build" the request in the CorePath system, the request is routed to Clinical Reviewers.

97.     Under eviCore's legal and contractual obligations, after a request for a service for a beneficiary of Medicare or Medicaid is "built" in CorePath and/or Image One and/or ISAAC, eviCore Clinical Reviewers are supposed to review the request to determine whether the service is medically necessary before prior authorization will be approved.  If the clinical information that was entered into Image One/ISAAC is insufficient for making such a determination, then Clinical Reviewers are supposed to place the case on hold and request additional information necessary for their decision.

98.     Instead of providing a meaningful review in all such cases, however, eviCore has devised a variety of interlocking schemes designed to ensure fast TAT, high rates of approval for requests (including 100% approvals for certain types of requests), and low costs of review to eviCore – by sacrificing a proper review entirely in many categories of cases.

### 2.     Directives to Manually Auto-Approve

99.     One fraudulent method by which eviCore reduces the time and money spent on its review responsibilities is to direct Clinical Reviewers to ignore acceptable standards of clinical

practice, evidence-based decision making, and their own clinical judgment, and to instead simply "auto-approve" all requests relating to certain providers, therapies, and populations.

100.    Clinical Reviewers follow and implement these "auto-approve" directives by simply approving whatever services a provider requests, without making an independent determination on whether those services are medically necessary or reasonable.

101.    These directives are relayed from eviCore management to Clinical Reviewers through training materials, emails, and conference calls.

102.    For example, on October 27, 2017, Relators were forwarded e-mail instructions from eviCore's David Baird, Senior Vice President of Program Operations, and Dr. Robert Westergan, Chief Medical Director, directing auto-approval for BCBS TX. Senior leadership at eviCore demanded that pediatric treatment requests be auto-approved due to "provider noise." At the time of this email, BCBS TX expected full medical necessity review of requests.  However, because eviCore was receiving complaints from providers, eviCore initiated auto-approvals without MCO approval.

103.    Approximately one month after this e-mail, one of the Relators attended a meeting in Waco, Texas, along with Vycki Rupakus (an eviCore provider relations representative) and Ann Jones, Vice President at BCBS TX (appearing via conference call).  At that meeting, it was agreed that pediatric developmental requests would be auto-approved for a six-month period to mollify providers.  Thereafter, requests would move back to traditional medical necessity review. However, eviCore never re-implemented full medical necessity review.

104.    In many cases, directives to "auto-approve" certain categories of requests originated from eviCore management.  eviCore is motivated to employ auto-approval procedures

- 25 -

for a variety of reasons, including handling high volumes of requests, staff shortages, and tight TATs, and increased profits.

105.    As an example of auto-approvals done without the MCOs' knowledge or consent, in an internal eviCore document titled "Auto-Approvals (IO-CDP) 6-1-20," the document states "**Approvals by QPID-sPA-PI-UPADS are not health plan directed approvals**.  These are approvals based on survey responses and other data collected by the system." (Emphasis in original).  The same notation was located in another internal eviCore document titled "Auto-Approvals (ISAAC) 5-11-20."

106.    Upon information and belief, eviCore's contracts with insurers include key timing provisions that require eviCore to approve, partially approve, or deny provider requests within a limited time-period or pay a penalty for the late response.

107.    Auto-approval also keeps review costs down by enabling eviCore to assign Clinical Reviewers to review cases outside of their scope of practice and licensure.  Because cases "in auto-approval status" are to be approved regardless of need, eviCore is able to assign Clinical Reviewers to approve cases in fields in which they lack experience, knowledge, and licensure, making eviCore's staff more flexible.

108.    For example, on March 23, 2018, when eviCore was "short staffed on the [occupational therapy] side," Marysue Agostini, Manager of MusculoSkeletal ("MSK") Specialized Therapy, opened review of auto-approve occupational therapy requests to all pediatric physical therapy Clinical Reviewers.  It is only the auto-approval system that makes it possible for eviCore to reassign staff in this way – the review eviCore would otherwise employ would require special training and knowledge that auto-approval schemes do not require.

109.     Reinforcing that "auto-approval" relieves the Clinical Reviewer of performing a meaningful review, in an October 28, 2017 email, Agostini noted: "[A]ny Passport cases with a start date of 11/1/17 or later requires medical necessity review.  A start date of 10/31/17 or before remains auto approval."

110.     Defendant eviCore has actual knowledge not only of the fact that its auto-approve scheme in general does not comply with statutory requirements, but also of many discrete examples where its "auto-approve" scheme led to inappropriate authorizations of services.

111.     Agostini, in a November 8, 2017 email, herself described categories of cases that Clinical Reviewers "are auto approving that ask for significantly more visits than we would approve," and requested a set of "examples of egregious requests" to use in an upcoming meeting. Agostini specifically referenced in this email a case in which a Clinical Reviewer had "to auto approve 200 visits for an ankle sprain last week."

112.     Furthermore, eviCore's auto-approval rubber-stamp had a large scope beyond just physical therapy services, including but not limited to the auto-approval of certain joint surgery, radiation therapy, sleep therapy, radiology services, cardiology procedures, interventional pain procedures, and laboratory management.  Indeed, internal eviCore documents, such as its nurse reviewer job aid for the ISAAC platform, outline all of the various health plans, lines of business and procedures/disciplines that are auto-approved, both with and without the knowledge of the health plan.

### 3.     CorePath and Image One

113.     eviCore has also implemented artificial intelligence systems to further streamline the fraudulent auto-approve process.

114.     The auto-approval scheme discussed above is less efficient than it might be: Although the scheme prevents Clinical Reviewers from approving, partially approving, or denying

cases based upon an independent determination of need, the scheme still requires a *de minimis* level of involvement from Clinical Reviewers, who must identify the request as involving a category "in auto-approval status," and then manually approve the request.  The necessity of this human input makes it difficult for eviCore to scale up its review process and increase its geographical coverage range, number of covered lives, and market share.

115.    To respond to this need, eviCore designed its data analytics system, CorePath.  By empowering this automated system to determine whether to authorize a requested service, eviCore saves itself significant costs, avoids the risk of TAT penalties, and makes its utilization management services "scalable" – by sacrificing the meaningful review it is obligated to perform.

116.    In a phone call on September 14, 2017, Bruce Brownstein, eviCore's MSK Product Advisor, advised certain pediatric Clinical Reviewers that eviCore's expansion into new business lines would increase the number of requests submitted to eviCore to a point where it would be impossible for Clinical Reviewers making determinations to keep up with the greater volume.  Brownstein further advised that he was working on a CorePath AI process specific to pediatric occupational and physical therapy, which would automatically approve the first and second such requests from a provider without any clinical review.  The first provider request in this context would be automatically approved.  To design criteria to enable the AI to handle the second request from a provider in this context, Brownstein sought, and received, assistance from certain pediatric Clinical Reviewers.

117.    In an October 26, 2017 email, Rocco Labbadia, eviCore Vice President for Clinical Content and Integration, circulated a document describing the CorePath system.  This document stated that CorePath would require providers to respond only to a "limited set of clinical questions" during the request for care, and explained CorePath's main goals: "[i]t is a primary intention of

CorePath to *resolve a high majority of episodes of care without requiring any practitioner review* or additional clinical information outside of the pathways" (emphasis added).  CorePath would avoid practitioner review by mechanically approving services requests on its own.

118.    In a phone call on September 15, 2018, Labbadia represented that Brownstein's automated process for pediatric therapy requests was designed with the goal of making eviCore's utilization review "scalable," *i.e.*, to enable eviCore to pursue more business lines and secure a greater market share.  Labbadia stated that pediatric therapy requests had been targeted by this program because of the longer review time associated with such requests.

119.    Even in those cases where the CorePath AI does not independently make the final decision as to authorizing a requested treatment, the Image One software still restricts the ability of Clinical Reviewers to conduct a meaningful review by, *e.g.*, making it technically impossible for the Clinical Reviewer to deny, or partially deny, certain categories of requests.

120.    For example, on September 6, 2017, Agostini notified the review team that she had identified a logic problem in the Image One system that needed to be addressed: With regard to WellCare Florida Medicaid cases, which were subject to an "auto-approve" directive at the time, "the system should be preventing us from making adverse determinations," *i.e.*, denials, "[h]owever, this is not happening."

121.    Similarly, in a March 7, 2018 email implementing a different review process for certain categories of WellCare cases that had been subject to auto-approval, Agostini noted that the change "will require an IT update as the system does not allow for these cases to be denied."

122.    As of March 2019, eviCore has implemented CorePath logic processes to automatically authorize requests from healthcare providers including Affinity, Blue Cross Blue Shield, Passport, and WellCare, across states including, at least, Arkansas, Connecticut, Illinois,

Kentucky, Louisiana, Maine, Missouri, Mississippi, New Mexico, New York, North Carolina, Oklahoma, South Carolina, Tennessee, and Texas.

123.    The CorePath scheme continues to evolve.  Weekly meeting minutes from a July 23, 2019 team meeting demonstrate that eviCore's senior leadership made adjustments to CorePath to include auto-approving visits for every second request during a time of high queue volume without any clinical review.

### C.    eviCore's Attempts to Whitewash its Auto-Approval Schemes

124.    In early February 2019, eviCore began a process of whitewashing its internal review materials to remove or obfuscate references to automatic approval.  At every stage of this process, however, eviCore made it clear to Clinical Reviewers that the replacement of the "auto-approve" language with euphemisms was not intended as a substantive change to the auto-approve process, which eviCore directed its Clinical Reviewers to continue.

