## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------------x

UNITED STATES OF AMERICA; and
the STATE OF ALASKA,
the STATE OF CONNECTICUT,
the STATE OF FLORIDA,
the STATE OF ILLINOIS,
the STATE OF LOUISIANA,
the STATE OF MICHIGAN,
the STATE OF MONTANA,
the STATE OF NEW JERSEY,
the STATE OF NEW MEXICO,
the STATE OF NEW YORK,
the STATE OF NORTH CAROLINA,
the STATE OF OKLAHOMA,
the STATE OF TENNESSEE,
the STATE OF TEXAS, and
the STATE OF WASHINGTON,

*ex rel.* [UNDER SEAL],

               Plaintiffs,

    vs.

[UNDER SEAL],

               Defendant.

---------------------------------------------------------------x

Case No. ---------

<u>JURY TRIAL DEMANDED</u>

**COMPLAINT
FOR VIOLATIONS OF THE
FEDERAL FALSE CLAIMS ACT, 31
U.S.C. § 3729, *ET SEQ.* AND STATE
LAW COUNTERPARTS**

<u>**UNDER SEAL**</u>
**Pursuant to 31 U.S.C. § 3730(b)(2)**

## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------------------x

UNITED STATES OF AMERICA; and
the STATE OF ALASKA,
the STATE OF CONNECTICUT,
the STATE OF FLORIDA,
the STATE OF ILLINOIS,
the STATE OF LOUISIANA,
the STATE OF MICHIGAN,
the STATE OF MONTANA,
the STATE OF NEW JERSEY,
the STATE OF NEW MEXICO,
the STATE OF NEW YORK,
the STATE OF NORTH CAROLINA,
the STATE OF OKLAHOMA,
the STATE OF TENNESSEE,
the STATE OF TEXAS, and
the STATE OF WASHINGTON,

*ex rel.* SW CHALLENGER, LLC,

                      Plaintiffs,

vs.

EVICORE HEALTHCARE MSI, LLC, and
WELLCARE HEALTH PLANS, INC.,

                      Defendants.

---------------------------------------------------------------------x

Case No. ----------

<u>JURY TRIAL DEMANDED</u>

**COMPLAINT
FOR VIOLATIONS OF THE
FEDERAL FALSE CLAIMS ACT, 31
U.S.C. § 3729, *ET SEQ.* AND STATE
LAW COUNTERPARTS**

<u>**UNDER SEAL**</u>
**Pursuant to 31 U.S.C. § 3730(b)(2)**

# TABLE OF CONTENTS

**Page**

I.   INTRODUCTION ........................................................................................1

II.  JURISDICTION AND VENUE ..................................................................4

III. PARTIES ....................................................................................................5

    A.   Plaintiffs ..........................................................................................5

    B.   Defendant eviCore ...........................................................................6

    C.   Defendant WellCare.........................................................................7

IV.  LEGAL AND REGULATORY FRAMEWORK.........................................9

    A.   The False Claims Act.......................................................................9

    B.   Medicare ........................................................................................11

    C.   Medicaid ........................................................................................14

V.   EVICORE'S FRAUDULENT CONDUCT.................................................19

    A.   Background on eviCore's Operations and Participation in Government
        Healthcare Programs......................................................................19

    B.   eviCore's Scheme – In Detail ........................................................20

        1.   Proper Prior Authorization Approvals and Denials..................20

        2.   Directives to Manually Auto-Approve .....................................22

        3.   CorePath and Image One .........................................................28

        4.   "All-Or-Nothing" Approvals ...................................................31

    C.   eviCore's Medical Necessity Review, When Performed, is Itself Deficient
        to the Point of Fraud ......................................................................34

    D.   eviCore's Attempts to Whitewash its Auto-Approval Schemes............37

    E.   eviCore's Fraudulent Scheme Caused the Submission of False Claims and
        Loss to the Federal and State Treasuries.........................................39

COUNT I VIOLATION OF THE FEDERAL FALSE CLAIMS ACT, 31 U.S.C. §
    3729(A)(1)(A).......................................................................................40

COUNT II VIOLATION OF FEDERAL FALSE CLAIMS ACT, 31 U.S.C. § 3729(A)(1)(B) ................................................................................41

COUNT III VIOLATION OF ALASKA MEDICAL ASSISTANCE FALSE CLAIMS AND REPORTING ACT ................................................................43

COUNT IV VIOLATION OF CONNECTICUT FALSE CLAIMS ACT ....................................45

COUNT V VIOLATION OF FLORIDA FALSE CLAIMS ACT ................................................46

COUNT VI VIOLATION OF ILLINOIS FALSE CLAIMS ACT ..............................................48

COUNT VII VIOLATION OF THE MICHIGAN MEDICAID FALSE CLAIMS ACT............49

COUNT VIII VIOLATION OF NEW JERSEY FALSE CLAIMS ACT .....................................52

COUNT IX VIOLATION OF NEW YORK FALSE CLAIMS ACT............................................53

COUNT X VIOLATION OF LOUISIANA MEDICAL ASSISTANCE PROGRAMS INTEGRITY LAW ....................................................................................55

COUNT XI VIOLATION OF MONTANA FALSE CLAIMS ACT............................................56

COUNT XII VIOLATION OF NEW MEXICO MEDICAID FALSE CLAIMS ACT ...............58

COUNT XIII VIOLATION OF NORTH CAROLINA FALSE CLAIMS ACT ..........................60

COUNT XIV VIOLATION OF OKLAHOMA MEDICAID FALSE CLAIMS ACT................61

COUNT XV VIOLATION OF TENNESSEE FALSE CLAIMS ACT ........................................63

COUNT XVI VIOLATION OF TEXAS MEDICAID FRAUD PREVENTION ACT ...............65

COUNT XVII VIOLATION OF WASHINGTON MEDICAID FRAUD FALSE CLAIMS ACT ..........................................................................................66

JURY TRIAL DEMAND ..........................................................................................................76

Plaintiff, SW Challenger, LLC ("SW Challenger"), on behalf of the United States of America (the "United States") and the States of Alaska, Connecticut, Florida, Illinois, Louisiana, Michigan, Montana, New Jersey, New Mexico, New York, North Carolina, Oklahoma, Tennessee, Texas, and Washington, (collectively, the "Qui Tam States"), brings this action pursuant to the Qui Tam provisions of the Federal Civil False Claims Act, 31 U.S.C. §§ 3729, *et seq.*, as amended (the "Federal False Claims Act"), and the Qui Tam States' statutes as enumerated below, against eviCore Healthcare MSI, LLC ("eviCore") and WellCare Health Plans, Inc. ("WellCare"). In support thereof, SW Challenger alleges as follows:

## I. __INTRODUCTION__

1. This is an action to recover damages and civil penalties on behalf of the United States and the Qui Tam States arising from false and/or fraudulent records, statements and claims made, used or presented and/or caused to be made, used or presented by Defendants and/or their agents or employees under the Federal False Claims Act and the Qui Tam States' statutes.

2. Medicare, Medicaid, and other government programs, including CHIP and EPSDT, as well as private insurance carriers, only cover and reimburse medical services which are medically "reasonable and necessary." 42 U.S.C. § 1395y(a)(1). Medicaid's coverage and reimbursement for medical services is based upon a determination of "medical necessity."

3. In some contexts, providers request prior authorization for the provision of a medical service. Prior authorization requests must be reviewed to determine whether the services requested are medically reasonable and necessary.

4. In administering government-funded healthcare insurance programs, managed care organizations ("MCOs"), such as WellCare, Passport, Blue Cross Blue Shield ("BCBS"), the Health Care Service Corporation ("HCSC"), Health Alliance Medical Plan ("HAMP"), and Moda

Health, are required to perform certain functions, including those related to prior authorization and utilization management and payment processing for outpatient and home health services. MCOs may subcontract with third parties, like Defendant eviCore, to perform these functions for the MCO under the government contracts.

5. eviCore is in the business of providing utilization management services to determine medical necessity for Medicare and Medicaid programs for outpatient and home health services. eviCore contracts with private insurance companies, *i.e.*, MCOs, to provide utilization management services and review prior authorization requests for medical necessity.

6. As relevant here, eviCore's contracts with MCOs, including its contracts with WellCare, include a key timing provision that requires eviCore to approve, partially approve, or deny in a timely fashion each request for prior authorization to deem services to a given beneficiary as medically reasonable and necessary (each request also referred to as a "case"). In many instances, the turnaround time ("TAT") to process requests for prior authorizations is only 24 to 48 hours. Failure to meet its prescribed TAT will result in contractual penalties for eviCore.

7. Since at least November 2016, Defendant eviCore has engaged in fraudulent activities involving its role as the gatekeeper for determining whether requested services are medically reasonable and necessary. As detailed herein, in compliance with directives from WellCare to approve certain services regardless of medical necessity, and in independent efforts to keep up with the high volume of prior authorization requests for services and to avoid contractual TAT penalties, eviCore instituted a scheme simply to "auto-approve" hundreds of cases on a daily basis, reflexively deeming those services as reasonable and necessary, even though there had been no appropriate medical necessity evaluation of those cases, and in some cases, no actual human evaluation of those cases whatsoever.

8.     eviCore specifically directed its qualified medical personnel, internally called "Clinical Reviewers," including Relators, to "auto-approve" or "approve as requested" services in specific jurisdictions, for specific populations, and/or under specific healthcare plans, before and without any review of the medical reasonableness and necessity of the services.

9.     These auto-approve directives, as described by eviCore to its reviewers, included, at various times, (i) directives to Clinical Reviewers to "auto-approve" certain categories of services without any review; and (ii) directives to use an "all-or-nothing" approach to approving requests of services, instead of approving only those portions of the request that the Clinical Reviewer deemed medically reasonable and necessary.

10.     Upon information and belief, certain auto-approval and all-or-nothing directives were implemented with the knowledge of or at the express direction of MCOs, such as WellCare, HCSC, HAMP, and Moda, and certain other directives were implemented by eviCore independently.

11.     In addition to the directives eviCore provided to its Clinical Reviewers, eviCore took further steps to ensure the approval of certain categories of requests by designing and implementing a data analytics system called "CorePath" that automatically approved certain requests in the absence of any human review.

12.     As a result of eviCore's fraudulent conduct, the government programs have been paying and continue to pay billions of dollars for services which have not been properly deemed medically reasonable and necessary.

13.     Defendants knew, or were reckless in not knowing, that their conduct, as described herein, would lead to the submission and payment of claims for reimbursement by government

healthcare programs for services that were not medically reasonable or necessary and thus, were not eligible for reimbursement.

14. But for Defendants' illegal conduct, those services would not have been approved nor reimbursed.

15. As a result, Defendants have caused, and continue to cause, the submission of billions of dollars of false claims to government programs, and Defendants have benefited from the payment of those false claims.

## II. JURISDICTION AND VENUE

16. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1345 and 31 U.S.C. §§ 3730 and 3732(a). The Court has original jurisdiction over the State law claims pursuant to 31 U.S.C. § 3732(b) because this action is brought under State laws for the recovery of funds paid by the Qui Tam States and arises from the same transactions or occurrences brought on behalf of the United States under 31 U.S.C. § 3730.

17. This Court has personal jurisdiction over the Defendants because, among other things, the Defendants transact business in this judicial district, and engaged in wrongdoing in this judicial district.

18. Venue is proper in this judicial district under 31 U.S.C. § 3732(a) and 28 U.S.C. §§ 1391(b) and (c). Defendants transact business within this judicial district, and acts proscribed by 31 U.S.C. § 3729 occurred in this judicial district.

19. Pursuant to 31 U.S.C. § 3730(b)(2), along with this Complaint, SW Challenger prepared and has served on the Attorney General of the United States, the United States Attorney for the Southern District of New York, and the Attorneys General of the Qui Tam States written disclosures of all material evidence and information currently in its possession.

20.     This action is not based upon prior public disclosure of allegations or transactions in a federal criminal, civil, or administrative hearing, in which the government or its agent is a party.  Nor have SW Challenger's allegations or transactions herein been publicly disclosed in a congressional, Government Accountability Office, or other federal report, hearing, audit, or investigation; or in news media; or in any other form as the term "publicly disclosed" is defined in 31 U.S.C. § 3730(e)(4)(A) and parallel provisions of the Qui Tam States' statutes.

21.     To the extent there has been a public disclosure unknown to Relators of any of the allegations herein, Relators are the original source of those allegations within the meaning of 31 U.S.C. § 3730(e)(4)(B) and parallel provisions of the Qui Tam States' statutes.

## III.    PARTIES

### A.    Plaintiffs

22.     Plaintiff SW Challenger, a Delaware Limited Liability Company, brings this action on behalf of itself, the United States of America and the Qui Tam States named herein.  Its principal place of business is c/o Seeger Weiss LLP, 55 Challenger Road, Ridgefield Park, NJ 07660.  Among the members of SW Challenger are current eviCore employees (referred to herein collectively as "Relators" and individually as "Relator #1" and "Relator #2") with personal knowledge of the fraudulent scheme alleged in this Complaint.  The Relators possess personal knowledge and experience regarding eviCore's "auto-approve" activities, including personal contact with the employees and executives of eviCore who have planned, initiated and directed the violations of law alleged herein.  The personal knowledge of SW Challenger is not distinct from that of the Relators.

23.     Relators #1 and #2 are employed by eviCore as Clinical Reviewers, whose primary job responsibilities include reviewing physical therapy and occupational therapy treatment requests to determine medical necessity in the prior authorization context.

24.     Relators' personal knowledge of Defendants' illegal conduct is supported by their own personal investigation undertaken to further develop and substantiate the allegations set forth in this Complaint.

25.     Plaintiff, the United States of America, acting through the Department of Health and Human Services ("HHS"), and its Centers for Medicare and Medicaid Services, administers the Health Insurance Program for the Aged and Disabled established by Title XVIII of the Social Security Act, 42 U.S.C. §§ 1395, *et seq.* ("Medicare"), and Grants to States for Medical Assistance Programs pursuant to Title XIX of the Social Security Act, 42 U.S.C. §§ 1396, *et seq.* ("Medicaid").

26.     Plaintiffs Qui Tam States participate in the Medicaid program and have State False Claims Acts which permit private persons, such as Relators, to sue on their behalf to recover for false and fraudulent claims submitted for payment by Medicaid programs and/or other government healthcare programs.