125.    On February 22, 2019, Agostini emailed a small group of Clinical Reviewer supervisors, advising them that "**we need to update our resources and remove any language of 'auto-approval,'**" and providing substitute language, such as "approve as requested," and "approve up to the benefit limit" with which to update the Administrative Algorithm and Health Plan Guide, two documents Clinical Reviewers rely upon in evaluating prior authorization requests. (Emphasis added).

126.    However, after these changes to the administrative algorithm and other job aids were implemented, on March 1, 2019, an announcement to reviewers stated that these updates to the Administrative Algorithm and Health Plan Guide were "minor updates to language that don't affect algorithm."

127.    eviCore's whitewashing of its prolific use of auto-approvals is notably illustrated in the case of the Texas Medicaid program. During a WebEx meeting held on Oct 3, 2019 for a

Texas Fair Hearing involving Health Care Service Corporation (BlueCross Blue Shield of Texas), Texas Medicaid officials and eviCore personnel, eviCore's Margaret Coutts misrepresented to HCSC/BCBS TX and Texas Medicaid personnel that a review decision granting full approval (made because of eviCore's auto-approval policy) was based on an appropriate medical necessity review.  Ms. Coutts did not disclose to HCSC and Texas Medicaid personnel that eviCore was auto-approving PT/OT treatment requests and instead said that a particular decision was reviewed for medical necessity (when in fact it was not).

128.    In a subsequent telephone conversation, Ms. Coutts spoke with one of the Relators. In that conversation, Ms. Coutts asked the Realtor to help her craft a plausible medical necessity explanation for the auto-approval review decision she had discussed with Texas Medicaid. Essentially, after lying to Texas Medicaid officials, eviCore's Coutts wanted Relator's assistance to help medically justify an auto-approval which was never subject to proper clinical review in the first instance.

### D.    eviCore's Fraudulent Scheme Caused the Submission of False Claims and Loss to Federal and State Governments

129.    Once a case has been approved by eviCore, the member receives the outpatient or home health service at the facility, the facility submits the bill to the payor, and the payor pays for the service.  In the case of Medicare Advantage and Medicaid Plans, the Government ultimately pays for the service.

130.    Accordingly, the vast majority of services that resulted from eviCore's scheme were approved for payment, performed, and reimbursed, despite the fact that none of the auto-approved cases had been properly qualified as medically reasonable and necessary, as is required for government reimbursement.

131.    As a result of eviCore's scheme, CMS and the Qui Tam States paid MCOs and their subcontractor, eviCore, millions of dollars to perform prior authorization reviews which either never happened or were undertaken in a sub-standard, worthless fashion.

132.    By virtue of the false or fraudulent claims for payment for worthless services that Defendant knowingly submitted or caused to be presented to the Government, the United States and the Qui Tam States have suffered actual damages and are entitled to recover treble damages plus a civil monetary penalty for each false claim.

133.    As a result of eviCore's fraudulent conduct, CMS and the Qui Tam States have been paying and continue to pay millions of dollars annually for worthless medical review services which were and are not medically appropriate.  At the very least, Defendant eviCore should be disgorged of the Government payments it has fraudulently received through its sub-contracts with MCOs.

**E.    Jane Doe 1's and Jane Doe 2's attempts to investigate and reform eviCore**

134.    Jane Doe 1 and Jane Doe 2 learned that eviCore was auto-approving medical services, despite its obligations to perform a full medical review to determine the appropriate care. They reasonably believed that eviCore was not complying with state and federal law and undertook to investigate and implement change within eviCore.

135.    In response to Jane Doe 1's and Jane Doe 2's efforts to reform eviCore, Jane Doe 1 and Jane Doe 2 were retaliated against and, ultimately, forced to resign.  Their working conditions become so intolerable that any reasonable person in the employees' position would have felt compelled to resign.

136.    Indeed, a member of the Clinical Review Team confirmed on September 26, 2019 that eviCore clinical reviewers were being targeted by management as a result of voicing their

concerns about the CorePath clinical review system and auto-approval schemes, stating "[it is] like Marshall Law…don't speak up, don't make a noise, otherwise you'll get targeted [by management]—it's extremely concerning!"

137.   eviCore discriminated against and marginalized Jane Doe 1 and Jane Doe 2 in direct retaliation for their investigative activities and having come forward to report eviCore's unlawful auto-approval schemes.

138.   eviCore knew that Jane Doe 1 and Jane Doe 2 were engaged in conduct protected under the FCA.   The FCA's anti-retaliation provision, 31 U.S.C. § 3730(h), prohibits discrimination against a person in the terms and conditions of employment because of that person's efforts in furtherance of an action under that statute or efforts to stop one or more violations of the federal False Claims Act.   A person retaliated against in violation of this section is entitled to reinstatement, double the amount of lost back pay, interest on the back pay, and special damages, including attorney fees and litigation costs.

### 1.   Jane Doe 1

139.   Jane Doe 1 began working for eviCore on July 17, 2017 as a Clinical Reviewer and was tasked with improving eviCore's pediatric guidelines for therapy directions. As a part of her training, Jane Doe 1 was assigned to health plans that were "auto-approvals" in order to familiarize herself with eviCore's approval pathway system, Image One.

140.   As a result of her experience and expertise, Jane Doe 1 was assigned to work on higher-level projects within her role. For example, her work involved updating and developing pediatric guidelines, to be approved by the Medical Advisory Board, and health plans to help guide authorization decisions. By the nature of her role, Jane Doe 1 was in direct contact with the authorization process at eviCore and was put in a position to critically analyze, develop, and improve that process.

141.    In mid-September 2017, Jane Doe 1 worked on a team with Jane Doe 2 to develop a pediatric pathway for eviCore's new data analytics system, CorePath.

142.    From October 2017 through January 2018, Jane Doe 1 lead a team of pediatric reviewers to develop an authorization decision matrix, based on current medical evidence, literature, and guidelines. This was a high-level project, in which Jane Doe 1 developed pediatric administrative and clinical algorithms to be implemented into the approval process.

143.    Jane Doe 1 was also asked to travel to represent eviCore and educate providers across the country.  For example, on October 24, 2017, Jane Doe 1 officially represented eviCore during paid travel to Orlando, Florida to provide on-site education at United Cerebral Palsy of Central Florida.

144.    In January 2018, Jane Doe 1 was selected to join the "Blue Ribbon" Team to update clinical review job aids and administrative algorithms. She maintained these updates until approximately January 2020, when Danna Mullins took over the project. It was while working on this project that Jane Doe 1 discovered the compliance whitewashing and auto-approval terminology from job aids.

145.    On February 8, 2019, as part of her effort to reform eviCore, Jane Doe 1 sent an email to eviCore's Compliance Department in which she reported her legal, professional, and ethical concerns regarding eviCore's systematic and excessive auto-approvals for treatment authorizations.

146.    On February 22, 2019, in response to her email, Jane Doe 1 discovered that Compliance instructed "auto-approval" language to be removed from job aids, but the clinical review auto-approve process was not to change. Jane Doe 1 identified this action as corporate whitewashing.

147.    On March 13, 2019 and March 15, 2019, Jane Doe 1 participated in two meetings between eviCore and WellCare senior management, in which she voiced her concerns about excessive auto-approvals and the patient-harm that is caused by the "all-or-nothing" approach to auto-approving all initial treatment plans.

148.    Shortly after she voiced her ethical concerns to eviCore's Compliance Department and during the March 2019 meetings with WellCare, and rather than expressing gratitude to Jane Doe 1 for coming forward and seeking to reform eviCore, eviCore management retaliated against Jane Doe 1 by intentionally targeting her with unreasonable and uncommon productivity requirements, which in effect guaranteed her exclusion from future merit-based assignments to high-level projects.  Among other things, on March 18, 2019, Jane Doe 1 received a phone call from her direct manager, Margaret Coutts, who informed her that Mary Mateo instructed that Jane Doe 1 was no longer allowed to take meeting requests or projects without first checking with her direct manager.

149.    From May 2019 to her resignation, Jane Doe 1's role within eviCore was limited to only reviewing prior authorizations. During the onset of COVID-19, the workload for reviewing authorizations was substantially reduced, and a notice was sent out to employees that they were not expected to reach prior productivity goals. Shortly after receiving this email, however, Jane Doe 1 received a verbal warning from Margaret Coutts that she had to meet her original productivity requirement.

150.    After withstanding this targeted retaliation, harassment, and marginalization because she pushed back against eviCore's unlawful auto-approval schemes, Jane Doe 1 was forced to resign from eviCore on March 20, 2020.

**2.     Jane Doe 2**

151.    Jane Doe 2 began employment with eviCore on November 7, 2016 as a Clinical Reviewer.

152.    In mid-September 2017, Jane Doe 2 worked on a team with Jane Doe 1 to develop a pediatric pathway for eviCore's new data analytics system, CorePath, that would allow eviCore to scale the clinical review process without hiring additional personnel, specifically by allowing treatment to be "auto-approved" without the case being touched by a Clinical Reviewer.

153.    On September 15, 2017, during a call with Rocco Labbadia, Jane Doe 2 voiced her concern about whether, given the complexity of pediatric decisions, a data analytics system could effectively make the same evidence-based review decisions that a Clinical Reviewer would make, as required by law.

154.    After Jane Doe 2 raised her concerns with eviCore management, she was promptly removed from meetings with the team, who eventually completed the CorePath system for non-Clinical Review.