**B.     Defendant eviCore**

27.     Defendant eviCore is a Tennessee limited liability company with its principal place of business located at 400 Buckwalter Place Boulevard, Bluffton, South Carolina 29910.

28.     eviCore is a direct successor to CareCore National ("CareCore").  In 2014, CareCore merged with MedSolutions, Inc., and the resulting entity rebranded itself as eviCore in 2015.

29.     Between 2007 and 2013, CareCore engaged in Medicaid and Medicare fraud on a national scale, in which, as the Department of Justice reported, CareCore "blindly approved

hundreds of thousands of medical procedures over a period of many years, leaving Medicare and Medicaid to foot the bill."[1] From 2007 to 2013, CareCore improperly authorized over 200,000 outpatient diagnostic procedures, and, in 2017, paid a $54 million settlement based on that conduct. At least half of eviCore's current executive leadership team, including eviCore's Chief Executive Officer, were also in management positions at CareCore during the period 2007 to 2013.

30.　　As set forth in detail below, eviCore has continued its fraudulent scheme to overbill government health care programs.

31.　　Like its predecessor CareCore, eviCore contracts with private healthcare insurance companies to provide prior authorization and utilization management services pertaining to home health and outpatient services ordered by treating providers for the insurers' patient-beneficiaries.

32.　　Many of eviCore's private insurer clients are also carrier contractors under Medicare and state Medicaid programs, as well as for other government healthcare programs. Thus, eviCore provides prior authorization for services that are ordered for Medicare, Medicaid and other government program patient-beneficiaries, many of which, as alleged herein, did not qualify as "covered services," yet were ultimately paid for by those programs.

33.　　eviCore employs a total of seventy-nine Physical Therapy ("PT"), Occupational Therapy ("OT"), and Speech Therapy ("SLP") Clinical Reviewers, of whom only thirteen are assigned to the review of pediatric therapy cases.

**C.　Defendant WellCare**

34.　　Defendant WellCare is a Delaware corporation with its principal place of business located at 8735 Henderson Road, Tampa, FL 33634.

---

[1] Acting U.S. Attorney Announces $54 Million Settlement of Civil Fraud Lawsuit Against Benefits Management Company for Improper Authorization Of Medical Procedures, (2017), https://www.justice.gov/usao-sdny/pr/acting-us-attorney-announces-54-million-settlement-civil-fraud-lawsuit-against-benefits.

a.   WellCare operates through its affiliates located throughout the country, and, directly or through its affiliates, has contracted with subcontractors of Centers for Medicare and Medicaid Services and/or Centers for Medicare and Medicaid Services itself, in connection with administering Medicare claims in various states, including Arkansas, Florida, Illinois, Kentucky, Louisiana, Mississippi, Missouri, Nebraska, New Jersey, New York, Ohio, South Carolina, and Texas.

b.   WellCare, directly or through its affiliates, has contracted with the States of Arkansas, Florida, Illinois, Kentucky, Louisiana, Mississippi, Missouri, Nebraska, New Jersey, New York, Ohio, South Carolina, and Texas, or their subcontractors, in connection with administering Medicaid claims in those states.

c.   WellCare, directly or through its affiliates, has contracted with eviCore in connection with requests for prior authorization and utilization management services for Medicare and Medicaid beneficiaries.

35.   In 2009, WellCare entered into a Deferred Prosecution Agreement and paid $40 million in restitution stemming from its falsification of patient data and its retention of Medicaid funds that should have been returned to Florida Medicaid, primarily through falsely inflating expenditure information it submitted to Florida Medicaid. On April 26, 2011, WellCare entered into a five-year Corporate Integrity Agreement with the Department of Health and Human Services based upon the same conduct. In 2012, WellCare paid a further $137.5 million to the federal government and the states of Connecticut, Florida, Georgia, Hawaii, Illinois, Indiana, Missouri, New York and Ohio to resolve actions based upon the same conduct.

36.     WellCare and other MCOs contracted, directly or indirectly, with one or more federal and/or state government programs to provide, *inter alia*, utilization management services for outpatient and home health procedures ordered for government program beneficiaries.

37.     MCOs contracted, directly or indirectly, with eviCore.

38.     MCOs delegated to eviCore the duty to make prior authorization medical necessity decisions on home health and outpatient services, certain of which eviCore and MCOs knew would result in payment/reimbursement by government programs for those services that were approved for government program beneficiaries.

39.     MCOs, including WellCare, directed certain of eviCore's auto-approval schemes, and therefore had actual knowledge of those schemes. As alleged herein, MCOs including WellCare, HCSC, BCBS, HAMP, and Moda failed to conduct proper audits of eviCore's services. Proper audits of eviCore's services by the MCOs would have revealed eviCore's fraudulent schemes to auto-approve medical necessity determinations.

## IV.     LEGAL AND REGULATORY FRAMEWORK

### A.     The False Claims Act

40.     The False Claims Act, 31 U.S.C. § 3729, as amended, provides:

> (a)     **Liability for certain acts –**
>
> (1) In general – Subject to paragraph (2), any person who –
>
> (A) knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval; [or]
>
> (B) knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim;
>
> \* \* \*
>
> is liable to the United States Government for a civil penalty of not less than $5,000 and not more than $10,000, as adjusted by the

Federal Civil Penalties Inflation Adjustment Act of 1990 (28 U.S.C. 2461 note; Public Law 104-410), plus 3 times the amount of damages which the Government sustains because of the act of that person.

31 U.S.C. § 3729(a)(l).

41. "Knowingly" is defined by the False Claims Act as "mean[ing] that a person, with respect to information—(i) has actual knowledge of the information; (ii) acts in deliberate ignorance of the truth or falsity of the information; or (iii) acts in reckless disregard of the truth or falsity of the information...." 31 U.S.C. § 3729(b)(1)(A).

42. Given its remedial purposes, the False Claims Act is interpreted broadly, and is "intended to reach all types of fraud, without qualification, that might result in financial loss to the Government." *United States v. Neifert-White Co.*, 390 U.S. 228, 232 (1968).

43. The False Claims Act empowers a private person having information regarding a false or fraudulent claim against the Government to bring an action on the Government's behalf and to share in any recovery. 31 U.S.C. § 3730. The complaint must be filed under seal without service on the defendant. *Id.* The complaint remains under seal to give the Government an opportunity to conduct an investigation into the allegations and to determine whether to join the action. *Id.*

44. Each of the Qui Tam States has adopted a False Claims Act that provides comparable relief to those states for the submission of false and fraudulent claims. These include:

    a. Alaska : ALASKA STAT. § 09.58.010, *et seq.*;

    b. Connecticut: CONN. GEN. STAT. § 4-277, *et seq.*;

    c. Florida: FLA. STAT. ANN. § 68.081, *et seq.*;

    d. Illinois: 740 ILL. COMP. STAT. ANN. 175/1, *et seq.*;

    e. Louisiana: LA. REV. STAT. ANN. § 46:437.1, *et seq.*;

f.  Michigan: MICH. COMP. LAWS ANN. § 400.601, *et seq.*;

g.  Montana: MONT. CODE ANN. § 17-8-401, *et seq.*;

h.  New Jersey: N.J. STAT. ANN. § 2A:32C-1, *et seq.*;

i.  New Mexico: N.M. STAT. ANN. § 27-14-1, *et seq.*;

j.  New York: N.Y. STATE FIN. LAW § 187, *et seq.*;

k.  North Carolina: N.C. GEN. STAT. § 1-605, *et seq.*;

l.  Oklahoma: OKLA. STAT. ANN. tit. 63, § 5053, *et seq.*;

m.  Tennessee: TENN. CODE ANN. §71-5-181, *et seq.*;

n.  Texas: TEX. HUM. RES. CODE ANN. § 36.001, *et seq.*;

o.  Washington: WASH. REV. CODE § 74.66.005, *et seq.*;

45.  Pursuant to the federal False Claims Act and the Qui Tam States' statutes, the Relators seek to recover, on behalf of the United States and the Qui Tam States, damages and civil penalties arising from the submission of false or fraudulent claims supported by false or misleading statements that the Defendants caused to be submitted for payments, and that Defendants knew or should have known were going to be paid ultimately by government healthcare programs, including the Medicare, Medicaid, and other government-funded programs.

**B.  Medicare**

46.  Title XVIII of the Social Security Act, 42 U.S.C. § 1395, *et seq.*, establishes the federal Medicare health insurance program for the elderly and disabled. Medicare operates by authorizing payments for inpatient and outpatient healthcare services to "providers," such as hospitals, skilled nursing facilities, outpatient rehabilitation facilities, and home health agencies. 42 U.S.C. §§ 1395cc(a), 1395x(u).

47.  The Centers for Medicare and Medicaid Services administers Medicare on behalf of the Secretary.

48.     For all services and items, Medicare coverage is limited to services that are medically "reasonable and necessary." 42 U.S.C. § 1395y(a)(1).

49.     Although "reasonable and necessary" is not defined in the Act, Congress has vested final authority in the Secretary to determine what items or services are "reasonable and necessary." *See* 42 U.S.C. § 1395ff(a); *Heckler v. Ringer*, 466 U.S. 602, 617 (1984).

50.     "A private physician's word on medical necessity is not dispositive." *Moore v. Reese*, 637 F.3d 1220, 1255 (11th Cir. 2011). *See also Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 834 (2003) ("[C]ourts have no warrant to require administrators automatically to accord special weight to the opinions of a claimant's physician; nor may courts impose on administrators a discrete burden of explanation when they credit reliable evidence that conflicts with a treating physician's evaluation.").

51.     Pursuant to Section 1874A of the Social Security Act, Medicare may contract with eligible entities, including MCOs, to perform certain functions or parts of those functions (or, to the extent provided in a contract, to secure performance thereof by other entities), *see* 42 U.S.C. § 1395kk-1(a), such as payment functions (including the function of developing local coverage determinations, as defined in section 1395ff(f)(2)(B)), provider services functions, and functions relating to services furnished to individuals entitled to benefits under Medicare part A or enrolled under Medicare part B of, or both, as follows:

> (A) Determination of payment amounts.—Determining (subject to the provisions of section 1395oo of this title and to such review by the Secretary as may be provided for by the contracts) the amount of the payments required pursuant to this subchapter to be made to providers of services, suppliers and individuals.

> (B) Making payments.—Making payments described in subparagraph (A) (including receipt, disbursement, and accounting for funds in making such payments).

> (C) Beneficiary education and assistance.—Providing education and outreach to individuals entitled to benefits under part A or enrolled under part B, or both, and

providing assistance to those individuals with specific issues, concerns, or problems.

(D) Provider consultative services.—Providing consultative services to institutions, agencies, and other persons to enable them to establish and maintain fiscal records necessary for purposes of this subchapter and otherwise to qualify as providers of services or suppliers.

(E) Communication with providers.—Communicating to providers of services and suppliers any information or instructions furnished to the medicare administrative contractor by the Secretary, and facilitating communication between such providers and suppliers and the Secretary.

(F) Provider education and technical assistance.—Performing the functions relating to provider education, training, and technical assistance.

(G) Improper payment outreach and education program.—Having in place an improper payment outreach and education program described in subsection (h).

(H) Additional functions.—Performing such other functions, including (subject to paragraph (5)) functions under the Medicare Integrity Program under section 1395ddd of this title, as are necessary to carry out the purposes of this subchapter.

42 U.S.C. § 1395kk-1(a)(4).

52.     As provided for in practice guidelines promulgated by HHS, individual states must ensure, through their contracts, that each MCO adopt guidelines that are based on valid and reliable clinical evidence of a particular field of practice. *See* 42 C.F.R. § 438.236. For example, the Agency for Health Care Administration, the Florida division that administers Medicaid, defines medical necessity with reference to the following statement: "services furnished or ordered must be individualized, specific and consistent with the condition under treatment, and not in excess of the member's needs and must be consistent with generally accepted professional medical standards." FLA. ADMIN. CODE ANN. r. 59G-1.010. Such guidelines are in place based on Early and Periodic Screening Diagnosis and Treatment (EPSDT) mandates for states that use of federal monies for Medicaid programs.

53.     Carrier contractors, including MCOs, are obligated to perform functions under the Medicare Integrity Program, 42 U.S.C. § 1395kk-1(a), which include any or all program integrity functions described in 42 C.F.R. § 421.304, which include "(a) [c]onducting medical reviews, utilization reviews, and reviews of potential fraud related to activities of providers of services..." and "(b) [a]uditing, settling and determining cost report payments for providers of services, or other individuals or entities. . . as necessary to help ensure proper Medicare payment." *See also* 42 C.F.R. § 421.200 (specifying carrier contractor functions).

54.     Carrier contractors are required to "identify and verify potential errors to produce the greatest protection to the Medicare program." Medicare Program Integrity Manual § 2.1B.

55.     In addition, carrier contractors, including MCOs, are "responsible for deterring and detecting fraud and abuse." Centers for Medicare and Medicaid Services Medicare Administrative Contractor Statement of Work § C.5.13.

**C.     Medicaid**

56.     The Medicaid Program, as enacted by Title XIX of the Social Security Act of 1965, 42 U.S.C. § 1396, *et seq.*, is a joint federal-state program that provides health care benefits for certain groups, primarily indigent and disabled individuals.

57.     This cooperative federal-state Medicaid program directs federal funding to participating states to provide medical assistance to "families with dependent children and of aged, blind and disabled individuals, whose income and resources are insufficient to meet the costs of *necessary* medical services." 42 U.S.C. § 1396-1 (emphasis added).

58.     The federal portion of each state's Medicaid payments, known as the Federal Medical Assistance Percentage ("FMAP"), is based on a state's per capita income compared to the national average. 42 U.S.C. § 1396d(b).

59.     The Medicaid statute requires each participating state to implement and administer a state plan for medical assistance services which contains certain specified minimum criteria for coverage and payment of claims.  42 U.S.C. §§ 1396, 1396a(a)(10).

60.     To prevent Medicaid from paying for unnecessary services, 42 U.S.C. § 1396a(a)(30)(A) requires states to maintain "methods and procedures" to "safeguard against unnecessary utilization" of Medicaid care and services.

61.     Although the standard of "medical necessity" is not explicitly denoted in the Medicaid Act, it has become a judicially accepted component of the federal legislative scheme. *See, e.g., Beal v. Doe*, 432 U.S. 438, 444 (1977).