155.    Rather than expressing gratitude to Jane Doe 2 for coming forward and seeking to reform eviCore, Jane Doe 2 was passed over for managerial promotions from within the Clinical Review Team because she had expressed her concern about the creation of CorePath.

156.    In September 2019, after completing monthly audits of the pediatric PT Clinical Reviewers, Jane Doe 2 notified audit manager, Pam Govender, and Manager of Clinical Review, MarySue Agostini, that she believed an audit decision required additional information from the provider.

157.    During a September 27, 2019 phone call with Jane Doe 2 and Margaret Coutts, eviCore's Director of Therapy, Laura Walters-Bietz, reprimanded Jane Doe 2 for "directing care" by recommending a consultative plan to a provider during a peer-to-peer call.

158.    The following week after this phone call, Jane Doe 2 was removed from Complex Case Management and Audit teams and Consultations teams.

159.    On March 27, 2020, the Clinical Review Team was notified that a new review process was being implemented, Episodic Authorization/Extended Model.

160.    On March 29, 2020, Jane Doe 2 reported ethical concerns about the excessive auto-approvals to eviCore's Compliance Department, and that she was concerned about her "culpability in approving care that could be potentially harmful to pediatric and adult patients, fraudulent, wasteful or abusive to the health care system."

161.    In February and March 2020, as described above, the Clinical Review queue volume decreased dramatically in response to an influx of additional reviewers and the COVID-19 pandemic.  On April 9, 2020, Mary Mateo sent out an email to the MSK Therapies PT/OT/ST Team, confirming that management would not be implementing the normal productivity requirements and productivity would not be tracked due to the low volume of treatment requests due to the COVID-19 pandemic.

162.    Yet, like Jane Doe 1, Jane Doe 2 received an email from Margaret Coutts containing a verbal warning about her low productivity, even though productivity expectations were lowered for the rest of the Clinical Review Team.

163.    After withstanding this targeted retaliation, harassment, and marginalization because she pushed back against eviCore's unlawful auto-approval schemes, Jane Doe 2 was forced to resign from eviCore on May 26, 2020.

164.    eviCore's retaliatory acts were, not coincidentally, taken shortly after Jane Doe 1 and Jane Doe 2 raised their concerns about the illegal conduct.  eviCore's wrongful conduct was

made in direct violation of the False Claims Act's prohibition against such retaliation.  See 31 U.S.C. § 3730(h).

165.     As a direct and proximate result of this unlawful retaliation, Jane Doe 1 and Jane Doe 2 have suffered emotional pain and mental anguish, together with serious economic damages.

## COUNT I
### Violation of the Federal False Claims Act, 31 U.S.C. § 3729(a)(1)(A)
### United States of America ex rel. Challenger LLC vs. eviCore

166.     Relator incorporates herein by reference each and every allegation of the preceding paragraphs of this Second Amended Complaint as though fully set forth herein.

167.     As a result of the foregoing conduct, eviCore knowingly presented, or caused to be presented, false or fraudulent claims for payment, in violation of 31 U.S.C. § 3729(a)(1)(A).

168.     The claims relevant to this Count include all claims for payment submitted by MCOs to CMS for the above-referenced prior authorization services that eviCore either never rendered, or performed in a worthless fashion, which were caused to be submitted by virtue of eviCore's scheme directly to CMS.

169.     Defendant eviCore caused the submission of such false claims for payment through their client MCOs, knowing that those private entities were agents for CMS, and knowing that eviCore's auto-approval prior authorization system violated a key audit function that had been delegated from CMS to MCOs and then sub-contracted to eviCore.

170.     All such claims for payment that eviCore caused to be submitted were false because they were for worthless prior authorization services that were not properly undertaken per the clear terms of the contract between CMS and the client MCOs.

171.     eviCore had knowledge of the falsity (as defined by the False Claims Act, 31 U.S.C. § 3729(b)(1)(A)) of the MCOs claims' for payment to the Government because, in its role as

utilization review manager for its insurer clients it had actual and constructive knowledge of the worthless services it was rendering as a result of its auto-approval process, and because, as utilization review manager for its insurer clients, eviCore was obligated by contract as well as under federal regulations to undertake a proper medical review of each case before it.

172.    As a result of eviCore's actions as set forth above in this Second Amended Complaint, the United States of America has been, and continues to be, severely damaged.

## COUNT II
### Violation of Federal False Claims Act, 31 U.S.C. § 3729(a)(1)(B)
### United States of America ex rel. SW Challenger LLC vs. eviCore

173.    Relator incorporates herein by reference each and every allegation of the preceding paragraphs of this Second Amended Complaint as though fully set forth herein.

174.    As a result of the foregoing conduct, eviCore knowingly made, used, or caused to be made or used, false or fraudulent records or statements material to the payment of false or fraudulent claims, in violation of 31 U.S.C. § 3729(a)(1)(B).

175.    The claims relevant to this Count include all claims for payment submitted by MCOs to CMS for the above-referenced prior authorization services that eviCore either never rendered, or performed in a worthless fashion, which were caused to be submitted by virtue of eviCore's scheme directly to CMS.

176.    The false or fraudulent records or statements underlying the false claims relevant to this Count include all false or fraudulent records or statements regarding eviCore's prior authorization approval process made by eviCore to its client MCOs and adopted by the MCOs in communications with the Government in carrying out the scheme.

177.    eviCore made false or fraudulent records or statements underlying the false claims to its client MCOs, knowing that the auto-approval process violated federal laws, that its client

MCOs were private entities acting as agents for the federal and/or state governments, and that the worthless services rendered as a result of the auto-approval process would be material to the payment decision of the Government in regards to whether it would continue to contract with and pay its MCOs.

178.    All such resulting claims for payment that eviCore caused to be submitted by its client-MCOs were false because eviCore's prior authorization process that incorporated auto-approve and CorePath AI schemes rendered eviCore's prior authorization services, and thus the services of its client MCOs, worthless such that the Government would not have otherwise paid for such fraudulent activity.

179.    eviCore had knowledge (as defined by the False Claims Act, 31 U.S.C. § 3729(b)(1)(A)) of the falsity of its client MCOs' claims for payment to the Government because, in its role as utilization review manager for its insurer clients, it had actual and constructive knowledge of the fraudulent prior authorization practices that eviCore had adopted, and because as utilization review manager for its insurer clients, eviCore was obligated by contract as well as under federal regulations to ensure such prior authorization services were performed in a correct and medically appropriate fashion.

180.    The United States of America, unaware of the falsity of the records or statements underlying the false claims caused to be made by eviCore, and in reliance on the accuracy of these records or statements underlying the false claims, paid its MCOs for eviCore's worthless services.

### COUNT III
**Violation of Federal False Claims Act, 31 U.S.C. § 3729(a)(1)(G)**
**United States of America ex rel. SW Challenger LLC vs. eviCore**

181.    Relator incorporates herein by reference each and every allegation of the preceding paragraphs of this Second Amended Complaint as though fully set forth herein.

182.     By virtue of the acts alleged herein, eviCore knowingly made, used or caused to be made or used false records or false statements that are material to an obligation to pay, transmit or return money to the Government.

183.     As a result of eviCore's acts, the United States has been damaged, and continues to be damaged, in a substantial amount to be determined at trial, and the United States is entitled to at least $ 11,665 and up to $23,331 for each and every violation of 31 U.S.C. § 3729 arising from eviCore's unlawful conduct as described herein

**COUNT IV**
**Violation of Federal False Claims Act, 31 U.S.C. § 3729(a)(1)(C)**
**United States of America ex rel. SW Challenger LLC vs. eviCore**

184.     Relator realleges and hereby incorporates by reference each and every allegation contained in the preceding paragraphs of this Second Amended Complaint.

185.     eviCore conspired with others to implement "auto-approval" procedures such that certain of the services that eviCore was being paid by the Government to render were either never rendered, or performed in a worthless fashion.

186.     Accordingly, eviCore and others conspired to defraud the Government by (a) getting false or fraudulent claims allowed or paid, and/or (b) committing a violation of the FCA, in violation of 31 U.S.C. § 3729(a).  By virtue of the false or fraudulent claims submitted, paid, or approved as a result of eviCore's conspiracy to defraud the Government, the United States has suffered substantial monetary damages.

**COUNT V**
**Violation of Alaska Medical Assistance False Claims and Reporting Act**
**State of Alaska vs. eviCore**

184.     Relator incorporates herein by reference the preceding paragraphs of the Complaint as though fully set forth herein.

185.    This is a civil action brought by Relator on behalf of the State of Alaska against Defendant eviCore, under the Alaska Medical Assistance False Claims and Reporting Act, Alaska Stat. § 09.58.010 et seq.

186.    The State of Alaska and/or one of its agents contracted, directly or indirectly, with one or more MCOs in connection with the administration of Medicaid claims and/or claims under other state-funded plans in Alaska.

187.    One or more MCOs, directly or indirectly, contracted with eviCore in connection with the administration of requests for prior authorization of services.

188.    eviCore, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly presented or caused to be presented, and may still be presenting or causing to be presented, to officers or employees of the State of Alaska or one of its agencies false or fraudulent claims for payment or approval, in violation of Alaska Stat. § 09.58.010 et seq.

189.    eviCore, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used, or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements to secure the payment or approval by the State of Alaska, or its political subdivisions, false records or statements material to false or fraudulent claims, in violation of Alaska Stat. § 09.58.010 *et seq*.