62.     It is consistent with Medicaid objectives "for a State to refuse to fund *unnecessary* – though perhaps desirable – medical services." *Beal*, 432 U.S. at 444-45 (emphasis in original).

63.     Each state can limit Medicaid services, if it chooses, to meet a state-created definition of medical necessity.  *See* 42 C.F.R. § 440.230(d) ("The [Medicaid] agency may place appropriate limits on a service based on such criteria as medical necessity or on utilization control procedures.").

64.     Many states have further defined medical necessity related to coverage under Medicaid by state statute, code or other regulatory provision.

65.     Further, state Medicaid agencies are required to perform audits to implement a Statewide surveillance and utilization control program:

> The Medicaid agency must implement a statewide surveillance and utilization control program that—
>
> (a) Safeguards against unnecessary or inappropriate use of Medicaid services and against excess payments;
>
> (b) Assesses the quality of those services;

> (c) Provides for the control of the utilization of all services provided under the plan in accordance with subpart B of this part; and
>
> (d) Provides for the control of the utilization of inpatient services in accordance with subparts C through I of this part.

42 C.F.R. § 456.3.

66.     As with Medicare, state Medicaid agencies can delegate their duties to private insurance carrier contractors, including MCOs, with which they also contract to administer health plans under state Medicaid managed care programs. *See* 42 C.F.R. § 434.6. Those delegated duties may include the determination as to whether services requested by a provider are medically necessary and appropriate.

67.     In addition to the above, the Qui Tam States have enacted state Medicaid laws or regulations governing, among other things, medical necessity, program quality assurance/auditing functions of carrier contractors, and subcontractor requirements. These include:

    a. Alaska

       i. ALASKA STAT. § 21.07.250(18) (medical necessity);

       ii. ALASKA STAT. § 21.07.020 (required contract provisions for managed care plans).

    b. Connecticut:

       i. CONN. GEN. STAT. § 17b-259b (medical necessity);

       ii. Conn. Gen. Stat. § 17b-28b (contracting);

       iii. CONN. GEN. STAT. § 17b-267 (quality assurance/auditing).

    c. Florida:

       i. FLA. ADMIN. CODE ANN. r. 59G-1.010(166) (medical necessity);

       ii. FLA. ADMIN. CODE ANN. r. 59G-8.100(9) (quality assurance/auditing); and

       iii. FLA. ADMIN. CODE ANN. r. 59G-8.100(2)(c), Fla. Admin. Code Ann. r. 59G-8.100(13) (subcontractor requirements).

d. Illinois:

    i. 215 ILL. COMP. STAT. 105/2; ILL. ADMIN. CODE, tit. 89, § 140.2 (medical necessity); and

    ii. 215 ILL. COMP. STAT. 134/80 (quality assurance/auditing).

e. Louisiana:

    i. LA. ADMIN. CODE tit. 50, pt. I, § 1101 (medical necessity definition and criteria);

    ii. LA. REV. STAT. ANN. §§ 40:2211, 40:2221 (contracting); and

    iii. LA. ADMIN. CODE tit. 50, pt. I, § 3305 (contracting and utilization management).

f. Michigan:

    i. MICH. COMP. LAWS ANN. § 400.111a (medical necessity);

    ii. MICH. COMP. LAWS ANN. § 333.26368.III.A.12 (quality assurance/ auditing as to subcontractors' arrangements with Medicaid managed care companies); and

    iii. MICH. COMP. LAWS ANN. § 333.26368.IV.H (ability to subcontract duties).

g. Montana:

    i. MONT. CODE. ANN. § 53-6-101(9) (necessary medical services); MONT. ADMIN. R. 37.82.102(18) (medically necessary defined); and

    ii. MONT. CODE ANN. § 53-6-705(8) (quality assurance required of managed care entity); MONT. ADMIN. R. 37.85.410 (designated review organization to determine medical necessity); MONT. ADMIN. R. 37.85.414(3) (designated review organization to perform quality control).

h. New Jersey:

    i. N.J. STAT. ANN. § 30:4D-5 (medical necessity);

    ii. N.J. STAT. ANN. § 30:4D-12; and Contract Template between NJ Department of Human Services and Medicaid Contractor, at p. 48, http://www.nj.gov/humanservices/dmahs/info/resources/care/hmo-contract.pdf. (quality assurance/auditing); and

    iii. N.J. STAT. ANN. § 30:4D-7(p), (q), (r); N.J. STAT. ANN. § 30:4D-7b - 7c; N.J. STAT. ANN. § 30:4D-8; N.J. STAT. ANN. § 30:4D-9 (ability to subcontract duties).

i. New Mexico:

    i. N.M. STAT. ANN. § 27-2-12.6 (medically necessary services); N.M. ADMIN. CODE tit. 8, § 300.1.9 (medically necessary) N.M. ADMIN. CODE tit. 8, § 301.5.9 (insuring recipients receive only necessary services);

    ii. N.M. ADMIN. CODE tit. 8, § 302.5 (quality control, prior authorization and utilization review); and

    iii. N.M. ADMIN. CODE tit. 8, § 300.6.9 (administration through contractors); and

    iv. N.M. ADMIN. CODE tit. 8, § 302.2.10(E) (contractors).

j. New York:

    i. N.Y. SOC. SERV. LAW § 365-a (medical necessity);

    ii. N.Y. SOC. SERV. LAW § 364-j(8), N.Y. COMP. CODES R. & REGS. tit. 10, § 98-1.12 (quality assurance/auditing); and

    iii. N.Y. COMP. CODES R. & REGS. tit. 10 § 98-1.11 (subcontractor requirements).

k. North Carolina:

    i. N.C. GEN. STAT. § 108A-55(a) (necessary medical care); N.C. GEN. STAT. § 108C-7 (medical necessity criteria); N.C. ADMIN. CODE tit. 10A, r. 22F.0104; and

    ii. N.C. ADMIN. CODE tit. 10A, r. 22A.0101 (fiscal agents under contract are required to conduct utilization reviews).

l. Oklahoma:

    i. OKLA. STAT. tit. 56, § 1002(7) (necessary medical services); OKLA. STAT. tit. 56, § 1011.2 (medically necessary services); OKLA. ADMIN. CODE § 317:30-3-1(f) (medical necessity standards); and

    ii. OKLA. STAT. tit. 56, § 1010.3 (contracting for claims administration).

m. Tennessee:

    i. TENN. CODE ANN. § 71-5-144 (medical necessity);

    ii. TENN. CODE ANN. § 71-5-130 (quality assurance/auditing and the authority to subcontract);

n. Texas:

    i. 1 TEX. ADMIN. CODE § 353.2(57) (defining medical necessity);

    ii. TEX. GOV'T CODE ANN. §§ 533.002, 533.005 (contracting); and

    iii. 1 TEX. ADMIN. CODE § 353.417 (managed care quality assessment required).

o. Washington:

    i. WASH. REV. CODE § 74.09.010 (10) (necessary medical services); WASH. ADMIN. CODE § 182-500-0085 (prior authorization requirement based upon medical necessity); and

    ii. WASH. ADMIN. CODE § 182-538-063 (subcontracting).

## V.    EVICORE'S FRAUDULENT CONDUCT

### A.    Background on eviCore's Operations and Participation in Government Healthcare Programs

68.    eviCore marketed, sold, and performed, and continues to market, sell, and perform, utilization management services to determine whether services that are covered and paid for by various government health insurance programs, including Medicare and Medicaid, are medically reasonable and necessary.

69.    eviCore specifically contracts with third-party insurance companies, such as WellCare, to perform utilization management services by providing medical reasonableness and necessity determinations for services ordered by physicians and allied health professionals for hundreds of thousands of covered lives, including Medicare and Medicaid beneficiaries.

70.    eviCore's Clinical Reviewers are trained in the use of utilization review criteria and rules provided to eviCore by MCOs (sometimes also referred to as the "Administrative Algorithm") to assess and to screen requests for prior authorization of evaluation and treatment procedures, which requests may have been processed previously by clerical intake department staff to collect demographic data. Clinical Reviewers consider the needs of individual patients and

characteristics of the local delivery system when applying the clinical criteria. eviCore's Clinical Reviewers have the authority to certify (*i.e.*, approve) requests when the clinical information provided is consistent with the utilization review criteria and standards of practice.

71.     The various schemes described herein, under which eviCore provided prior authorization for services in the absence of medical necessity review, and in some cases with no review at all, not only violated eviCore's own internal policies and procedures, but, more importantly, resulted in the submission of false claims for payment of services that were not properly determined to be medically reasonable and necessary in violation of the reimbursement rules and regulations governing government healthcare programs.

72.     All such false claims caused to be submitted by eviCore's fraudulent conduct violate the Federal False Claims Act and the Qui Tam States' statutes.

**B.     eviCore's Scheme – In Detail**

**1.     Proper Prior Authorization Approvals and Denials**

73.     If (1) a treating provider decides that a patient requires services and (2) that patient is a beneficiary of one of the government programs that contracts with an MCO that in turn contracts with eviCore (or if the patient is a direct beneficiary of a private insurer that contracts with eviCore), then the provider or his/her office must communicate with eviCore to obtain prior authorization for the service in order to ensure that the costs of the services will be covered by the government program or private insurer.

74.     This communication can be accomplished by telephoning eviCore, faxing eviCore, or using eviCore's website.  Regardless of which method the provider pursues, the information is entered into a request management system maintained by eviCore, called "Image One."  The Image One system prompts users – eviCore intake personnel, eviCore Clinical Reviewers, or the

providers themselves – to provide some of the points of demographic and clinical information necessary for eviCore to make medical necessity determinations.

75. In addition to "Image One," eviCore employs a data analytics system called "CorePath" to manage such requests. CorePath was created to automate prior authorization requests for a wide variety of populations, conditions and diagnoses. This automation is not based on valid and reliable clinical information and evidence-based clinical guidelines, but rather on criteria that do not meaningfully determine medical necessity, such as the number of visits at issue.

76. CorePath relies on insufficient clinical information in an effort to generate prior authorizations regardless of medical necessity.

77. The Image One system contains a "journal" field, which tracks the lifetime of the request in narrative form. In the context of cases "in auto-approval status," Clinical Reviewers are required to enter information into the journal explaining their approval, that either (i) does not meaningfully analyze the medical reasonableness or necessity of the request, or (ii) is itself fraudulent. MCOs, including WellCare, BCBS, HCSC, HAMP, and Moda, have the capability to access and review these journal entries.

78. When a provider uses the eviCore website to make a request, the provider himself/herself enters clinical information directly into CorePath.

79. When a prior authorization request comes in by telephone or fax and contains the information necessary to "build" the request in the CorePath system, the request is routed to intake department personnel. The intake department personnel, who are non-clinical clerks, use the information provided to "build" the request in the CorePath system in order to enable the system to generate a prior authorization decision.

80. When a prior authorization request comes in by telephone or fax and does not contain the information necessary to "build" the request in the CorePath system, the request is routed to Clinical Reviewers.

81. Under eviCore's legal and contractual obligations, after a request for a service for a beneficiary of Medicare or Medicaid is "built" in CorePath and/or Image One, eviCore Clinical Reviewers must review the request to determine whether the service is medically necessary before prior authorization will be approved. If the clinical information that was entered into Image One is insufficient for making such a determination, then Clinical Reviewers place the case on hold and request additional information necessary for their decision.

82. Instead of providing medical necessity review in all such cases, however, eviCore has devised a variety of interlocking schemes designed to ensure fast TAT, high rates of approval for requests, and low costs of review to eviCore – by sacrificing medical necessity review entirely in many categories of cases.

### 2. Directives to Manually Auto-Approve

83. One method by which eviCore reduces the time and money spent on medical necessity review is to direct Clinical Reviewers to ignore acceptable standards of clinical practice, evidence-based decision making, and their own clinical judgment, and to instead simply "auto-approve" all requests relating to certain providers, therapies, and populations.

84. Clinical Reviewers follow and implement these "auto-approve" directives by simply approving whatever services a provider requests, without making an independent determination on whether those services are medically necessary or reasonable.

85. These directives are relayed from eviCore management to Clinical Reviewers through training materials, emails, and conference calls.

86.     In some cases, as set forth in further detail below, directives to "auto-approve" certain categories of requests originated from WellCare and were relayed to Clinical Reviewers by eviCore in order to maintain and further eviCore's relationships with WellCare.

87.     In other cases, directives to "auto-approve" certain categories of requests originated from eviCore management. Even in the absence of any request from an MCO, eviCore is motivated to employ auto-approval procedures for a variety of reasons, including handling high volumes of requests, staff shortages, and tight TATs.

88.     Upon information and belief, eviCore's contracts with insurers include key timing provisions that require eviCore to approve, partially approve, or deny provider requests within a limited time-period or pay a penalty for the late response.

89.     Auto-approval also keeps review costs down by enabling eviCore to assign Clinical Reviewers to review cases outside of their scope of practice and licensure. Because cases "in auto-approval status" are to be approved regardless of medical necessity, eviCore is able to assign Clinical Reviewers to approve cases in fields in which they lack experience, knowledge, and licensure, making eviCore's staff more flexible. For example, on March 23, 2018, when eviCore was "short staffed on the [occupational therapy] side," Marysue Agostini, Manager of MusculoSkeletal ("MSK") Specialized Therapy, opened review of auto-approve occupational therapy requests to all pediatric physical therapy Clinical Reviewers. It is only the auto-approval system that makes it possible for eviCore to reassign staff in this way – the medical necessity review eviCore would otherwise employ would require special training and knowledge that auto-approval schemes do not require.

90.     Reinforcing that "auto-approval" relieves the Clinical Reviewer of performing a medical necessity review, in an October 28, 2017 email, Agostini noted: "[A]ny Passport cases

with a start date of 11/1/17 or later requires medical necessity review. A start date of 10/31/17 or before remains auto approval."

91.     eviCore internal documents also make clear that "auto-approval" is knowingly applied to cases for which medical necessity review is required.