190.    eviCore, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, and with actual knowledge of the information, knowingly made, used or caused to be made or used, and may still be making, using or causing to be made or used, false

records or statements to conceal, avoid, or decrease an obligation to pay or transmit money to the State of Alaska, or its political subdivisions, in violation of Alaska Stat. § 09.58.010 *et seq.*

191.    The State of Alaska and/or its agencies or political subdivisions, unaware of the falsity of the claims and/or statements made by eviCore, and in reliance on the accuracy of these claims and/or statements, paid, and may continue to pay for services that are not medically reasonable and necessary for beneficiaries of health insurance programs funded by the state or its agencies or political subdivisions.

192.    As a result of Defendants' actions, as set forth above, the State of Alaska and/or its agencies or political subdivisions have been, and may continue to be, severely damaged

**COUNT VI**
**Violation of California False Claims Act**
**State of California vs. eviCore**

193.    Relator incorporates herein by reference the preceding paragraphs of the Complaint as though fully set forth herein.

194.    This is a civil action brought by Relator on behalf of the State of California against Defendant eviCore, under the California False Claims Act, Cal. Gov't Code § 12650, *et seq.*

195.    The State of California and/or one of its agents contracted, directly or indirectly, with one or more MCOs in connection with the administration of Medicaid claims and/or claims under other state-funded plans in California.

196.    One or more MCOs, directly or indirectly, contracted with eviCore in connection with the administration of requests for prior authorization of services.

197.    eviCore, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly presented or caused to be presented, and may still be presenting or causing to be presented, to

officers or employees of the State of California or one of its agencies false or fraudulent claims for payment or approval, in violation of Cal. Gov't Code § 12650, *et seq.*

198.     eviCore, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used, or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements to secure the payment or approval by the State of California, or its political subdivisions, false records or statements material to false or fraudulent claims, in violation of Cal. Gov't Code § 12650, *et seq.*

199.     eviCore, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, and with actual knowledge of the information, knowingly made, used or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money to the State of California, or its political subdivisions, in violation of Cal. Gov't Code § 12650, *et seq.*.

200.     The State of California and/or its agencies or political subdivisions, unaware of the falsity of the claims and/or statements made by eviCore, and in reliance on the accuracy of these claims and/or statements, paid, and may continue to pay for services that are not medically reasonable and necessary for beneficiaries of health insurance programs funded by the state or its agencies or political subdivisions.

201.     As a result of Defendants' actions, as set forth above, the State of California and/or its agencies or political subdivisions have been, and may continue to be, severely damaged

**COUNT VII**
**Violation of Connecticut False Claims Act**
**State of Connecticut vs. eviCore**

202.    Relator incorporates herein by reference the preceding paragraphs of the Complaint as though fully set forth herein.

203.    This is a civil action brought by Relator on behalf of the State of Connecticut against Defendant eviCore, under the State of Connecticut's False Claims Act for Medical Assistance Programs, Conn. Gen. Stat. § 4-277.

204.    The State of Connecticut and/or one of its agents contracted, directly or indirectly, with one or more MCOs in connection with the administration of Medicaid claims and/or claims under other state-funded plans in Connecticut.

205.    One or more MCOs, directly or indirectly, contracted with eviCore in connection with the administration of requests for prior authorization of services.

206.    eviCore, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly presented or caused to be presented, and may still be presenting or causing to be presented, to officers or employees of the State of Connecticut or one of its agencies false or fraudulent claims for payment or approval under a medical assistance program administered by the Department of Social Services, in violation of Conn. Gen. Stat. § 4-275(a)(1).

207.    eviCore, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used, or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements to secure the payment or approval by the State of Connecticut, or its political subdivisions, false or fraudulent claims under a medical assistance program administered by the Department of Social Services, in violation of Conn. Gen. Stat. § 4-275(a)(2).

208.    eviCore, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, and with actual knowledge of the information, knowingly made, used or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money to the State of Connecticut, or its political subdivisions, under a medical assistance program administered by the Department of Social Services, in violation of Conn. Gen. Stat. § 4-275(a)(7).

209.    The State of Connecticut and/or its agencies or political subdivisions, unaware of the falsity of the claims and/or statements made by eviCore, and in reliance on the accuracy of these claims and/or statements, paid, and may continue to pay for services that are not medically reasonable and necessary for beneficiaries of health insurance programs funded by the state or its agencies or political subdivisions.

210.    As a result of Defendants' actions, as set forth above, the State of Connecticut and/or its agencies or political subdivisions have been, and may continue to be, severely damaged.

## COUNT VIII
### Violation of Florida False Claims Act
### State of Florida vs. eviCore

211.    Relator incorporates herein by reference the preceding paragraphs of the Complaint as though fully set forth herein.

212.    This is a civil action brought by Relator on behalf of the State of Florida against Defendant eviCore, under the State of Florida's False Claims Act, FLA. STAT. ANN. § 68.083(2).

213.    The State of Florida and/or one of its agents contracted, directly or indirectly, with one or more MCOs in connection with the administration of Medicaid claims and/or claims under other state-funded plans in Florida.

214.      One or more MCOs, directly or indirectly, contracted with eviCore in connection with the administration of requests for prior authorization of services.

215.    eviCore, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly presented or caused to be presented, and may still be presenting or causing to be presented, to officers or employees of the State of Florida or one of its agencies false or fraudulent claims for payment or approval, in violation of FLA. STAT. ANN. § 68.082(2)(a).

216.    eviCore in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used, or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements to get false or fraudulent claims paid or approved by the State of Florida or one of its agencies, in violation of FLA. STAT. ANN. § 68.082(2)(b).

217.    eviCore, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money to the State of Florida or one of its agencies, in violation of FLA. STAT. ANN. § 68.082 (2)(g).

218.    The State of Florida and/or its agencies or political subdivisions, unaware of the falsity of the claims and/or statements made by Defendant eviCore, and in reliance on the accuracy of these claims and/or statements, paid, and may continue to pay for services that are not medically reasonable and necessary for beneficiaries of health insurance programs funded by the state or its agencies or political subdivisions.

219. As a result of Defendant's actions, as set forth above, the State of Florida and/or its agencies or political subdivisions have been, and may continue to be, severely damaged.

**COUNT IX**
**Violation of Illinois False Claims Act**
**State of Illinois vs. eviCore**

220. Relator incorporates herein by reference the preceding paragraphs of the Complaint as though fully set forth herein.

221. This is a civil action brought by Relator on behalf of the State of Illinois against Defendant eviCore, under the Illinois False Claims Act, 740 ILL. COMP. STAT. ANN. 175/4(b).

222. The State of Illinois and/or one of its agents contracted, directly or indirectly, with one or more MCOs in connection with the administration of Medicaid claims and/or claims under other state-funded plans in Illinois.

223. MCOs, directly or indirectly, contracted with eviCore in connection with the administration of requests for prior authorization of services.

224. Defendant eviCore, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly presented, or caused to be presented, and may still be presenting or causing to be presented, false or fraudulent claims for payment or approval, in violation of 740 ILL. COMP. STAT. ANN. 175/3(a)(1)(A).

225. Defendant eviCore, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used, or caused to be made or used, and may still be making, using, or causing to be made or used, false records or statements material to false or fraudulent claims, in violation of 740 ILL. COMP. STAT. ANN. 175/3(a)(1)(B).

226.     Defendant eviCore, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used, or caused to be made or used, and may still be making, using, or causing to be made or used, false records or statements material to obligations to pay or transmit money or property to the state or knowingly concealed or knowingly and improperly avoided or decreased or may still be knowingly concealing or knowingly and improperly avoiding or decreasing obligations to pay or transmit money or property to the state, in violation of 740 ILL. COMP. STAT. ANN. 175/3(a)(1)(G).

227.     The State of Illinois and/or its agencies or political subdivisions, unaware of the falsity of the claims and/or statements made by Defendant eviCore, and in reliance on the accuracy of those claims and/or statements, paid, and may continue to pay for services that are not medically reasonable and necessary for beneficiaries of health insurance programs funded by the state or its agencies or political subdivisions.

228.     As a result of Defendants' actions, as set forth above, the State of Illinois and/or its agencies or political subdivisions have been, and may continue to be, severely damaged.

**COUNT** X
**Violation of the Michigan Medicaid False Claims Act**
**State of Michigan vs. eviCore**

229.     Relator incorporates herein by reference the preceding paragraphs of the Complaint as though fully set forth herein.

230.     This is a civil action brought by Relator in the name of the State of Michigan against Defendant eviCore, under the Michigan Medicaid False Claims Act, MICH. COMP. LAWS ANN. § 400.610a(l).

231.    The State of Michigan and/or one of its agents contracted, directly or indirectly, with one or more MCOs in connection with the administration of Medicaid claims and/or claims under other state-funded plans in Michigan.

232.    MCOs directly or indirectly, contracted with eviCore in connection with the administration of requests for prior authorization of services.

233.    Defendant eviCore, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made or caused to be made, and may still be making or causing to be made, false statements or false representations of material facts in applications for Medicaid benefits, in violation of MICH. COMP. LAWS ANN. § 400.603(1).

234.    Defendant eviCore, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made or cause to be made false statements or false representations of material facts for use in determining rights to Medicaid benefits, in violation of MICH. COMP. LAWS ANN. § 400.603(2).

235.    Defendant eviCore, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly concealed or failed to disclose, and may still be concealing or failing to disclose, events affecting their initial or continued rights to receive Medicaid benefits or the initial or continued rights of any other person on whose behalf Defendant has applied for or are receiving benefits for, with intent to obtain benefits to which Defendant or other persons are not entitled or in an amount greater than that to which Defendant or other persons are entitled, in violation of MICH. COMP. LAWS ANN. § 400.603(3).