92.     In a document available on eviCore's internal Sharepoint server, titled "Developmental Pediatrics Concurrent / Prior Authorization Review Journal Templates," eviCore provides form journal entries to be used in CorePath for all cases "where medical necessity review is required." This document includes a section of "Statements for Developmental Pediatrics Auto-Approvals by Health Plan," which provides scripts for Clinical Reviewers to use in journal entries for the various categories of auto-approve cases, such as "Documentation shows needs for skilled care. Approved at the direction of the health plan," and even, simply, "Automated approval at the request of the health plan."

93.     eviCore has actual knowledge not only of the fact that its auto-approve scheme in general does not comply with statutory requirements for medical necessity review, but also of many discrete examples where its "auto-approve" scheme led to inappropriate authorizations of services.

94.     Agostini, in a November 8, 2017 email, herself described categories of cases that Clinical Reviewers "are auto approving that ask for significantly more visits than we would approve," and requested a set of "examples of egregious requests" to use in an upcoming meeting. Agostini specifically referenced in this email a case in which a Clinical Reviewer had "to auto approve 200 visits for an ankle sprain last week."

95.     In a February 2019 email chain with subject "Wellcare FL CMS (Childrens Medical Services) Membership," a number of Clinical Reviewers expressed concern to Agostini regarding

the nature of the requests they were to auto-approve generally, and regarding specific improper requests.

96.    One Clinical Reviewer noted to Agostini that "[t]he requests are far in excess of what we typically approve as far as frequency and duration." Another Clinical Reviewer wrote, "Some of the requests I had yesterday were awful. It is not appropriate for an older child with MD to receive 3 times per week for 6 months to work on strengthening by pushing the therapist's hands with their legs." Another identified further inappropriate requests, including requests for (i) therapy visits at four times per week over six months for a twelve-year-old who scores normal on standardized tests, but who the provider states, "based on clinical opinion has gross motor skills at 4 yo;" and (ii) therapy visits at three times a week over six months for a pediatric member who is able to run and jump, but who purportedly needed balance training.

97.    In response to these concerns, including the specific inappropriate auto-approvals Clinical Reviewers identified, Agostini offered to, at a later date, "initiate a clinical discussion with Medical leadership at WellCare FL to discuss how best to approach the inappropriate therapy you are seeing. I expect that they will be adverse to denying care but should support a significant provider education effort." Agostini did not intervene to prevent the authorization of the identified cases, nor did she alter eviCore's previous directive to automatically approve these cases, which she herself identified as "inappropriate therapy."

98.    Following this email traffic, in a February 13, 2019 call with Clinical Reviewers, Agostini stated: "I know it's a challenge for us to approve this level of care when what we're seeing is not supportive of what these providers are doing."

99.    Upon information and belief, not only is WellCare aware that eviCore's role as "utilization manager" is a nullity, but WellCare in fact directed certain aspects of this scheme.

When asked on the February 13, 2019 call whether eviCore has "any plans to act as utilization managers" for Florida Medicaid pediatric patients, Agostini answered "I think eviCore would like to, but we have to follow the directives from the health plan."

100.    As an example, a provider for WellCare Missouri Medicaid submitted a request for a fourteen-year-old female with amplified pain syndrome. The provider requested two-hour physical therapy sessions five days per week for a period of four weeks, and the same frequency and number of occupational therapy visits. The provider did not submit any clinical documentation regarding the physical therapy plan of care, did not provide the minimum of three functional and measurable therapy goals, and did not indicate that a less intense frequency of therapy had been attempted and was found ineffective. eviCore auto-approved the request in full based on its agreement with WellCare.

101.    As another example, a provider for WellCare Medicaid Kentucky submitted a series of requests for non-surgical management of a thirteen-year-old boy who suffered a right elbow dislocation. Pursuant to the auto-approve scheme, eviCore approved a total of 56 physical therapy visits for this condition. Accepted standards of medical practice dictate a far smaller number of visits, and eviCore's own internal guidelines reflect six to fourteen visits as the accepted standard of practice.

102.    eviCore, since at least November 2016, in accordance with its collusion with WellCare, has directed its Clinical Reviewers to "auto-approve" all requests for physical therapy and occupational therapy for Wellcare Medicare and Medicaid Florida WDD, WellCare Medicaid South Carolina, and WellCare Medicaid Kentucky. For cases where no specific number of visits was requested by the provider, and therefore the request could not be automatically approved, eviCore promulgated guidelines directing Clinical Reviewers to approve a set number of visits

based upon whether the request was an initial or subsequent request, whether the request was for a developmental or non-developmental condition, and the completeness of the information submitted by the provider.

103.    eviCore, at various times since November 2016, has directed its Clinical Reviewers to "auto-approve" a set number of treatment visits for Medicare beneficiaries in response to requests from BCBS MI providers who have been classified as "Tier A" based upon their history of service utilization.

104.    eviCore, at various times since June 2017, and continuously from October 2017 through February 2019, has directed its Clinical Reviewers to "auto-approve" all requests for treatment of pediatric developmental conditions from HCSC BCBS Texas Medicaid (classified by eviCore as "Alberto N. Cases").

105.    eviCore, at various times since at least October 2017, in accordance with its collusion with WellCare, has directed its Clinical Reviewers to "auto-approve" all requests for treatment of developmental conditions in patients under twenty-one years of age for WellCare Medicaid Nebraska, Missouri, Kentucky, and South Carolina.

106.    eviCore, from at least October 2017 to, directed its MSK Therapies Clinical Reviewers to "auto-approve" all Health Alliance Medical Plan Medicare cases in Washington and Illinois.

107.    eviCore, since February 1, 2019, in accordance with its collusion with WellCare, has directed its Clinical Reviewers to "auto-approve" all pediatric requests for WellCare Medicaid Florida Children's Medical Service at the provider's requested visit frequency, for six months. Between February 1, 2019 and March 13, 2019, 11,000 requests from providers to eviCore and WellCare resulted in the approval of 124,000 visits for the period February 2019 to August 2019.

The average physical therapy request in Florida WellCare Medicaid was for thirty-two visits, compared to the national averages of 7 to 10 visits per physical therapy request. In the opinions of Relators, approximately the majority of automatically approved requests for WellCare Medicaid Florida Children's Medical Service do not meet the definition of medical necessity.

108.  eviCore has, at various times since November 2016, also directed its Clinical Reviewers to "auto-approve" requests from Affinity Medicare and Medicaid NY, HCSC BCBSIL Medicaid, Passport Medicaid KY and WellCare Medicaid and Medicare plans, in order to enable eviCore to better manage the volume of requests under those plans.

109.  eviCore has, at various times since November 2016, also directed its Clinical Reviewers to "auto-approve" Medicare requests from BCBS, Cambia, HAMP, and Moda, in states including, at least, Alaska, Idaho, Illinois, Michigan, New Mexico, Oklahoma, Oregon, Utah, Texas, and Washington.

### 3.  CorePath and Image One

110.  eviCore has also implemented artificial intelligence systems to further streamline the fraudulent auto-approve process.

111.  The auto-approval schemes discussed above share a feature that makes them less efficient than they might be: Although each scheme prevents Clinical Reviewers from approving, partially approving, or denying cases based upon an independent determination of medical necessity, each scheme still requires a *de minimis* level of involvement from Clinical Reviewers, who must identify the request as involving a category "in auto-approval status," and then manually approve the request. The necessity of this human input makes it difficult for eviCore to scale up its review process and increase its geographical coverage range, number of covered lives, and market share.

112. To respond to this need, eviCore designed its data analytics system, CorePath. By empowering this automated system to determine whether to authorize a requested service, eviCore saves itself significant costs, avoids the risk of TAT penalties, and makes its utilization management services "scalable" – by sacrificing the medical necessity review it is obligated to perform.

113. In a phone call on September 14, 2017, Bruce Brownstein, eviCore's MSK Product Advisor, advised certain pediatric Clinical Reviewers that eviCore's expansion into new business lines would increase the number of requests submitted to eviCore to a point where it would be impossible for Clinical Reviewers making medical necessity determinations to keep up with the greater volume. Brownstein further advised that he was working on a CorePath AI process specific to pediatric occupational and physical therapy, which would automatically approve the first and second such requests from a provider without any clinical review. The first provider request in this context would be automatically approved. To design criteria to enable the AI to handle the second request from a provider in this context, Brownstein sought, and received, assistance from certain pediatric Clinical Reviewers.

114. In an October 26, 2017 email, Rocco Labbadia, eviCore Vice President for Clinical Content and Integration, circulated a document describing the CorePath system. This document stated that CorePath would require providers to respond only to a "limited set of clinical questions" during the request for care, and explained CorePath's main goals: "[i]t is a primary intention of CorePath to *resolve a high majority of episodes of care without requiring any practitioner review* or additional clinical information outside of the pathways" (emphasis added). CorePath would avoid practitioner review by mechanically approving services requests on its own: "The number of visits approved and date span of the approval will be based on algorithms that take into account

the clinical condition of the patient and are weighted by data analytics that describe the likely duration and intensity of appropriate care."

115.    In a phone call on September 15, 2018, Labbadia represented that Brownstein's automated process for pediatric therapy requests was designed with the goal of making eviCore's utilization review "scalable," *i.e.*, to enable eviCore to pursue more business lines and secure a greater market share. Labbadia stated that pediatric therapy requests had been targeted by this program because of the longer review time associated with such requests.

116.    In an email on February 6, 2019, Agostini advised pediatric Clinical Reviewers that eviCore was "working on programming so these cases," WellCare Florida Children's Medical Services cases, "will be approved up front and not come to review." On information and belief, this is because a combination of non-clinical intake agents and the CorePath AI are now auto-approving those requests.

117.    For example, in one case involving a 21-year-old WellCare Nebraska Medicaid member with Rett's syndrome, a provider submitted a request through CorePath and received 104, hour-long physical therapy visits over a one-year period, to improperly treat a developmental condition. The provider supported the request with invalid test results, and listed certain goals.

118.    The goals submitted by the provider were neither functional nor measurable, and the test results submitted by the provider in this case were not norm-referenced for a 21-year-old person. Further, eviCore review guidelines for WellCare dictate that approval periods be limited to a three-month duration. Last, because the member was over the age of 20, she was no longer eligible under Medicaid guidelines for rehabilitative therapy for a developmental condition.

119. Despite this incomplete and inaccurate clinical information, and the ineligibility of the patient, CorePath inappropriately approved the request in full, providing prior authorization for all 104, hour-long physical therapy visits over a one-year period.

120. Even in those cases where the CorePath AI does not independently make the final decision as to authorizing a requested treatment, the Image One software still restricts the ability of Clinical Reviewers to determine medical necessity by, *e.g.*, making it technically impossible for the Clinical Reviewer to deny, or partially deny, certain categories of requests.

121. For example, on September 6, 2017, Agostini notified the review team that she had identified a logic problem in the Image One system that needed to be addressed: With regard to WellCare Florida Medicaid cases, which were subject to an "auto-approve" directive at the time, "the system should be preventing us from making adverse determinations," *i.e.*, denials, "[h]owever, this is not happening."

122. Similarly, in a March 7, 2018 email implementing a different review process for certain categories of WellCare cases that had been subject to auto-approval, Agostini noted that the change "will require an IT update as the system does not allow for these cases to be denied."

123. As of March 2019, eviCore has implemented CorePath logic processes to automatically authorize requests from healthcare providers including Affinity, Blue Cross Blue Shield, Passport, and WellCare, across states including, at least, Arkansas, Connecticut, Illinois, Kentucky, Louisiana, Maine, Missouri, Mississippi, New Mexico, New York, North Carolina, Oklahoma, South Carolina, Tennessee, and Texas.

### 4. "All-Or-Nothing" Approvals

124. Beyond directing Clinical Reviewers to automatically approve certain categories of requests, eviCore also created other systems to authorize services that were not determined by a Clinical Reviewer to be medically reasonable and necessary, including "all-or-nothing" review.

125.    Clinical Reviewers are instructed that when they see a request in Image One that is subject to "all-or-nothing" review, they are to make a binary decision between two actions: Authorize the request in full or deny it completely.

126.    If a Clinical Reviewer determines that *any* part of a request subject to "all-or-nothing" review is medically reasonable or necessary, then the Clinical Reviewer is directed to approve the request in full, including not only those services the Clinical Reviewer determined were medically necessary, but also any other requested services that do not meet the requirements of medical necessity.

127.    Clinical Reviewers are authorized to call the provider to attempt to negotiate in cases where the requested services went beyond what was medically necessary. But in a December 6, 2018 email, Vycki Rupakus, eviCore's Director of Provider Engagement Therapy, explained that if, on that call, the provider is "adamant about continued care, the request should be approved," regardless of the Clinical Reviewer's medical necessity determination.

128.    For example, in the pediatric therapy context, a provider may request a number of visits with a therapist or a duration of treatment that is not supported by clinical information the provider submitted to eviCore. If a Clinical Reviewer determines that a lesser number of visits with a therapist than requested is medically reasonable and necessary, then the Clinical Reviewer is required by eviCore to approve the full number of medically unreasonable and unnecessary visits requested.

129.    eviCore's "all-or-nothing" review was implemented in a March 7, 2018 email from Agostini to eviCore's Clinical Reviewers, and initially applied to all WellCare pediatric developmental requests that had been subject to the "auto-approval" directive at that time, including WellCare Kentucky, Florida, Nebraska, and Missouri.

130.     In the March 7, 2018 email, Agostini communicated the substance of the "all-or-nothing" review process: "If there is a need for therapy, any request by the therapist should be approved (even if it is excessive)."

131.     Agostini identified the new "all-or-nothing" review instruction as an "ask from WellCare."

132.     Pursuant to Agostini's email, if a request included clinical information that showed a developmental delay was present, then the request for service had to be fully approved, regardless of the medical necessity or reasonableness of the requested service, or its relationship to the demonstrated developmental delay.

133.     As an example, a provider for WellCare Kentucky Medicaid submitted a series of requests starting in November 2017 for a six-year-old boy with an unspecified developmental delay. eviCore received six requests for physical therapy and six requests for occupational therapy, and because these requests were governed by eviCore's "all-or-nothing" scheme, all of these requests were approved, for a total of 114 therapy visits in less than two years. The seventh request for physical therapy in this case was the first request to be reviewed by a Clinical Reviewer, the prior requests having been resolved – and granted – by the CorePath AI discussed *supra*. The seventh request for occupational therapy in this case was the first request to be reviewed by an occupational therapy clinical reviewer for medical necessity. However, despite the fact that requests in this case were finally being assigned to an appropriate Clinical Reviewer, eviCore's guidelines still mandated "all-or-nothing" review, causing the Clinical Review to approve requested services that went beyond medical necessity.