236.     Defendant eviCore, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made or presented or caused to be made or presented, and may still be making or presenting or causing to be made or presented to employees or officers of the State of Michigan, false claims under the social welfare act, Act No. 280 of the Public Acts of 1939, in violation of MICH. COMP. LAWS ANN. § 400.607(1).

237.     Defendant eviCore, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made or presented or caused to be made or presented, and may still be making or presenting or causing to be made or presented claims under the social welfare act, Act No. 280 of the Public Acts of 1939, that falsely represent that the goods or services for which the claims were made were medically necessary in accordance with professionally accepted standards, in violation of MICH. COMP. LAWS ANN. § 400.607(2).

238.     The State of Michigan, and/or its agencies or political subdivisions, unaware of the falsity of the claims and/or statements made by Defendant eviCore, and in reliance on the accuracy of these claims and/or statements, paid, and may continue to pay for services that are not medically reasonable and necessary for beneficiaries of health insurance programs funded by the state or its agencies or political subdivisions.

239.     As a result of Defendant eviCore's actions, as set forth above, the State of Michigan and/or its agencies or political subdivisions have been, and may continue to be, severely damaged.

**COUNT XI**
**Violation of New Jersey False Claims Act**
**State of New Jersey vs. eviCore**

240.    Relator incorporates herein by reference the preceding paragraphs of the Complaint as though fully set forth herein.

241.    This is a civil action brought by Relator, in the name of the State of New Jersey, against Defendant eviCore, pursuant to the State of New Jersey False Claims Act, N.J. STAT. ANN. § 2A:32C-5(b).

242.    The State of New Jersey and/or one of its agents contracted, directly or indirectly, with one or more carrier contractors in connection with the administration of Medicaid claims and/or claims under other state-funded plans in New Jersey.

243.    MCOs directly or indirectly, contracted with eviCore in connection with the administration of requests for prior authorization of services.

244.    Defendant eviCore, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly presented or caused to be presented, and may still be causing to be presented, to an employee, officer or agent of the State, or to any contractor, grantee, or other recipient of State funds, false or fraudulent claims for payment or approval under the New Jersey Medicaid program, in violation of N.J. STAT. ANN. § 2A:32C-3(a).

245.    Defendant eviCore, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used or caused to be made or used, and may still be making, using, or causing to be made or used, false records or statements to get false or fraudulent claims paid or approved by the State, in violation of N.J. STAT. ANN. § 2A:32C-3(b).

246. Defendant eviCore, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used or caused to be made or used, and may still be making, using, or causing to be made or used, false records or statements to conceal, avoid or decrease obligations to pay or transmit money or property to the State, in violation of N.J. STAT. ANN. § 2A:32C-3(g).

247. The State of New Jersey and/or its agencies or political subdivisions, unaware of the falsity of the claims and/or statements made by Defendant eviCore, and in reliance on the accuracy of these claims and/or statements, paid, and may continue to pay for services that are not medically reasonable and necessary for beneficiaries of health insurance programs funded by the state or its agencies or political subdivisions.

248. As a result of Defendants' actions, as set forth above, the State of New Jersey and/or its agencies or political subdivisions have been, and may continue to be, severely damaged.

<u>COUNT XII</u>
**Violation of New York False Claims Act**
**State of New York vs. eviCore**

249. Relator incorporates herein by reference the preceding paragraphs of the Complaint as though fully set forth herein.

250. This is a civil action brought by Relator on behalf of the State of New York against Defendant eviCore, under the State of New York False Claims Act, N.Y. STATE FIN. LAW § 190(2).

251. The State of New York and/or one of its agents contracted, directly or indirectly, with one or more MCOs in connection with the administration of Medicaid claims and/or claims under other state-funded plans in New York.

252. MCOs directly or indirectly, contracted with eviCore in connection with the administration of requests for prior authorization of services.

253.    Defendant eviCore, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly presented or caused to be presented, and may still be presenting or causing to be presented, false or fraudulent claims for payment or approval, in violation of N.Y. STATE FIN. LAW § 189(1)(a).

254.    Defendant eviCore, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements material to false or fraudulent claims, in violation of N.Y. STATE FIN. LAW § 189(1)(b).

255.    Defendant eviCore, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used, or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements material to obligations to pay or transmit money or property to the State of New York or one of its political subdivisions, in violation of N.Y. STATE FIN. LAW § 189(1)(g).

256.    The State of New York, and/or its agencies or political subdivisions, unaware of the falsity of the claims and/or statements made by Defendant eviCore, and in reliance on the accuracy of these claims and/or statements, paid, and may continue to pay for services that are not medically reasonable or necessary for beneficiaries of health insurance programs funded by the state or its agencies or political subdivisions.

257.    As a result of Defendants' actions, as set forth above, the State of New York and/or its agencies or political subdivisions have been, and may continue to be, severely damaged.

**COUNT XIII**
**Violation of Louisiana Medical Assistance Programs Integrity Law**
**State of Louisiana vs. eviCore**

258.     Relator incorporates herein by reference the preceding paragraphs of the Complaint as though fully set forth herein.  The allegations contained in this Count are based upon information and belief.

259.     This is a civil action brought by Relator in the name of the State of Louisiana against Defendant eviCore, under the Louisiana Medical Assistance Programs Integrity Law, LA. REV. STAT. ANN. § 46:439.1(A).

260.     The State of Louisiana and/or one of its agents contracted, directly or indirectly, with one or more MCOs in connection with the administration of Medicaid claims and/or claims under other state-funded plans in Louisiana.

261.     MCOs, directly or indirectly, contracted with eviCore in connection with the administration of requests for prior authorization of services for Louisiana state-funded plan beneficiaries.

262.     Defendant eviCore, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly presented or caused to be presented, and may still be presenting or causing to be presented, false or fraudulent claims for payment or approval under the Medicaid program, in violation of LA. REV. STAT. ANN. § 46:438.3(A).

263.     Defendant eviCore, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements material to false or fraudulent claims to get such false

- 55 -

or fraudulent claims under the Medicaid program, in violation of LA. REV. STAT. ANN. § 46:438.3(B).

264.     Defendant eviCore, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements material to  obligations to pay or transmit money or property to the state, or knowingly concealing or knowingly and improperly avoiding or decreasing obligations to pay or transmit money or property to the state, relative to the Medicaid program, in violation of LA. REV. STAT. ANN. § 46:438.3(C).

265.     The State of Louisiana, and/or its agencies or political subdivisions, unaware of the falsity of the claims and/or statements made by Defendant eviCore, and in reliance on the accuracy of these claims and/or statements, paid, and may continue to pay for services that are not medically reasonable and necessary for beneficiaries of health insurance programs funded by the state or its agencies or political subdivisions.

266.     As a result of Defendants' actions, as set forth above, the State of Louisiana and/or its agencies or political subdivisions have been, and may continue to be, severely damaged.

**COUNT XIV**
**Violation of Montana False Claims Act**
**State of Montana vs. eviCore**

267.     Relator incorporates herein by reference the preceding paragraphs of the Complaint as though fully set forth herein.  The allegations contained in this Count are based upon information and belief.

268.     This is a civil action brought by Relator in the name of the State of Montana against Defendant eviCore, under the Montana False Claims Act, MONT. CODE ANN. § 17-8-406.

269.    The State of Montana and/or one of its agents contracted, directly or indirectly, with one or more MCOs in connection with the administration of Medicaid claims and/or claims under other state-funded plans in Montana.

270.    MCOs, directly or indirectly, contracted with eviCore in connection with the administration of requests for prior authorization of services for Montana state-funded plan beneficiaries.

271.    Defendant eviCore, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly presented or caused to be presented, and may still be presenting or causing to be presented, false or fraudulent claims for payment or approval under the Medicaid program and/or other state-funded programs, in violation of MONT. CODE ANN. § 17-8-403(1)(a).

272.    Defendant eviCore, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements material to false or fraudulent claims to get such false or fraudulent claims under the Medicaid program and/or other state-funded programs paid for or approved, in violation of MONT. CODE ANN. § 17-8-403(1)(b).

273.    Defendant eviCore, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements material to  obligations to pay or transmit money or property to the state, or knowingly concealing or knowingly and improperly avoiding or decreasing

obligations to pay or transmit money or property to the state, relative to the Medicaid program and/or other state-funded programs, in violation of MONT. CODE ANN. § 17-8-403(1)(g).

274.     The State of Montana, and/or its agencies or political subdivisions, unaware of the falsity of the claims and/or statements made by Defendant eviCore, and in reliance on the accuracy of these claims and/or statements, paid, and may continue to pay for services that are not medically reasonable and necessary for beneficiaries of health insurance programs funded by the state or its agencies or political subdivisions.

275.     As a result of Defendants' actions, as set forth above, the State of Montana and/or its agencies or political subdivisions have been, and may continue to be, severely damaged.

## COUNT XV
### Violation of New Mexico Medicaid False Claims Act
### State of New Mexico vs. eviCore

276.     Relator incorporates herein by reference the preceding paragraphs of the Complaint as though fully set forth herein.  The allegations contained in this Count are based upon information and belief.

277.     This is a civil action brought by Relator in the name of the State of New Mexico against Defendant eviCore, under the New Mexico Medicaid False Claims Act,  N.M. STAT. ANN. § 27-14-7(B).