134. eviCore's "all-or-nothing" review process is incompatible with medical necessity review, and the application of the scheme makes it impossible to use the medical necessity guidelines outlined by CMS in determining prior authorization.

135. Categories of requests have been subject to "all-or-nothing" review at various times since March 2018 include, at least, all WellCare pediatric developmental requests in Florida, Kentucky, Missouri, and Nebraska.

### C.     eviCore's Medical Necessity Review, When Performed, is Itself Deficient to the Point of Fraud

136. Even when eviCore nominally reviewed provider requests for medical necessity, the processes eviCore employed failed to ensure the adequacy of the review and caused hundreds of thousands of false claims to be presented to the United States and the Qui Tam States.

137. eviCore routinely assigned Clinical Reviewers to review requests beyond the scope of the Clinical Reviewer's clinical expertise and licensure, without providing proper training to the Clinical Reviewer, and without meaningfully reviewing the accuracy of the non-specialist Clinical Reviewer's determinations.

138. For example, since at least November 2016, eviCore has assigned OT, PT, and SLP therapy reviewers to review requests across one another's disciplines, despite the fact that such requests are outside the clinical expertise and licensure of those Clinical Reviewers. In re-assigning non-specialist Clinical Reviewers, eviCore failed to meaningfully train Clinical Reviewers on how to apply medical necessity review guidelines in reviewing requests beyond the scope of their expertise and licensure. National organizations including the Utilization Review Accreditation Commission and the National Committee for Quality Assurance require that prior authorization determinations be made by specialists within their own discipline.

139.     Criteria to establish a developmental delay that qualifies for skilled care services varies between states and managed care organizations. WellCare guidelines state that eligibility for therapy to address developmental delay is based on a norm-referenced standardized test score that falls 1.0 standard deviations or more below the mean in at least one subtest area of a composite score.

140.     Under HCSC BCBS Texas Medicaid guidelines, eligibility for therapy is based on a score that falls 1.5 standard deviation or more below the mean in at least one subtest area of composite score on a norm-referenced standardized test. When a pediatric member's test score is less than 1.5 standard deviations below the mean, a criterion-referenced test along with informed evidenced-based clinical statements must be included to support the medical necessity of services. Measurable, functional, short- and long-term goals will be considered, along with test results. If a pediatric member cannot complete test assessment, documentation of the reason a standardized test score could not be used must also be reported. A functional description of the child's abilities and deficits must also be to Clinical Reviewers to determine medical necessity.

141.     In a series of Wednesday conference calls for the purpose of training OT Clinical Reviewers on how to review PT requests, Agostini and Carrie Jordan, Manager of MSK Specialized Therapy, directed OT and PT Clinical Reviewers to consider standardized test scores for developmental pediatric cases as "guidelines," instead of as the determinative factors those tests are meant to be under state programs.

142.     Further, as part of the same training, Agostini and Jordan directed OT and PT Clinical Reviewers to "round" scores in ways that led to increased approvals – for example, by deeming a score 1.47 standard deviations below the mean (which would make certain PT requests medically unnecessary under Texas guidelines) to "count as" a score 1.5 standard deviations below

the mean (which would make those same PT requests medically necessary under Texas guidelines).

143.    Following this contentious team meeting in which Agostini and Jordan recommended that standardized test scores reported on pediatric prior authorization requests be used 'as a guideline' only, concern was raised by several Clinical Reviewers regarding this policy change which is inconsistent with accepted standards of pediatric physical therapy practice. Communication continued with Agostini following a pediatric team meeting on January 23, 2019. It was later reported that Laura Walters-Beitz, Director Clinical Services PT/OT/ST, Product Operations, had given direction to Agostini to uphold the previous review policy to regard standardized test scores as intended (*i.e.*, without rounding) in order to determine eligibility for therapy services.

144.    Due to eviCore's failures in training and staffing, as illustrated above, eviCore's Clinical Reviewers are often not equipped to accurately determine the medical necessity of requests they review.

145.    Although eviCore conducts monthly audits of the subset of requests its Clinical Reviewers actually review for medical necessity, eviCore's audit function is flawed in ways that complement its training and staffing deficiencies.

146.    Despite the fact that monthly audits purport to require a score of 95% or better, failing Clinical Reviewers are allowed to continue without extra training, oversight, remediation or consequences for repeated poor scores.

147.    eviCore does not adequately train its Clinical Reviewers to review requests from outside the Clinical Reviewer's specialty, despite assigning out-of-specialty cases to its Clinical Reviewers. Further, eviCore's audit function does not serve as an effective quality control

mechanism for its Clinical Reviewers' determinations. Through these failures, eviCore has caused the submission of false claims for reimbursement of services provided to Medicaid and Medicare beneficiaries.

### D. eviCore's Attempts to Whitewash its Auto-Approval Schemes

148. In early February 2019, eviCore began a process of whitewashing its internal review materials to remove or obfuscate references to automatic approval. At every stage of this process, however, eviCore made it clear to Clinical Reviewers that the replacement of the "auto-approve" language with euphemisms was not intended as a substantive change to the auto-approve process, which eviCore directed its Clinical Reviewers to continue.

149. On February 22, 2019, Agostini emailed a small group of Clinical Reviewer supervisors, advising them that "we need to update our resources and remove any language of 'auto-approval,'" and providing substitute language, such as "approve as requested," and "approve up to the benefit limit" with which to update the Administrative Algorithm and Health Plan Guide, two documents Clinical Reviewers rely upon in evaluating prior authorization requests.

150. However, after these changes to the administrative algorithm and other job aids were implemented, on March 1, 2019, an announcement to reviewers stated that these updates to the Administrative Algorithm and Health Plan Guide were "minor updates to language that don't affect algorithm."

151. On March 13, 2019, eviCore and WellCare held a conference call to discuss their management of the WellCare Florida CMS Medicaid pediatric population. Among the attendees on the conference call were Vycki Rupakus, Cayce Awe, Chris Chapman, and Dan Moffett of eviCore; and Tanya Hillary, Alan Smith, and Claudius Conner of WellCare.

152. During this call, eviCore proposed four review processes as potential paths forward for WellCare's Florida Medicaid CMS population.

153.     Option 1 was to continue the auto-approval scheme eviCore and WellCare had previously agreed upon.  In discussing Option 1, Chris Chapman eviCore's Director of Account Management, acknowledged the need to "get away from the term 'auto approval,'" and noted the alternative language "approved at the direction of the healthplan."  Chapman confirmed that the substance of the review under Option 1, however, would still be to "just approve the requested amount."

154.     Option 3 was the only one of the proposed options that included the "medical necessity review" required by law.  One "consideration" identified with regard to Option 3 was the "Cost to eviCore" that would be associated with a full medical necessity review.

155.     On March 15, 2019, eviCore had an internal conference call to follow up on the issues raised with WellCare on March 13, and to decide upon a plan of action.  During this call, Chapman discussed departing from the auto-approval scheme as a decision between staying "within the constraints of what we currently do versus implementing a whole new process that's going to require a lot of resources from eviCore."

156.     On the same call, Cayce Awe, eviCore's Vice President for Strategic Client Relationships noted that eviCore makes a limited amount of money per year per patient with regard to the population at issue, and proposed that eviCore "look at each approach as to whether or not that keeps us within at least that spend, you know, our cost."

157.     One method eviCore management discussed for minimizing review costs was further CorePath automation:  "the intent would be that on the phone and on the web we would be able to automate 90 percent" of review.

158.     eviCore management also discussed proposing to WellCare an "educate and pay" review system.  "Educate and pay" does not involve full medical necessity review – instead, a

medically unnecessary provider request is approved, but eviCore also explains to the provider why the request did not meet medical necessity and sends the provider instructional criteria for future requests. As Daniel Moffett, eviCore's Vice President of MSK Operations, summarized, "'educate and pay' just overwrites it at the end and says 'this would have been the decision, however, because of blah blah blah, we're approving it. . . . [W]e're not even going to send it to review, we're just going to identify the member and send this criteria."

159.    Ultimately, at the conclusion of the March 15 call, eviCore management settled on "educate and pay" as the best proposal to WellCare. As noted above, "educate and pay" does not substantively differ from eviCore's normal auto-approval schemes with regard to the rate at which requests are approved – its only difference is the provision of instructional criteria to providers.

**E.    eviCore's Fraudulent Scheme Caused the Submission of False Claims and Loss to the Federal and State Treasuries**

160.    Once a case has been approved by eviCore, the member received the outpatient or home health service at the facility, the facility submits the bill to the payor, and the payor pays for the service. In the case of government beneficiaries, the government programs ultimately pay for the service.

161.    Accordingly, the vast majority of services that resulted from eviCore's scheme were approved for payment, performed, and reimbursed, despite the fact that none of the auto-approved cases had been properly qualified as medically reasonable and necessary, as is required for government reimbursement.

162.    As a result of eviCore's scheme, government healthcare programs spent billions of dollars, paying for and/or reimbursing for services that were not medically reasonable or necessary.

163. By virtue of the false or fraudulent claims that Defendants knowingly caused to be presented, the United States and the Qui Tam States have suffered actual damages and are entitled to recover treble damages plus a civil monetary penalty for each false claim.

164. As a result of Defendants' fraudulent conduct, the government healthcare programs have been paying and continue to pay thousands of dollars daily for services which were and are not medically reasonable and necessary.

## COUNT I
### Violation of the Federal False Claims Act, 31 U.S.C. § 3729(a)(1)(A)
### United States of America ex rel. Challenger LLC vs. eviCore and WellCare

165. Relator incorporates herein by reference each and every allegation of the preceding paragraphs of this Complaint as though fully set forth herein.

166. As a result of the foregoing conduct, eviCore and WellCare knowingly presented, or caused to be presented, false or fraudulent claims for payment, in violation of 31 U.S.C. § 3729(a)(1)(A).

167. The claims relevant to this Count include all claims for reimbursement of services ordered by treating providers for Medicare and Medicaid beneficiaries that were not medically reasonable or necessary, which were caused to be submitted by virtue of eviCore's and WellCare's scheme directly or indirectly, to Medicare and/or state Medicaid agencies.

168. eviCore caused the submission of such false claims through their client MCOs, including WellCare, knowing that those private entities were agents for the federal and/or state governments, that the auto-approved prior authorization requests would be submitted by the MCOs, including WellCare, to Medicare and/or state Medicaid agencies, and that for each and every auto-approved prior authorization request, the federal and/or state government would base its payments to MCOs, including WellCare, on those auto-approved prior authorization requests.

169.    All such claims eviCore caused to be submitted were false because they were for services that were not properly qualified as medically reasonable or necessary.

170.    eviCore had knowledge (as defined by the False Claims Act, 31 U.S.C. § 3729(b)(1)(A)) of the claims' falsity because, in its role as utilization review manager for its insurer clients it had actual and constructive knowledge of the medical information of the beneficiaries required to make the determination as to whether or not the services ordered were medically reasonable and necessary, and because, as utilization review manager for its insurer clients, eviCore was obligated by contract as well as under federal and state regulations to ensure such services so ordered were medically reasonable and necessary.

171.    WellCare had knowledge (as defined by the False Claims Act, 31 U.S.C. § 3729(b)(1)(A)) of the claims' falsity because of its directions to eviCore to authorize claims without regard to whether such services were medically reasonable and necessary.

172.    As a result of eviCore's and WellCare's actions as set forth above in this Complaint, the United States of America has been, and continues to be, severely damaged.

**COUNT II**
**Violation of Federal False Claims Act, 31 U.S.C. § 3729(a)(1)(B)**
**United States of America ex rel. SW Challenger LLC vs. eviCore and WellCare**

173.    Relator incorporates herein by reference each and every allegation of the preceding paragraphs of this Complaint as though fully set forth herein.

174.    As a result of the foregoing conduct, eviCore and WellCare knowingly made, used, or caused to be made or used, false or fraudulent records or statements material to the payment of false or fraudulent claims, in violation of 31 U.S.C. § 3729(a)(1)(B).

175.    The claims relevant to this Count include all claims for reimbursement of services ordered by treating providers for Medicare and Medicaid beneficiaries that were not medically

reasonable or necessary, which were caused to be submitted by virtue of eviCore's scheme, directly or indirectly, to Medicare and/or state Medicaid agencies.

176. The false or fraudulent records or statements underlying the false claims relevant to this Count include all false or fraudulent records or statements regarding the medical reasonableness and necessity of services ordered by treating providers for Medicare and Medicaid beneficiaries made by eviCore to its client MCOs, including WellCare, in carrying out its scheme.

177. eviCore made false or fraudulent records or statements underlying the false claims to its client MCOs, including WellCare, knowing that the auto-approved prior authorizations had not been subject to a determination of medically reasonableness and necessity, that its client MCOs were private entities acting as agents for the federal and/or state governments, and that the auto-approved prior authorizations would be material to the payment decisions of these MCOs, who in turn, paid for all such resulting claims out of the federal and/or state funds.

178. All such resulting claims eviCore caused to be submitted were false because the prior authorization approvals that were the result of auto-approve, all-or-nothing, or CorePath AI schemes were for services that were not properly qualified as medically reasonable or necessary.

179. eviCore had knowledge (as defined by the False Claims Act, 31 U.S.C. § 3729(b)(1)(A)) of the claims' falsity because, in its role as utilization review manager for its insurer clients, it had actual and constructive knowledge of the medical information of the beneficiaries required to make the determination as to whether or not the services ordered were medically reasonable or necessary, and because as utilization review manager for its insurer clients, eviCore was obligated by contract as well as under federal and state regulations to ensure such services so ordered were medically reasonable and necessary.

180.    WellCare had knowledge (as defined by the False Claims Act, 31 U.S.C. § 3729(b)(1)(A)) of the claims' falsity because of its directions to eviCore to authorize claims without regard to whether such services were medically reasonable and necessary.

181.    The United States of America, unaware of the falsity of the records or statements underlying the false claims caused to be made by eviCore, and in reliance on the accuracy of these records or statements underlying the false claims, paid and may still be paying or reimbursing for services which were and are not medically reasonable and necessary.