278.     The State of New Mexico and/or one of its agents contracted, directly or indirectly, with one or more MCOs in connection with the administration of Medicaid claims and/or claims under other state-funded plans in New Mexico.

279.     MCOs, directly or indirectly, contracted with eviCore in connection with the administration of requests for prior authorization of services for New Mexico state-funded plan beneficiaries.

280.    Defendant eviCore, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly presented or caused to be presented, and may still be presenting or causing to be presented, false or fraudulent claims for payment or approval under the Medicaid program and/or other state-funded programs, in violation of N.M. STAT. ANN. § 27-14-4(A).

281.    Defendant eviCore, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements material to false or fraudulent claims to get such false or fraudulent claims under the Medicaid program and/or other state-funded programs paid for or approved, in violation of N.M. STAT. ANN. § 27-14-4(B).

282.    Defendant eviCore, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements material to  obligations to pay or transmit money or property to the state, or knowingly concealing or knowingly and improperly avoiding or decreasing obligations to pay or transmit money or property to the state, relative to the Medicaid program and/or other state-funded programs, in violation of N.M. STAT. ANN.  § 27-14-4(E).

283.    The State of New Mexico, and/or its agencies or political subdivisions, unaware of the falsity of the claims and/or statements made by Defendant eviCore, and in reliance on the accuracy of these claims and/or statements, paid, and may continue to pay for services that are not medically reasonable and necessary for beneficiaries of health insurance programs funded by the state or its agencies or political subdivisions.

284.     As a result of Defendants' actions, as set forth above, the State of New Mexico and/or its agencies or political subdivisions have been, and may continue to be, severely damaged.

**COUNT XVI**
**Violation of North Carolina False Claims Act**
**State of North Carolina vs. eviCore**

285.     Relator incorporates herein by reference the preceding paragraphs of the Complaint as though fully set forth herein.

286.     This is a civil action brought by Relator on behalf of the State of North Carolina against Defendant eviCore, under the State of North Carolina's False Claims Act, N.C. GEN. STAT. § 1-608(b).

287.     The State of North Carolina and/or one of its agents contracted, directly or indirectly, with one or more MCOs in connection with the administration of Medicaid claims and/or claims under other state-funded plans in North Carolina.

288.     One or more MCOs, directly or indirectly, contracted with eviCore in connection with the administration of requests for prior authorization of services.

289.     eviCore, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly presented or caused to be presented, and may still be presenting or causing to be presented, false or fraudulent claims for payment or approval under the Medicaid program and/or other state-funded programs, in violation of N.C. GEN. STAT. § 1-607(a)(1).

290.     eviCore, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements material to false or fraudulent claims to get such false or fraudulent

claims under the Medicaid program and/or other state-funded programs paid for or approved, in violation of N.C. GEN. STAT. § 1-607(a)(2).

291.    eviCore, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements material to  obligations to pay or transmit money or property to the state, or knowingly concealing or knowingly and improperly avoiding or decreasing obligations to pay or transmit money or property to the state, relative to the Medicaid program and/or other state-funded programs, in violation of N.C. GEN. STAT. § 1-607(a)(7).

292.    The State of North Carolina and/or its agencies or political subdivisions, unaware of the falsity of the claims and/or statements made by eviCore, and in reliance on the accuracy of these claims and/or statements, paid, and may continue to pay for services that are not medically reasonable and necessary for beneficiaries of health insurance programs funded by the state or its agencies or political subdivisions.

293.    As a result of Defendants' actions, as set forth above, the State of North Carolina and/or its agencies or political subdivisions have been, and may continue to be, severely damaged

**COUNT XVII**
**Violation of Oklahoma Medicaid False Claims Act**
**State of Oklahoma vs. eviCore**

294.    Relator incorporates herein by reference the preceding paragraphs of the Complaint as though fully set forth herein.  The allegations contained in this Count are based upon information and belief.

295.    This is a civil action brought by Relator in the name of the State of Oklahoma against Defendant eviCore, under the Oklahoma Medicaid False Claims Act, OKLA. STAT. ANN. tit. 63, § 5053.2.B.1.

296.    The State of Oklahoma and/or one of its agents contracted, directly or indirectly, with one or more MCOs in connection with the administration of Medicaid claims and/or claims under other state-funded plans in Oklahoma.

297.    MCOs, directly or indirectly, contracted with eviCore in connection with the administration of requests for prior authorization of services for Oklahoma state-funded plan beneficiaries.

298.    Defendant eviCore, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly presented or caused to be presented, and may still be presenting or causing to be presented, false or fraudulent claims for payment or approval under the Medicaid program and/or other state-funded programs, in violation of OKLA. STAT. ANN. tit. 63, § 5053.1.B.1.

299.    Defendant eviCore, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements material to false or fraudulent claims to get such false or fraudulent claims under the Medicaid program and/or other state-funded programs paid for or approved, in violation of OKLA. STAT. ANN. tit. 63, § 5053.1.B.2.

300.    Defendant eviCore, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used or caused to be made or used, and may still be making, using or causing to

be made or used, false records or statements material to  obligations to pay or transmit money or property to the state, or knowingly concealing or knowingly and improperly avoiding or decreasing obligations to pay or transmit money or property to the state, relative to the Medicaid program and/or other state-funded programs, in violation of OKLA. STAT. ANN. tit. 63, § 5053.1.B.7.

301.    The State of Oklahoma, and/or its agencies or political subdivisions, unaware of the falsity of the claims and/or statements made by Defendant eviCore, and in reliance on the accuracy of these claims and/or statements, paid, and may continue to pay for services that are not medically reasonable and necessary for beneficiaries of health insurance programs funded by the state or its agencies or political subdivisions.

302.    As a result of Defendants' actions, as set forth above, the State of Oklahoma and/or its agencies or political subdivisions have been, and may continue to be, severely damaged.

## <u>COUNT XVIII</u>
### Violation of Tennessee False Claims Act
### State of Tennessee vs. eviCore

303.    Relator incorporates herein by reference the preceding paragraphs of this Complaint as though fully set forth herein.

304.    This is a civil action brought by Relator, on behalf of the State of Tennessee, against Defendants under Tennessee's False Claims Act, Tenn. Code Ann. §71-5-181, et seq.

305.    eviCore, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly presented or caused to be presented, and may still be presenting or causing to be presented, false or fraudulent claims for payment or approval under the Medicaid program, in violation of TENN. CODE ANN. § 71-5-182(a)(l)(A).

306.    eviCore, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements material to false or fraudulent claims to get such false or fraudulent claims under the Medicaid program paid for or approved, in violation of TENN. CODE ANN. § 71-5-182(a)(l)(B).

307.    eviCore, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used, or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements material to  obligations to pay or transmit money or property to the state, or knowingly concealing or knowingly and improperly avoiding or decreasing obligations to pay or transmit money or property to the state, relative to the Medicaid program, in violation of TENN. CODE ANN. § 71-5-182(a)(1)(D).

308.    The State of Tennessee, or its political subdivisions, unaware of the falsity of the claims and/or statements made, or knowingly caused to be made, by eviCore, and in reliance upon the accuracy of these claims and/or statements, paid, and may continue to pay, for services that are not medically reasonable and necessary for beneficiaries of health insurance programs funded by the state or its agencies or political subdivisions.

309.    As a result of Defendants' actions, as set forth above, the State of Tennessee and/or its political subdivisions have been, and may continue to be, severely damaged.

**COUNT XIX**
**Violation of Texas Medicaid Fraud Prevention Act**
**State of Texas vs. eviCore**

310.    Relator incorporates herein by reference the preceding paragraphs of the Complaint as though fully set forth herein.  The allegations contained in this Count are based upon information and belief.

311.    This is a civil action brought by Relator in the name of the State of Texas against Defendant eviCore, under the Texas Medicaid Fraud Prevention Act, TEX. HUM. RES. CODE ANN. § 36.101.

312.    The State of Texas and/or one of its agents contracted, directly or indirectly, with one or more MCOs in connection with the administration of Medicaid claims and/or claims under other state-funded plans in Texas.

313.    MCOs, including HCSC, directly or indirectly, contracted with eviCore in connection with the administration of requests for prior authorization of services for Texas state-funded plan beneficiaries.

314.    Defendant eviCore, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly presented or caused to be presented, and may still be presenting or causing to be presented, false or fraudulent claims for payment or approval under the Medicaid program and/or other state-funded programs, in violation of TEX. HUM. RES. CODE ANN. § 36.002(1).

315.    Defendant eviCore, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements material to false or fraudulent claims to get such false

or fraudulent claims under the Medicaid program and/or other state-funded programs paid for or approved, in violation of TEX. HUM. RES. CODE ANN. § 36.002(2).

316.    Defendant eviCore, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements material to  obligations to pay or transmit money or property to the state, or knowingly concealing or knowingly and improperly avoiding or decreasing obligations to pay or transmit money or property to the state, relative to the Medicaid program and/or other state-funded programs, in violation of TEX. HUM. RES. CODE ANN. § 36.002(12).

317.    The State of Texas, and/or its agencies or political subdivisions, unaware of the falsity of the claims and/or statements made by Defendant eviCore, and in reliance on the accuracy of these claims and/or statements, paid, and may continue to pay for services that are not medically reasonable and necessary for beneficiaries of health insurance programs funded by the state or its agencies or political subdivisions.

318.    As a result of Defendants' actions, as set forth above, the State of Texas and/or its agencies or political subdivisions have been, and may continue to be, severely damaged.