**COUNT III**
**Violation of Alaska Medical Assistance False Claims and Reporting Act**
**State of Alaska vs. eviCore**

182.    Relator incorporates herein by reference the preceding paragraphs of the Complaint as though fully set forth herein.

183.    This is a civil action brought by Relator on behalf of the State of Alaska against Defendant eviCore, under the Alaska Medical Assistance False Claims and Reporting Act, Alaska Stat. § 09.58.010 et seq.

184.    The State of Alaska and/or one of its agents contracted, directly or indirectly, with one or more MCOs in connection with the administration of Medicaid claims and/or claims under other state-funded plans in Alaska.

185.    One or more MCOs, directly or indirectly, contracted with eviCore in connection with the administration of requests for prior authorization of services.

186.    eviCore, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly presented or caused to be presented, and may still be presenting or causing to be presented, to

officers or employees of the State of Alaska or one of its agencies false or fraudulent claims for payment or approval, in violation of Alaska Stat. § 09.58.010 et seq.

187.   eviCore, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used, or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements to secure the payment or approval by the State of Alaska, or its political subdivisions, false records or statements material to false or fraudulent claims, in violation of Alaska Stat. § 09.58.010 et seq.

188.   eviCore, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, and with actual knowledge of the information, knowingly made, used or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money to the State of Alaska, or its political subdivisions, in violation of Alaska Stat. § 09.58.010 et seq.

189.   The State of Alaska and/or its agencies or political subdivisions, unaware of the falsity of the claims and/or statements made by eviCore, and in reliance on the accuracy of these claims and/or statements, paid, and may continue to pay for services that are not medically reasonable and necessary for beneficiaries of health insurance programs funded by the state or its agencies or political subdivisions.

190.   As a result of Defendants' actions, as set forth above, the State of Alaska and/or its agencies or political subdivisions have been, and may continue to be, severely damaged

## COUNT IV
### Violation of Connecticut False Claims Act
### State of Connecticut vs. eviCore

191.     Relator incorporates herein by reference the preceding paragraphs of the Complaint as though fully set forth herein.

192.     This is a civil action brought by Relator on behalf of the State of Connecticut against Defendant eviCore, under the State of Connecticut's False Claims Act for Medical Assistance Programs, Conn. Gen. Stat. § 4-277.

193.     The State of Connecticut and/or one of its agents contracted, directly or indirectly, with one or more MCOs in connection with the administration of Medicaid claims and/or claims under other state-funded plans in Connecticut.

194.     One or more MCOs, directly or indirectly, contracted with eviCore in connection with the administration of requests for prior authorization of services.

195.     eviCore, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly presented or caused to be presented, and may still be presenting or causing to be presented, to officers or employees of the State of Connecticut or one of its agencies false or fraudulent claims for payment or approval under a medical assistance program administered by the Department of Social Services, in violation of Conn. Gen. Stat. § 4-275(a)(1).

196.     eviCore, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used, or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements to secure the payment or approval by the State of Connecticut, or its political subdivisions, false or fraudulent claims under a medical assistance program administered by the Department of Social Services, in violation of Conn. Gen. Stat. § 4-275(a)(2).

- 45 -

197.     eviCore, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, and with actual knowledge of the information, knowingly made, used or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money to the State of Connecticut, or its political subdivisions, under a medical assistance program administered by the Department of Social Services, in violation of Conn. Gen. Stat. § 4-275(a)(7).

198.     The State of Connecticut and/or its agencies or political subdivisions, unaware of the falsity of the claims and/or statements made by eviCore, and in reliance on the accuracy of these claims and/or statements, paid, and may continue to pay for services that are not medically reasonable and necessary for beneficiaries of health insurance programs funded by the state or its agencies or political subdivisions.

199.     As a result of Defendants' actions, as set forth above, the State of Connecticut and/or its agencies or political subdivisions have been, and may continue to be, severely damaged.

## COUNT V
### Violation of Florida False Claims Act
### State of Florida vs. eviCore and WellCare

200.     Relator incorporates herein by reference the preceding paragraphs of the Complaint as though fully set forth herein.

201.     This is a civil action brought by Relator on behalf of the State of Florida against Defendant eviCore, under the State of Florida's False Claims Act, FLA. STAT. ANN. § 68.083(2).

202.     The State of Florida and/or one of its agents contracted, directly or indirectly, with Wellcare in connection with the administration of Medicaid claims and/or claims under other state-funded plans in Florida.

203. WellCare, directly or indirectly, contracted with eviCore in connection with the administration of requests for prior authorization of services.

204. Defendants eviCore and WellCare, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly presented or caused to be presented, and may still be presenting or causing to be presented, to officers or employees of the State of Florida or one of its agencies false or fraudulent claims for payment or approval, in violation of FLA. STAT. ANN. § 68.082(2)(a).

205. Defendants eviCore and WellCare, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used, or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements to get false or fraudulent claims paid or approved by the State of Florida or one of its agencies, in violation of FLA. STAT. ANN. § 68.082(2)(b).

206. Defendants eviCore and WellCare, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money to the State of Florida or one of its agencies, in violation of FLA. STAT. ANN. § 68.082 (2)(g).

207. The State of Florida and/or its agencies or political subdivisions, unaware of the falsity of the claims and/or statements made by Defendants eviCore and WellCare, and in reliance on the accuracy of these claims and/or statements, paid, and may continue to pay for services that

are not medically reasonable and necessary for beneficiaries of health insurance programs funded by the state or its agencies or political subdivisions.

208.    As a result of Defendants' actions, as set forth above, the State of Florida and/or its agencies or political subdivisions have been, and may continue to be, severely damaged.

**COUNT VI**
**Violation of Illinois False Claims Act**
**State of Illinois vs. eviCore**

209.    Relator incorporates herein by reference the preceding paragraphs of the Complaint as though fully set forth herein.

210.    This is a civil action brought by Relator on behalf of the State of Illinois against Defendant eviCore, under the Illinois False Claims Act, 740 ILL. COMP. STAT. ANN. 175/4(b).

211.    The State of Illinois and/or one of its agents contracted, directly or indirectly, with one or more MCOs in connection with the administration of Medicaid claims and/or claims under other state-funded plans in Illinois.

212.    MCOs, directly or indirectly, contracted with eviCore in connection with the administration of requests for prior authorization of services.

213.    Defendant eviCore, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly presented, or caused to be presented, and may still be presenting or causing to be presented, false or fraudulent claims for payment or approval, in violation of 740 ILL. COMP. STAT. ANN. 175/3(a)(1)(A).

214.    Defendant eviCore, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used, or caused to be made or used, and may still be making, using, or causing

to be made or used, false records or statements material to false or fraudulent claims, in violation of 740 ILL. COMP. STAT. ANN. 175/3(a)(1)(B).

215.     Defendant eviCore, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used, or caused to be made or used, and may still be making, using, or causing to be made or used, false records or statements material to obligations to pay or transmit money or property to the state or knowingly concealed or knowingly and improperly avoided or decreased or may still be knowingly concealing or knowingly and improperly avoiding or decreasing obligations to pay or transmit money or property to the state, in violation of 740 ILL. COMP. STAT. ANN. 175/3(a)(1)(G).

216.     The State of Illinois and/or its agencies or political subdivisions, unaware of the falsity of the claims and/or statements made by Defendant eviCore, and in reliance on the accuracy of those claims and/or statements, paid, and may continue to pay for services that are not medically reasonable and necessary for beneficiaries of health insurance programs funded by the state or its agencies or political subdivisions.

217.     As a result of Defendants' actions, as set forth above, the State of Illinois and/or its agencies or political subdivisions have been, and may continue to be, severely damaged.

**COUNT VII**
**Violation of the Michigan Medicaid False Claims Act**
**State of Michigan vs. eviCore**

218.     Relator incorporates herein by reference the preceding paragraphs of the Complaint as though fully set forth herein.

219. This is a civil action brought by Relator in the name of the State of Michigan against Defendant eviCore, under the Michigan Medicaid False Claims Act, MICH. COMP. LAWS ANN. § 400.610a(l).

220. The State of Michigan and/or one of its agents contracted, directly or indirectly, with one or more MCOs in connection with the administration of Medicaid claims and/or claims under other state-funded plans in Michigan.

221. MCOs, including WellCare, directly or indirectly, contracted with eviCore in connection with the administration of requests for prior authorization of services.

222. Defendant eviCore, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made or caused to be made, and may still be making or causing to be made, false statements or false representations of material facts in applications for Medicaid benefits, in violation of MICH. COMP. LAWS ANN. § 400.603(1).

223. Defendant eviCore, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made or cause to be made false statements or false representations of material facts for use in determining rights to Medicaid benefits, in violation of MICH. COMP. LAWS ANN. § 400.603(2).

224. Defendant eviCore, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly concealed or failed to disclose, and may still be concealing or failing to disclose, events affecting their initial or continued rights to receive Medicaid benefits or the initial or continued rights of any other person on whose behalf Defendant has applied for or are receiving benefits for,

with intent to obtain benefits to which Defendant or other persons are not entitled or in an amount greater than that to which Defendant or other persons are entitled, in violation of MICH. COMP. LAWS ANN. § 400.603(3).

225. Defendant eviCore, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made or presented or caused to be made or presented, and may still be making or presenting or causing to be made or presented to employees or officers of the State of Michigan, false claims under the social welfare act, Act No. 280 of the Public Acts of 1939, in violation of MICH. COMP. LAWS ANN. § 400.607(1).

226. Defendant eviCore, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made or presented or caused to be made or presented, and may still be making or presenting or causing to be made or presented claims under the social welfare act, Act No. 280 of the Public Acts of 1939, that falsely represent that the goods or services for which the claims were made were medically necessary in accordance with professionally accepted standards, in violation of MICH. COMP. LAWS ANN. § 400.607(2).

227. The State of Michigan, and/or its agencies or political subdivisions, unaware of the falsity of the claims and/or statements made by Defendant eviCore, and in reliance on the accuracy of these claims and/or statements, paid, and may continue to pay for services that are not medically reasonable and necessary for beneficiaries of health insurance programs funded by the state or its agencies or political subdivisions.

228. As a result of Defendant eviCore's actions, as set forth above, the State of Michigan and/or its agencies or political subdivisions have been, and may continue to be, severely damaged.

## COUNT VIII
### Violation of New Jersey False Claims Act
### State of New Jersey vs. eviCore

229.    Relator incorporates herein by reference the preceding paragraphs of the Complaint as though fully set forth herein.

230.    This is a civil action brought by Relator, in the name of the State of New Jersey, against Defendant eviCore, pursuant to the State of New Jersey False Claims Act, N.J. STAT. ANN. § 2A:32C-5(b).

231.    The State of New Jersey and/or one of its agents contracted, directly or indirectly, with one or more carrier contractors in connection with the administration of Medicaid claims and/or claims under other state-funded plans in New Jersey.

232.    MCOs, including WellCare, directly or indirectly, contracted with eviCore in connection with the administration of requests for prior authorization of services.

233.    Defendant eviCore, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly presented or caused to be presented, and may still be causing to be presented, to an employee, officer or agent of the State, or to any contractor, grantee, or other recipient of State funds, false or fraudulent claims for payment or approval under the New Jersey Medicaid program, in violation of N.J. STAT. ANN. § 2A:32C-3(a).

234.    Defendant eviCore, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used or caused to be made or used, and may still be making, using, or causing to be made or used, false records or statements to get false or fraudulent claims paid or approved by the State, in violation of N.J. STAT. ANN. § 2A:32C-3(b).

235.    Defendant eviCore, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used or caused to be made or used, and may still be making, using, or causing to be made or used, false records or statements to conceal, avoid or decrease obligations to pay or transmit money or property to the State, in violation of N.J. STAT. ANN. § 2A:32C-3(g).

236.    The State of New Jersey and/or its agencies or political subdivisions, unaware of the falsity of the claims and/or statements made by Defendant eviCore, and in reliance on the accuracy of these claims and/or statements, paid, and may continue to pay for services that are not medically reasonable and necessary for beneficiaries of health insurance programs funded by the state or its agencies or political subdivisions.

237.    As a result of Defendants' actions, as set forth above, the State of New Jersey and/or its agencies or political subdivisions have been, and may continue to be, severely damaged.

## COUNT IX
### Violation of New York False Claims Act
### State of New York vs. eviCore

238.    Relator incorporates herein by reference the preceding paragraphs of the Complaint as though fully set forth herein.

239.    This is a civil action brought by Relator on behalf of the State of New York against Defendant eviCore, under the State of New York False Claims Act, N.Y. STATE FIN. LAW § 190(2).

240.    The State of New York and/or one of its agents contracted, directly or indirectly, with one or more MCOs in connection with the administration of Medicaid claims and/or claims under other state-funded plans in New York.

241.    MCOs, including WellCare, directly or indirectly, contracted with eviCore in connection with the administration of requests for prior authorization of services.

242.     Defendant eviCore, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly presented or caused to be presented, and may still be presenting or causing to be presented, false or fraudulent claims for payment or approval, in violation of N.Y. STATE FIN. LAW § 189(1)(a).

243.     Defendant eviCore, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements material to false or fraudulent claims, in violation of N.Y. STATE FIN. LAW § 189(1)(b).

244.     Defendant eviCore, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used, or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements material to obligations to pay or transmit money or property to the State of New York or one of its political subdivisions, in violation of N.Y. STATE FIN. LAW § 189(1)(g).

245.     The State of New York, and/or its agencies or political subdivisions, unaware of the falsity of the claims and/or statements made by Defendant eviCore, and in reliance on the accuracy of these claims and/or statements, paid, and may continue to pay for services that are not medically reasonable or necessary for beneficiaries of health insurance programs funded by the state or its agencies or political subdivisions.

246.     As a result of Defendants' actions, as set forth above, the State of New York and/or its agencies or political subdivisions have been, and may continue to be, severely damaged.

## COUNT X
### Violation of Louisiana Medical Assistance Programs Integrity Law
### State of Louisiana vs. eviCore

247.    Relator incorporates herein by reference the preceding paragraphs of the Complaint as though fully set forth herein. The allegations contained in this Count are based upon information and belief.

248.    This is a civil action brought by Relator in the name of the State of Louisiana against Defendant eviCore, under the Louisiana Medical Assistance Programs Integrity Law, LA. REV. STAT. ANN. § 46:439.1(A).