### COUNT XX
### Violation of Washington Medicaid Fraud False Claims Act
### State of Washington vs. eviCore

319.    Relator incorporates herein by reference the preceding paragraphs of the Complaint as though fully set forth herein.  The allegations contained in this Count are based upon information and belief.

320.    This is a civil action brought by Relator in the name of the State of Washington against Defendant eviCore, under the Washington Medicaid Fraud False Claims Act, WASH. REV. CODE § 74.66.050.

321.    The State of Washington and/or one of its agents contracted, directly or indirectly, with one or more MCOs in connection with the administration of Medicaid claims and/or claims under other state-funded plans in Washington.

322.    MCOs directly or indirectly, contracted with eviCore in connection with the administration of requests for prior authorization of services for Washington state-funded plan beneficiaries.

323.    Defendant eviCore, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly presented or caused to be presented, and may still be presenting or causing to be presented, false or fraudulent claims for payment or approval under the Medicaid program and/or other state-funded programs, in violation of WASH. REV. CODE § 74.66.020(1)(a).

324.    Defendant eviCore, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements material to false or fraudulent claims to get such false or fraudulent claims under the Medicaid program and/or other state-funded programs paid for or approved, in violation of WASH. REV. CODE § 74.66.020(1)(b).

325.    Defendant eviCore, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used or caused to be made or used, and may still be making, using or causing to

be made or used, false records or statements material to  obligations to pay or transmit money or property to the state, or knowingly concealing or knowingly and improperly avoiding or decreasing obligations to pay or transmit money or property to the state, relative to the Medicaid program and/or other state-funded programs, in violation of WASH. REV. CODE § 74.66.020(1)(g).

326.    The State of Washington, and/or its agencies or political subdivisions, unaware of the falsity of the claims and/or statements made by Defendant eviCore, and in reliance on the accuracy of these claims and/or statements, paid, and may continue to pay for services that are not medically reasonable and necessary for beneficiaries of health insurance programs funded by the state or its agencies or political subdivisions.

327.    As a result of Defendants' actions, as set forth above, the State of Washington and/or its agencies or political subdivisions have been, and may continue to be, severely damaged.

## COUNT XXI
### Violation of False Claims Act, 31 U.S.C. § 3730(h)
### Jane Doe 1 v. eviCore

328.     Jane Doe 1 incorporates herein by reference each and every allegation of the preceding paragraphs of this Second Amended Complaint as though fully set forth herein.

329.     Jane Doe 1 was engaged in conduct protected under the FCA, including the investigation and reporting of fraud as described herein.

330.     eviCore knew that Jane Doe 1 was engaged in such protected conduct.

331.     As a result of eviCore's wrongful retaliatory conduct, Jane Doe 1's working conditions become so intolerable that any reasonable person in the employee's position would have felt compelled to resign.

332.     eviCore's wrongful retaliatory conduct against Jane Doe 1 was because of Jane Doe 1's involvement in the protected conduct, causing Jane Doe 1 to suffer, and continue to suffer, substantial financial and emotional damage in an amount to be proven at trial.

## COUNT XXII
### Violation of False Claims Act, 31 U.S.C. § 3730(h)
### Jane Doe 2 v. eviCore

333.     Jane Doe 2 incorporates herein by reference each and every allegation of the preceding paragraphs of this Second Amended Complaint as though fully set forth herein.

334.     Jane Doe 2 was engaged in conduct protected under the FCA, including the investigation and reporting of fraud as described herein.

335.     eviCore knew that Jane Doe 2 was engaged in such protected conduct.

336.     As a result of eviCore's wrongful retaliatory conduct, Jane Doe 2's working conditions become so intolerable that any reasonable person in the employee's position would have felt compelled to resign.

337.     eviCore's wrongful retaliatory conduct against Jane Doe 2 was because of Jane Doe 2's involvement in the protected conduct, causing Jane Doe 2 to suffer, and continue to suffer, substantial financial and emotional damage in an amount to be proven at trial.

## PRAYER FOR RELIEF

**WHEREFORE**, Relators pray that judgment be entered against Defendant, ordering as follows:

A.     That Defendant cease and desist from violating 31 U.S.C. § 3729, *et seq*., ALASKA STAT. § 09.58.010, *et seq.*; CAL. GOV'T CODE § 12650, *et seq.*; CONN. GEN. STAT. § 4-277, *et seq.*; FLA. STAT. ANN. § 68.081, *et seq.*; 740 ILL. COMP. STAT. ANN. 175/1, *et seq.*; LA. REV. STAT. ANN. § 46:437.1, *et seq.*; MICH. COMP. LAWS ANN. § 400.601, *et seq.*; MONT. CODE ANN. § 17-8-401, *et seq.*; N.C. GEN. STAT. § 1-605, *et seq.*; N.J. STAT. ANN. § 2A:32C-1, *et seq.*; N.M. STAT. ANN. § 27-14-1, *et seq.*; N.Y. STATE FIN. LAW § 187, *et seq.*; OKLA. STAT. ANN. tit. 63, § 5053, *et seq.*; TENN. CODE ANN. §71-5-182, *et seq.*; TEX. HUM. RES. CODE ANN. § 36.001, *et seq.*; and WASH. REV. CODE § 74.66.005, *et seq.*;

B.     That civil penalties of not less than $ 11,665 and up to $23,331 per claim as provided by 31 U.S.C. § 3729(a) and adjusted for inflation be imposed for each and every false or fraudulent claim that Defendant caused to be submitted to the United States and/or its grantees, for each false record or statement Defendant made, used, or caused to be made or used that was material to a false or fraudulent claim, that three times the amount of damages the United States sustained because of Defendants' actions also be imposed;

C.     That judgment be entered in Relator's favor and against Defendants in the amount of the damages sustained by the State of Alaska or its political subdivisions multiplied as provided

for in Alaska Stat. § 09.58.010  et seq., plus a civil penalty of not less than $5,500 or more than $11,000 as provided by Alaska Stat. § 09.58.010 et seq.,  and adjusted for inflation, to the extent such multiplied penalties shall fairly compensate the State of Alaska or its political subdivisions for losses resulting from the various schemes undertaken by Defendants, together with penalties for specific claims to be identified at trial after full discovery and attorney fees and costs as provided by Alaska Stat. § 09.58.010(c).

D.   That judgment be entered in Relators' favor and against Defendant in the amount of damages sustained by the State of California multiplied as provided for in CAL. GOV'T CODE § 12650, *et seq.*, plus a civil penalty of not less than $11,463 or more than $23,331 for each act in violation of the State of California's False Claims Act, as provided by CAL. GOV'T CODE § 12650, *et seq.* and adjusted for inflation, to the extent such multiplied penalties shall fairly compensate the State of California for losses resulting from the various schemes undertaken by Defendant, together with penalties for specific claims to be identified at trial after full discovery.

E.   That judgment be entered in Relators' favor and against Defendant in the amount of the damages sustained by the State of Connecticut multiplied as provided for in Conn. Gen. Stat. § 4-275(b)(2), plus a civil penalty of not less than $11,181 or more than $22,363 for each act in violation of the State of Connecticut False Claims Act, as provided by Conn. Gen. Stat. § 4-275(b)(1) and adjusted for inflation, to the extent such multiplied penalties shall fairly compensate the State of Connecticut for losses resulting from the various schemes undertaken by Defendant, together with penalties for specific claims to be identified at trial after full discovery.

F.   That judgment be entered in Relators' favor and against Defendant in the amount of the damages sustained by the State of Florida or its agencies or political subdivisions, multiplied as provided for in FLA. STAT. ANN. § 68.082(2), plus a civil penalty of not less than five thousand

five hundred dollars ($5,500) or more than eleven thousand dollars ($11,000), as provided by FLA. STAT. ANN. § 68.082, to the extent such penalties shall fairly compensate the State of Florida or its agencies or political subdivisions for losses resulting from the various schemes undertaken by Defendant, together with penalties for specific claims to be identified at trial after full discovery;

G.     That judgment be entered in Relators' favor and against Defendant in the amount of the damages sustained by the State of Illinois or its agencies or political subdivisions, multiplied as provided for in 740 ILL. COMP. STAT. ANN. 175/3(a)(1), plus a civil penalty of not less than $11,181 or more than $22,363, as provided for in 740 ILL. COMP. STAT. ANN. 175/3(a)(1) and adjusted for inflation, and the costs of this civil action as provided by 740 ILL. COMP. STAT. ANN. 175/3(a)(2),  to the extent such penalties shall fairly compensate the State of Illinois or its agencies or political subdivisions for losses resulting from the various schemes undertaken by Defendant, together with penalties for specific claims to be identified at trial after full discovery;

H.     That judgment be entered in Relators' favor and against Defendant in the amount of the damages sustained by the State of Louisiana or its agencies or political subdivisions, plus a fine of not to exceed ten thousand dollars ($10,000) or three times the value of the illegal remuneration, whichever is greater, as provided for in LA. REV. STAT. ANN. § 46:438.6, plus a civil penalty of not less than five thousand five hundred dollars ($5,500) or more than eleven thousand dollars ($11,000) for each act in violation of the Louisiana Medical Assistance Programs Integrity Law, to the extent such penalties shall fairly compensate the State of Louisiana for losses resulting from the various schemes undertaken by Defendant, together with penalties for specific claims to be identified at trial after full discovery;