249.    The State of Louisiana and/or one of its agents contracted, directly or indirectly, with one or more MCOs in connection with the administration of Medicaid claims and/or claims under other state-funded plans in Louisiana.

250.    MCOs, directly or indirectly, contracted with eviCore in connection with the administration of requests for prior authorization of services for Louisiana state-funded plan beneficiaries.

251.    Defendant eviCore, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly presented or caused to be presented, and may still be presenting or causing to be presented, false or fraudulent claims for payment or approval under the Medicaid program, in violation of LA. REV. STAT. ANN. § 46:438.3(A).

252.    Defendant eviCore, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements material to false or fraudulent claims to get such false

or fraudulent claims under the Medicaid program, in violation of LA. REV. STAT. ANN. § 46:438.3(B).

253.    Defendant eviCore, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements material to  obligations to pay or transmit money or property to the state, or knowingly concealing or knowingly and improperly avoiding or decreasing obligations to pay or transmit money or property to the state, relative to the Medicaid program, in violation of LA. REV. STAT. ANN. § 46:438.3(C).

254.    The State of Louisiana, and/or its agencies or political subdivisions, unaware of the falsity of the claims and/or statements made by Defendant eviCore, and in reliance on the accuracy of these claims and/or statements, paid, and may continue to pay for services that are not medically reasonable and necessary for beneficiaries of health insurance programs funded by the state or its agencies or political subdivisions.

255.    As a result of Defendants' actions, as set forth above, the State of Louisiana and/or its agencies or political subdivisions have been, and may continue to be, severely damaged.

### COUNT XI
### Violation of Montana False Claims Act
### State of Montana vs. eviCore

256.    Relator incorporates herein by reference the preceding paragraphs of the Complaint as though fully set forth herein.  The allegations contained in this Count are based upon information and belief.

257.    This is a civil action brought by Relator in the name of the State of Montana against Defendant eviCore, under the Montana False Claims Act, MONT. CODE ANN. § 17-8-406.

258.    The State of Montana and/or one of its agents contracted, directly or indirectly, with one or more MCOs, including WellCare, in connection with the administration of Medicaid claims and/or claims under other state-funded plans in Montana.

259.    MCOs, directly or indirectly, contracted with eviCore in connection with the administration of requests for prior authorization of services for Montana state-funded plan beneficiaries.

260.    Defendant eviCore, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly presented or caused to be presented, and may still be presenting or causing to be presented, false or fraudulent claims for payment or approval under the Medicaid program and/or other state-funded programs, in violation of MONT. CODE ANN. § 17-8-403(1)(a).

261.    Defendant eviCore, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements material to false or fraudulent claims to get such false or fraudulent claims under the Medicaid program and/or other state-funded programs paid for or approved, in violation of MONT. CODE ANN. § 17-8-403(1)(b).

262.    Defendant eviCore, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements material to  obligations to pay or transmit money or property to the state, or knowingly concealing or knowingly and improperly avoiding or decreasing

obligations to pay or transmit money or property to the state, relative to the Medicaid program and/or other state-funded programs, in violation of MONT. CODE ANN. § 17-8-403(1)(g).

263.     The State of Montana, and/or its agencies or political subdivisions, unaware of the falsity of the claims and/or statements made by Defendant eviCore, and in reliance on the accuracy of these claims and/or statements, paid, and may continue to pay for services that are not medically reasonable and necessary for beneficiaries of health insurance programs funded by the state or its agencies or political subdivisions.

264.     As a result of Defendants' actions, as set forth above, the State of Montana and/or its agencies or political subdivisions have been, and may continue to be, severely damaged.

## COUNT XII
### Violation of New Mexico Medicaid False Claims Act
### State of New Mexico vs. eviCore

265.     Relator incorporates herein by reference the preceding paragraphs of the Complaint as though fully set forth herein.    The allegations contained in this Count are based upon information and belief.

266.     This is a civil action brought by Relator in the name of the State of New Mexico against Defendant eviCore, under the New Mexico Medicaid False Claims Act, N.M. STAT. ANN. § 27-14-7(B).

267.     The State of New Mexico and/or one of its agents contracted, directly or indirectly, with one or more MCOs, including WellCare, in connection with the administration of Medicaid claims and/or claims under other state-funded plans in New Mexico.

268.     MCOs, directly or indirectly, contracted with eviCore in connection with the administration of requests for prior authorization of services for New Mexico state-funded plan beneficiaries.

269.    Defendant eviCore, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly presented or caused to be presented, and may still be presenting or causing to be presented, false or fraudulent claims for payment or approval under the Medicaid program and/or other state-funded programs, in violation of N.M. STAT. ANN. § 27-14-4(A).

270.    Defendant eviCore, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements material to false or fraudulent claims to get such false or fraudulent claims under the Medicaid program and/or other state-funded programs paid for or approved, in violation of N.M. STAT. ANN. § 27-14-4(B).

271.    Defendant eviCore, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements material to  obligations to pay or transmit money or property to the state, or knowingly concealing or knowingly and improperly avoiding or decreasing obligations to pay or transmit money or property to the state, relative to the Medicaid program and/or other state-funded programs, in violation of N.M. STAT. ANN.  § 27-14-4(E).

272.    The State of New Mexico, and/or its agencies or political subdivisions, unaware of the falsity of the claims and/or statements made by Defendant eviCore, and in reliance on the accuracy of these claims and/or statements, paid, and may continue to pay for services that are not medically reasonable and necessary for beneficiaries of health insurance programs funded by the state or its agencies or political subdivisions.

273. As a result of Defendants' actions, as set forth above, the State of New Mexico and/or its agencies or political subdivisions have been, and may continue to be, severely damaged.

**COUNT XIII**
**Violation of North Carolina False Claims Act**
**State of North Carolina vs. eviCore**

274. Relator incorporates herein by reference the preceding paragraphs of the Complaint as though fully set forth herein.

275. This is a civil action brought by Relator on behalf of the State of North Carolina against Defendant eviCore, under the State of North Carolina's False Claims Act, N.C. GEN. STAT. § 1-608(b).

276. The State of North Carolina and/or one of its agents contracted, directly or indirectly, with one or more MCOs in connection with the administration of Medicaid claims and/or claims under other state-funded plans in North Carolina.

277. One or more MCOs, directly or indirectly, contracted with eviCore in connection with the administration of requests for prior authorization of services.

278. eviCore, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly presented or caused to be presented, and may still be presenting or causing to be presented, false or fraudulent claims for payment or approval under the Medicaid program and/or other state-funded programs, in violation of N.C. GEN. STAT. § 1-607(a)(1).

279. eviCore, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements material to false or fraudulent claims to get such false or fraudulent

claims under the Medicaid program and/or other state-funded programs paid for or approved, in violation of N.C. Gen. Stat. § 1-607(a)(2).

280.    eviCore, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements material to  obligations to pay or transmit money or property to the state, or knowingly concealing or knowingly and improperly avoiding or decreasing obligations to pay or transmit money or property to the state, relative to the Medicaid program and/or other state-funded programs, in violation of N.C. Gen. Stat. § 1-607(a)(7).

281.    The State of North Carolina and/or its agencies or political subdivisions, unaware of the falsity of the claims and/or statements made by eviCore, and in reliance on the accuracy of these claims and/or statements, paid, and may continue to pay for services that are not medically reasonable and necessary for beneficiaries of health insurance programs funded by the state or its agencies or political subdivisions.

282.    As a result of Defendants' actions, as set forth above, the State of North Carolina and/or its agencies or political subdivisions have been, and may continue to be, severely damaged

## COUNT XIV
### Violation of Oklahoma Medicaid False Claims Act
### State of Oklahoma vs. eviCore

283.    Relator incorporates herein by reference the preceding paragraphs of the Complaint as though fully set forth herein.  The allegations contained in this Count are based upon information and belief.

284. This is a civil action brought by Relator in the name of the State of Oklahoma against Defendant eviCore, under the Oklahoma Medicaid False Claims Act, OKLA. STAT. ANN. tit. 63, § 5053.2.B.1.

285. The State of Oklahoma and/or one of its agents contracted, directly or indirectly, with one or more MCOs in connection with the administration of Medicaid claims and/or claims under other state-funded plans in Oklahoma.

286. MCOs, directly or indirectly, contracted with eviCore in connection with the administration of requests for prior authorization of services for Oklahoma state-funded plan beneficiaries.

287. Defendant eviCore, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly presented or caused to be presented, and may still be presenting or causing to be presented, false or fraudulent claims for payment or approval under the Medicaid program and/or other state-funded programs, in violation of OKLA. STAT. ANN. tit. 63, § 5053.1.B.1.

288. Defendant eviCore, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements material to false or fraudulent claims to get such false or fraudulent claims under the Medicaid program and/or other state-funded programs paid for or approved, in violation of OKLA. STAT. ANN. tit. 63, § 5053.1.B.2.

289. Defendant eviCore, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used or caused to be made or used, and may still be making, using or causing to

be made or used, false records or statements material to obligations to pay or transmit money or property to the state, or knowingly concealing or knowingly and improperly avoiding or decreasing obligations to pay or transmit money or property to the state, relative to the Medicaid program and/or other state-funded programs, in violation of OKLA. STAT. ANN. tit. 63, § 5053.1.B.7.

290.     The State of Oklahoma, and/or its agencies or political subdivisions, unaware of the falsity of the claims and/or statements made by Defendant eviCore, and in reliance on the accuracy of these claims and/or statements, paid, and may continue to pay for services that are not medically reasonable and necessary for beneficiaries of health insurance programs funded by the state or its agencies or political subdivisions.

291.     As a result of Defendants' actions, as set forth above, the State of Oklahoma and/or its agencies or political subdivisions have been, and may continue to be, severely damaged.

**COUNT XV**
**Violation of Tennessee False Claims Act**
**State of Tennessee vs. eviCore**

292.     Relator incorporates herein by reference the preceding paragraphs of this Complaint as though fully set forth herein.

293.     This is a civil action brought by Relator, on behalf of the State of Tennessee, against Defendants under Tennessee's False Claims Act, Tenn. Code Ann. §71-5-181, et seq.

294.     eviCore, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly presented or caused to be presented, and may still be presenting or causing to be presented, false or fraudulent claims for payment or approval under the Medicaid program, in violation of TENN. CODE ANN. § 71-5-182(a)(l)(A).

295.    eviCore, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements material to false or fraudulent claims to get such false or fraudulent claims under the Medicaid program paid for or approved, in violation of TENN. CODE ANN. § 71-5-182(a)(l)(B).

296.    eviCore, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used, or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements material to   obligations to pay or transmit money or property to the state, or knowingly concealing or knowingly and improperly avoiding or decreasing obligations to pay or transmit money or property to the state, relative to the Medicaid program, in violation of TENN. CODE ANN. § 71-5-182(a)(1)(D).

297.    The State of Tennessee, or its political subdivisions, unaware of the falsity of the claims and/or statements made, or knowingly caused to be made, by eviCore, and in reliance upon the accuracy of these claims and/or statements, paid, and may continue to pay, for services that are not medically reasonable and necessary for beneficiaries of health insurance programs funded by the state or its agencies or political subdivisions.

298.    As a result of Defendants' actions, as set forth above, the State of Tennessee and/or its political subdivisions have been, and may continue to be, severely damaged.

**COUNT XVI**
**Violation of Texas Medicaid Fraud Prevention Act**
**State of Texas vs. eviCore**

299.     Relator incorporates herein by reference the preceding paragraphs of the Complaint as though fully set forth herein. The allegations contained in this Count are based upon information and belief.

300.     This is a civil action brought by Relator in the name of the State of Texas against Defendant eviCore, under the Texas Medicaid Fraud Prevention Act, TEX. HUM. RES. CODE ANN. § 36.101.

301.     The State of Texas and/or one of its agents contracted, directly or indirectly, with one or more MCOs in connection with the administration of Medicaid claims and/or claims under other state-funded plans in Texas.

302.     MCOs, including HCSC, directly or indirectly, contracted with eviCore in connection with the administration of requests for prior authorization of services for Texas state-funded plan beneficiaries.

303.     Defendant eviCore, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly presented or caused to be presented, and may still be presenting or causing to be presented, false or fraudulent claims for payment or approval under the Medicaid program and/or other state-funded programs, in violation of TEX. HUM. RES. CODE ANN. § 36.002(1).

304.     Defendant eviCore, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements material to false or fraudulent claims to get such false

or fraudulent claims under the Medicaid program and/or other state-funded programs paid for or approved, in violation of TEX. HUM. RES. CODE ANN. § 36.002(2).

305.    Defendant eviCore, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements material to  obligations to pay or transmit money or property to the state, or knowingly concealing or knowingly and improperly avoiding or decreasing obligations to pay or transmit money or property to the state, relative to the Medicaid program and/or other state-funded programs, in violation of TEX. HUM. RES. CODE ANN. § 36.002(12).

306.    The State of Texas, and/or its agencies or political subdivisions, unaware of the falsity of the claims and/or statements made by Defendant eviCore, and in reliance on the accuracy of these claims and/or statements, paid, and may continue to pay for services that are not medically reasonable and necessary for beneficiaries of health insurance programs funded by the state or its agencies or political subdivisions.

307.    As a result of Defendants' actions, as set forth above, the State of Texas and/or its agencies or political subdivisions have been, and may continue to be, severely damaged.

## COUNT XVII
### Violation of Washington Medicaid Fraud False Claims Act
### State of Washington vs. eviCore

308.    Relator incorporates herein by reference the preceding paragraphs of the Complaint as though fully set forth herein.  The allegations contained in this Count are based upon information and belief.

309. This is a civil action brought by Relator in the name of the State of Washington against Defendant eviCore, under the Washington Medicaid Fraud False Claims Act, WASH. REV. CODE § 74.66.050.

310. The State of Washington and/or one of its agents contracted, directly or indirectly, with one or more MCOs in connection with the administration of Medicaid claims and/or claims under other state-funded plans in Washington.

311. MCOs, including WellCare, directly or indirectly, contracted with eviCore in connection with the administration of requests for prior authorization of services for Washington state-funded plan beneficiaries.