I.     That judgment be entered in Relators' favor and against Defendant in the amount of damages sustained by the State of Michigan or its agencies or political subdivisions, for the

value of payments or benefits provided, directly or indirectly, as a result of Defendants' unlawful acts, as provided for in MICH. COMP. LAWS ANN. §§ 400.603 – 400.606, 400.610b, in order to fairly compensate the State of Michigan or its agencies or political subdivisions for losses resulting from the various schemes undertaken by Defendant, together with penalties for specific claims to be identified at trial after full discovery;

J.      That judgment be entered in Relators' favor and against Defendants in the amount of the damages sustained by the State of Montana or its agencies or political subdivisions, multiplied times three, as provided for in MONT. CODE ANN. § 17-8-403, plus a civil penalty of not less than five thousand five hundred dollars ($5,500) or more than eleven thousand dollars ($11,000) for each act in violation of the Montana False Claims Act, and the attorney fees, expenses, and costs of this civil action as provided by MONT. CODE ANN. § 17-8-403, to the extent such penalties shall fairly compensate the State of Montana for losses resulting from the various schemes undertaken by Defendant, together with penalties for specific claims to be identified at trial after full discovery;

K.      That judgment be entered in Relators' favor and against Defendants in the amount of the damages sustained by the State of New Jersey or its agencies or political subdivisions, multiplied as provided for in N.J. STAT. ANN. § 2A:32C-3, plus a civil penalty of not less than $11,181 or more than $22,363 as allowed under the federal False Claims Act (31 U.S.C. § 3729 et seq.) for each act in violation, to the extent such penalties shall fairly compensate the State of New Jersey or its agencies or political subdivisions for losses resulting from the various schemes undertaken by Defendant, together with penalties for specific claims to be identified at trial after full discovery;

L.     That judgment be entered in Relators' favor and against Defendants in the amount of the damages sustained by the State of New Mexico or its agencies or political subdivisions, multiplied times three, as provided for in N.M. STAT. ANN. §§ 27-14-2, 27-14-4, plus a civil penalty of not less than $5,000 and not more than $10,000 for each claim as provided by N.M. STAT. ANN. 44-9-3 , and attorney fees and costs of this civil action as provided by N.M. STAT. ANN. 44-9-1 *et seq.* and N.M. STAT. ANN. 27-14-1 *et seq.*, to the extent such penalties shall fairly compensate the State of New Mexico for losses resulting from the various schemes undertaken by Defendant, together with penalties for specific claims to be identified at trial after full discovery;

M.     That judgment be entered in Relators' favor and against Defendants in the amount of damages sustained by the State of New York or its agencies or political subdivisions, multiplied as provided for in N.Y. STATE FIN. LAW § 189(1)(h), plus a civil penalty of not less than six thousand dollars ($6,000) or more than twelve thousand dollars ($12,000) for each false claim, pursuant to N.Y. STATE FIN. LAW § 189(1)(h), to the extent such penalties shall fairly compensate the State of New York or its agencies or political subdivisions for losses resulting from the various schemes undertaken by Defendant, together with penalties for specific claims to be identified at trial after full discovery;

N.     That judgment be entered in Relator's favor and against Defendants in the amount of the damages sustained by the State of North Carolina, multiplied as provided for in N.C. Gen. Stat. § 1-605 et seq., plus a civil penalty of not less than $5,500 and not more than $11,000 for each violation as provided by N.C. Gen. Stat. § 1-607, and the costs of this civil action as provided by N.C. Gen. Stat. § 1-607, to the extent such penalties shall fairly compensate the State of North Carolina for losses resulting from the various schemes undertaken by Defendants, together with penalties for specific claims to be identified at trial after full discovery.

O.     That judgment be entered in Relators' favor and against Defendants in the amount of the damages sustained by the State of Oklahoma or its agencies or political subdivisions, multiplied times three, as provided for in OKLA. STAT. ANN. tit. 63, § 5053.1, plus a civil penalty of not less than $11,181 or more than $22,363 as provided by OKLA. STAT. ANN. tit. 63, § 5053.1(B) and adjusted for inflation, to the extent such penalties shall fairly compensate the State of Oklahoma for losses resulting from the various schemes undertaken by Defendant, together with penalties for specific claims to be identified at trial after full discovery;

P.     That judgment be entered in Relator's favor and against Defendants in the amount of the damages sustained by the State of Tennessee, multiplied as provided for in Tenn. Code Ann. § 71-5-181, et seq., plus a civil penalty of not less than $5,000 and not more than $25,000 and adjusted for inflation as provided by Tenn. Code Ann. § 71-5-182, and the costs of this civil action as provided by Tenn. Code Ann. § 71-5-182, to the extent such penalties shall fairly compensate the State of Tennessee for losses resulting from the various schemes undertaken by Defendants, together with penalties for specific claims to be identified at trial after full discovery.

Q.     That judgment be entered in Relators' favor and against Defendants in the amount of the damages sustained by the State of Texas or its agencies or political subdivisions, multiplied times two, as provided for in TEX. HUM. RES. CODE ANN. § 36.052, plus a civil penalty of not less than $11,181 or more than $22,363, pursuant to TEX. HUM. RES. CODE ANN. § 36.052(a)(3) and adjusted for inflation, to the extent such penalties shall fairly compensate the State of Texas for losses resulting from the various schemes undertaken by Defendant, together with penalties for specific claims to be identified at trial after full discovery;

R.     That judgment be entered in Relators' favor and against Defendants in the amount of the damages sustained by the State of Washington or its agencies or political subdivisions,

multiplied times three, as provided for in WASH. REV. CODE § 74.66.020, plus a civil penalty of not less than the greater of $10,957 or the minimum inflation adjusted penalty amount imposed as provided by 31 U.S.C. § 3729(a) and not more than the greater of $21,916 or the maximum inflation adjusted penalty amount imposed as provided by 31 U.S.C. § 3729(a) for each act in violation of the Washington Medicaid Fraud False Claims Act, to the extent such penalties shall fairly compensate the State of Washington for losses resulting from the various schemes undertaken by Defendant, together with penalties for specific claims to be identified at trial after full discovery;

      S.     That Defendant be enjoined from concealing, removing, encumbering, or disposing of assets which may be required to pay the civil monetary penalties imposed by the Court;

      T.     That Defendant disgorge all sums by which it has been enriched unjustly by its wrongful conduct;

      U.     That Relators be awarded the maximum amount allowed pursuant to 31 U.S.C. § 3730(d) and § 3730(h), ALASKA STAT. § 09.58.010, *et seq.*; CAL. GOV'T CODE § 12650, *et seq.*; CONN. GEN. STAT. § 4-277, *et seq.*, FLA. STAT. ANN. § 68.081, *et seq.*, 740 ILL. COMP. STAT. ANN. 175/1, *et seq.*, LA. REV. STAT. ANN. § 46:437.1, *et seq.*,  MICH. COMP. LAWS ANN. § 400.601, *et seq*; MONT. CODE ANN. § 17-8-401, *et seq.*; N.C. GEN. STAT. § 1-605, *et seq.*; N.J. STAT. ANN. § 2A:32C-1, *et seq.*, N.M. STAT. ANN. § 27-14-1, *et seq.*, N.Y. STATE FIN. LAW § 187, *et seq.*, OKLA. STAT. ANN. tit. 63, § 5053, *et seq.*; TENN. CODE ANN. §71-5-182, *et seq.*; TEX. HUM. RES. CODE ANN. § 36.001, *et seq*; and WASH. REV. CODE § 74.66.005, *et seq.*;

      V.     That Defendant reinstate Jane Doe 1 and Jane Doe 2 to the same positions that they would have had but for the wrongful constructive termination;

W.      That Jane Doe 1 and Jane Doe 2 be awarded two times the amount of back pay they would have earned but for the retaliation, and interest on that award;

X.      That Jane Doe 1 and Jane Doe 2 be awarded compensation for all special damages they have sustained as a result of eviCore's termination in violation of public policy.

Y.      That Relators be awarded all costs, including but not limited to, court costs, expert fees and all attorney fees, costs and expenses incurred by Relators in the prosecution of this suit; and

Z.       That Relators be granted such other and further relief as the Court deems just and proper.

## <u>JURY TRIAL DEMAND</u>

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, SW Challenger, Jane Doe 1,

and Jane Doe 2 demand a trial by jury of all issues so triable.

DATED:          September 23, 2020                    Respectfully submitted,

                                                      **SEEGER WEISS LLP**


                                                      By:  _/s/ Stephen A. Weiss_
                                                      Stephen A. Weiss, Esq.
                                                      Maxwell H. Kelly, Esq.
                                                      77 Water Street, 8th Fl
                                                      New York, NY 10005
                                                      Tel:    (212)-584-0700
                                                      sweiss@seegerweiss.com
                                                      mkelly@seegerweiss.com

                                                      SEEGER WEISS LLP
                                                      Christopher L. Ayers, Esq.
                                                      55 Challenger Road, 6th Fl
                                                      Ridgefield Park, NJ 07660
                                                      Tel:   (973) 639-9100
                                                      cayers@seegerweiss.com

                                                      STONE & MAGNANINI LLP
                                                      David S. Stone, Esq.
                                                      Robert A. Magnanini, Esq.
                                                      100 Connell Drive, Suite 2200
                                                      Berkeley Heights, New Jersey 07922
                                                      Telephone: 973-218-1111
                                                      dstone@stonemagnalaw.com
                                                      rmagnanini@stonemagnalaw.com

                                                      *Counsel for Plaintiffs SW Challenger, LLC,*
                                                      *Jane Doe 1, and Jane Doe 2*