312. Defendant eviCore, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly presented or caused to be presented, and may still be presenting or causing to be presented, false or fraudulent claims for payment or approval under the Medicaid program and/or other state-funded programs, in violation of WASH. REV. CODE § 74.66.020(1)(a).

313. Defendant eviCore, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements material to false or fraudulent claims to get such false or fraudulent claims under the Medicaid program and/or other state-funded programs paid for or approved, in violation of WASH. REV. CODE § 74.66.020(1)(b).

314. Defendant eviCore, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used or caused to be made or used, and may still be making, using or causing to

be made or used, false records or statements material to obligations to pay or transmit money or property to the state, or knowingly concealing or knowingly and improperly avoiding or decreasing obligations to pay or transmit money or property to the state, relative to the Medicaid program and/or other state-funded programs, in violation of WASH. REV. CODE § 74.66.020(1)(g).

315. The State of Washington, and/or its agencies or political subdivisions, unaware of the falsity of the claims and/or statements made by Defendant eviCore, and in reliance on the accuracy of these claims and/or statements, paid, and may continue to pay for services that are not medically reasonable and necessary for beneficiaries of health insurance programs funded by the state or its agencies or political subdivisions.

316. As a result of Defendants' actions, as set forth above, the State of Washington and/or its agencies or political subdivisions have been, and may continue to be, severely damaged.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Relators pray that judgment be entered against Defendant, ordering as follows:

A.     That Defendant cease and desist from violating 31 U.S.C. § 3729, *et seq.*; ALASKA STAT. § 09.58.010, *et seq.*; CONN. GEN. STAT. § 4-277, *et seq.*; FLA. STAT. ANN. § 68.081, *et seq.*; 740 ILL. COMP. STAT. ANN. 175/1, *et seq.*; LA. REV. STAT. ANN. § 46:437.1, *et seq.*; MICH. COMP. LAWS ANN. § 400.601, *et seq.*; MONT. CODE ANN. § 17-8-401, *et seq.*; N.C. GEN. STAT. § 1-605, *et seq.*; N.J. STAT. ANN. § 2A:32C-1, *et seq.*; N.M. STAT. ANN. § 27-14-1, *et seq.*; N.Y. STATE FIN. LAW § 187, *et seq.*; OKLA. STAT. ANN. tit. 63, § 5053, *et seq.*; TENN. CODE ANN. §71-5-182, *et seq.*; TEX. HUM. RES. CODE ANN. § 36.001, *et seq.*; and WASH. REV. CODE § 74.66.005, *et seq.*;

B.     That civil penalties of not less than $11,181 or more than $22,363 per claim as provided by 31 U.S.C. § 3729(a) and adjusted for inflation be imposed for each and every false or fraudulent claim that Defendant caused to be submitted to the United States and/or its grantees, for each false record or statement Defendant made, used, or caused to be made or used that was material to a false or fraudulent claim, that three times the amount of damages the United States sustained because of Defendants' actions also be imposed;

C.     That judgment be entered in Relator's favor and against Defendants in the amount of the damages sustained by the State of Alaska or its political subdivisions multiplied as provided for in Alaska Stat. § 09.58.010  et seq., plus a civil penalty of not less than $5,500 or more than $11,000 as provided by Alaska Stat. § 09.58.010 et seq.,  and adjusted for inflation, to the extent such multiplied penalties shall fairly compensate the State of Alaska or its political subdivisions for losses resulting from the various schemes undertaken by Defendants, together with penalties

for specific claims to be identified at trial after full discovery and attorney fees and costs as provided by Alaska Stat. § 09.58.010(c).

D.     That judgment be entered in Relators' favor and against Defendants in the amount of the damages sustained by the State of Connecticut multiplied as provided for in Conn. Gen. Stat. § 4-275(b)(2), plus a civil penalty of not less than $11,181 or more than $22,363 for each act in violation of the State of Connecticut False Claims Act, as provided by Conn. Gen. Stat. § 4-275(b)(1) and adjusted for inflation, to the extent such multiplied penalties shall fairly compensate the State of Connecticut for losses resulting from the various schemes undertaken by Defendants, together with penalties for specific claims to be identified at trial after full discovery.

E.     That judgment be entered in Relators' favor and against Defendants in the amount of the damages sustained by the State of Florida or its agencies or political subdivisions, multiplied as provided for in FLA. STAT. ANN. § 68.082(2), plus a civil penalty of not less than five thousand five hundred dollars ($5,500) or more than eleven thousand dollars ($11,000), as provided by FLA. STAT. ANN. § 68.082, to the extent such penalties shall fairly compensate the State of Florida or its agencies or political subdivisions for losses resulting from the various schemes undertaken by Defendant, together with penalties for specific claims to be identified at trial after full discovery;

F.     That judgment be entered in Relators' favor and against Defendant in the amount of the damages sustained by the State of Illinois or its agencies or political subdivisions, multiplied as provided for in 740 ILL. COMP. STAT. ANN. 175/3(a)(1), plus a civil penalty of not less than $11,181 or more than $22,363, as provided for in 740 ILL. COMP. STAT. ANN. 175/3(a)(1) and adjusted for inflation, and the costs of this civil action as provided by 740 ILL. COMP. STAT. ANN. 175/3(a)(2),  to the extent such penalties shall fairly compensate the State of Illinois or its

agencies or political subdivisions for losses resulting from the various schemes undertaken by Defendant, together with penalties for specific claims to be identified at trial after full discovery;

G.     That judgment be entered in Relators' favor and against Defendant in the amount of the damages sustained by the State of Louisiana or its agencies or political subdivisions, plus a fine of not to exceed ten thousand dollars ($10,000) or three times the value of the illegal remuneration, whichever is greater, as provided for in LA. REV. STAT. ANN. § 46:438.6, plus a civil penalty of not less than five thousand five hundred dollars ($5,500) or more than eleven thousand dollars ($11,000) for each act in violation of the Louisiana Medical Assistance Programs Integrity Law, to the extent such penalties shall fairly compensate the State of Louisiana for losses resulting from the various schemes undertaken by Defendant, together with penalties for specific claims to be identified at trial after full discovery;

H.     That judgment be entered in Relators' favor and against Defendant in the amount of damages sustained by the State of Michigan or its agencies or political subdivisions, for the value of payments or benefits provided, directly or indirectly, as a result of Defendants' unlawful acts, as provided for in MICH. COMP. LAWS ANN. §§ 400.603 – 400.606, 400.610b, in order to fairly compensate the State of Michigan or its agencies or political subdivisions for losses resulting from the various schemes undertaken by Defendant, together with penalties for specific claims to be identified at trial after full discovery;

I.     That judgment be entered in Relators' favor and against Defendants in the amount of the damages sustained by the State of Montana or its agencies or political subdivisions, multiplied times three, as provided for in MONT. CODE ANN. § 17-8-403, plus a civil penalty of not less than five thousand five hundred dollars ($5,500) or more than eleven thousand dollars ($11,000) for each act in violation of the Montana False Claims Act, and the attorney fees,

expenses, and costs of this civil action as provided by MONT. CODE ANN. § 17-8-403, to the extent such penalties shall fairly compensate the State of Montana for losses resulting from the various schemes undertaken by Defendant, together with penalties for specific claims to be identified at trial after full discovery;

J.　　That judgment be entered in Relators' favor and against Defendants in the amount of the damages sustained by the State of New Jersey or its agencies or political subdivisions, multiplied as provided for in N.J. STAT. ANN. § 2A:32C-3, plus a civil penalty of not less than $11,181 or more than $22,363 as allowed under the federal False Claims Act (31 U.S.C. § 3729 et seq.) for each act in violation, to the extent such penalties shall fairly compensate the State of New Jersey or its agencies or political subdivisions for losses resulting from the various schemes undertaken by Defendant, together with penalties for specific claims to be identified at trial after full discovery;

K.　　That judgment be entered in Relators' favor and against Defendants in the amount of the damages sustained by the State of New Mexico or its agencies or political subdivisions, multiplied times three, as provided for in N.M. STAT. ANN. §§ 27-14-2, 27-14-4, plus a civil penalty of not less than $5,000 and not more than $10,000 for each claim as provided by N.M. STAT. ANN. 44-9-3 , and attorney fees and costs of this civil action as provided by N.M. STAT. ANN. 44-9-1 et seq. and N.M. STAT. ANN. 27-14-1 et seq., to the extent such penalties shall fairly compensate the State of New Mexico for losses resulting from the various schemes undertaken by Defendant, together with penalties for specific claims to be identified at trial after full discovery;

L.　　That judgment be entered in Relators' favor and against Defendants in the amount of damages sustained by the State of New York or its agencies or political subdivisions, multiplied as provided for in N.Y. STATE FIN. LAW § 189(1)(h), plus a civil penalty of not less than six

thousand dollars ($6,000) or more than twelve thousand dollars ($12,000) for each false claim, pursuant to N.Y. STATE FIN. LAW § 189(1)(h), to the extent such penalties shall fairly compensate the State of New York or its agencies or political subdivisions for losses resulting from the various schemes undertaken by Defendant, together with penalties for specific claims to be identified at trial after full discovery;

      M.     That judgment be entered in Relator's favor and against Defendants in the amount of the damages sustained by the State of North Carolina, multiplied as provided for in N.C. Gen. Stat. § 1-605 et seq., plus a civil penalty of not less than $5,500 and not more than $11,000 for each violation as provided by N.C. Gen. Stat. § 1-607, and the costs of this civil action as provided by N.C. Gen. Stat. § 1-607, to the extent such penalties shall fairly compensate the State of North Carolina for losses resulting from the various schemes undertaken by Defendants, together with penalties for specific claims to be identified at trial after full discovery.

      N.     That judgment be entered in Relators' favor and against Defendants in the amount of the damages sustained by the State of Oklahoma or its agencies or political subdivisions, multiplied times three, as provided for in OKLA. STAT. ANN. tit. 63, § 5053.1, plus a civil penalty of not less than $11,181 or more than $22,363 as provided by OKLA. STAT. ANN. tit. 63, § 5053.1(B) and adjusted for inflation, to the extent such penalties shall fairly compensate the State of Oklahoma for losses resulting from the various schemes undertaken by Defendant, together with penalties for specific claims to be identified at trial after full discovery;

      O.     That judgment be entered in Relator's favor and against Defendants in the amount of the damages sustained by the State of Tennessee, multiplied as provided for in Tenn. Code Ann. § 71-5-181, et seq., plus a civil penalty of not less than $5,000 and not more than $25,000 and adjusted for inflation as provided by Tenn. Code Ann. § 71-5-182, and the costs of this civil action

as provided by Tenn. Code Ann. § 71-5-182, to the extent such penalties shall fairly compensate the State of Tennessee for losses resulting from the various schemes undertaken by Defendants, together with penalties for specific claims to be identified at trial after full discovery.

P.    That judgment be entered in Relators' favor and against Defendants in the amount of the damages sustained by the State of Texas or its agencies or political subdivisions, multiplied times two, as provided for in TEX. HUM. RES. CODE ANN. § 36.052, plus a civil penalty of not less than $11,181 or more than $22,363, pursuant to TEX. HUM. RES. CODE ANN. § 36.052(a)(3) and adjusted for inflation, to the extent such penalties shall fairly compensate the State of Texas for losses resulting from the various schemes undertaken by Defendant, together with penalties for specific claims to be identified at trial after full discovery;

Q.    That judgment be entered in Relators' favor and against Defendants in the amount of the damages sustained by the State of Washington or its agencies or political subdivisions, multiplied times three, as provided for in WASH. REV. CODE § 74.66.020, plus a civil penalty of not less than the greater of $10,957 or the minimum inflation adjusted penalty amount imposed as provided by 31 U.S.C. § 3729(a) and not more than the greater of $21,916 or the maximum inflation adjusted penalty amount imposed as provided by 31 U.S.C. § 3729(a) for each act in violation of the Washington Medicaid Fraud False Claims Act, to the extent such penalties shall fairly compensate the State of Washington for losses resulting from the various schemes undertaken by Defendant, together with penalties for specific claims to be identified at trial after full discovery; and

R.    That Defendants be enjoined from concealing, removing, encumbering, or disposing of assets which may be required to pay the civil monetary penalties imposed by the Court;

S.    That Defendants disgorge all sums by which they have been enriched unjustly by their wrongful conduct;

T.    That Relators be awarded the maximum amount allowed pursuant to 31 U.S.C. § 3730(d) and § 3730(h), ALASKA STAT. § 09.58.010, *et seq.*; CONN. GEN. STAT. § 4-277, *et seq.*, FLA. STAT. ANN. § 68.081, *et seq.*, 740 ILL. COMP. STAT. ANN. 175/1, *et seq.*, LA. REV. STAT. ANN. § 46:437.1, *et seq.*, MICH. COMP. LAWS ANN. § 400.601, *et seq*; MONT. CODE ANN. § 17-8-401, *et seq.*; N.C. GEN. STAT. § 1-605, *et seq.*; N.J. STAT. ANN. § 2A:32C-1, *et seq.*, N.M. STAT. ANN. § 27-14-1, *et seq.*, N.Y. STATE FIN. LAW § 187, *et seq.*, OKLA. STAT. ANN. tit. 63, § 5053, *et seq.*; TENN. CODE ANN. §71-5-182, *et seq.*; TEX. HUM. RES. CODE ANN. § 36.001, *et seq*; and WASH. REV. CODE § 74.66.005, *et seq.*;

U.    That Relators be awarded all costs, including but not limited to, court costs, expert fees and all attorney fees, costs and expenses incurred by Relators in the prosecution of this suit; and

V.    That Relators be granted such other and further relief as the Court deems just and proper.

## JURY TRIAL DEMAND

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, SW Challenger demands a trial by jury of all issues so triable.

DATED:     March 20, 2019

Respectfully submitted,

**SEEGER WEISS LLP**

By: _Stephen L. Weiss_

Stephen A. Weiss, Esq.
Maxwell H. Kelly, Esq.
77 Water Street, 8th Fl
New York, NY 10005
Tel:    (212)-584-0700
sweiss@seegerweiss.com
mkelly@seegerweiss.com

SEEGER WEISS LLP
Christopher L. Ayers, Esq.
55 Challenger Road, 6th Fl
Ridgefield Park, NJ 07660
Tel:    (973) 639-9100
cayers@seegerweiss.com

*Counsel for Plaintiff SW Challenger, LLC*