```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 8/13/2021
```

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-----------------------------------X
                                   :
UNITED STATES OF AMERICA           :
*ex rel.* SW CHALLENGER, LLC, et al.,:
                                   :      19 Civ. 2501 (VM)
                    Plaintiffs,    :
                                   :
         - against -               :      **DECISION AND ORDER**
                                   :
EVICORE HEALTHCARE MSI, LLC,       :
                                   :
                    Defendant.     :
                                   :
-----------------------------------X

**VICTOR MARRERO, United States District Judge**

Plaintiff relator, SW Challenger, LLC, on behalf of the United States and the states of Alaska, California, Connecticut, Florida, Illinois, Louisiana, Michigan, Montana, New Jersey, New Mexico, New York, North Carolina, Oklahoma, Tennessee, Texas, and Washington (the "Qui Tam States"), and Jane Doe 1 and Jane Doe 2 (together with the forgoing entities, "Relators"), filed the second amended complaint in this action on September 23, 2020. (See "SAC," Dkt. No. 15.) The SAC brings twenty-two causes of action against eviCore Healthcare MSI, LLC ("eviCore") alleging healthcare fraud in violation of the False Claims Act ("FCA"), 31 U.S.C. §§ 3729, et seq., and various analogous state laws.

Now before the Court is eviCore's motion to dismiss the SAC. (See "Motion," Dkt. No. 21.) For the reasons set forth below, the Motion is GRANTED.

## I.    BACKGROUND

A.   FACTS[1]

This qui tam[2] action arises from eviCore's alleged practice, beginning as early November 2016, of automatically approving medical services without undertaking the proper review. According to Relators, eviCore contracted with health-insurance companies covering certain Medicare and Medicaid beneficiaries to provide prior authorization and utilization management services that it did not actually provide. Relators also allege that eviCore retaliated against two employees, Jane Doe 1 and Jane Doe 2, by taking adverse action against them when they refused to engage in the alleged fraudulent scheme.

Relators allege that they have "direct personal knowledge" of eviCore's auto-approval of physical therapy treatment. (SAC ¶ 24.) With respect to eviCore's other alleged

---

[1] Except as otherwise noted, the following background derives from the SAC. The Court takes all facts alleged therein as true and construes the justifiable inferences arising therefrom in the light most favorable to Plaintiff, as required under the standard set forth in Section II, infra. See Spool v. World Child Int'l Adoption Agency, 520 F.3d 178, 180 (2d Cir. 2008) (citing GICC Cap. Corp. v. Tech. Fin. Grp., Inc., 67 F.3d 463, 465 (2d Cir. 1995)); see also Chambers v. Time Warner, Inc., 282 F.3d 147, 152 (2d Cir. 2002). Except when specifically quoted, no further citation will be made to the SAC.

[2] Under the qui tam provisions of the FCA, private persons "may bring a civil action for a violation of section 3729 for the person and for the United States Government." 31 U.S.C. § 3730(b)(1). Such suits are brought "in the name of the Government," and the plaintiffs bringing such suits are called "relators." United States ex rel. Woods v. Empire Blue Cross and Blue Shield, No. 99 Civ. 4968, 2002 WL 1905899, at *4 (S.D.N.Y. 2002) (citing 31 U.S.C. § 3730(b)(2)).

auto-approval processes, Relators acknowledge that they do not have firsthand knowledge, but assert that "through their interactions with other reviewers working at eviCore, they learned that these procedures were not limited to physical therapy." (Id.)

1.   Program Structure

Relators allege fraud with respect to two programs: Medicare Advantage and Medicaid. The federal Medicare program provides healthcare benefits to elderly and disabled people, while Medicaid, a joint federal and state program, provides healthcare benefits to indigent and disabled people.[3] The Centers for Medicare and Medicaid Services ("CMS") is the federal agency that administers both the Medicare and Medicaid programs. CMS does not itself provide healthcare to qualifying individuals. Instead, CMS contracts with private health-insurance companies (known as managed care organizations ("MCOs")), that in turn approve and distribute funds for healthcare services to providers, such as hospitals, nursing facilities, rehabilitation facilities, and home health agencies. Those providers then deliver the care directly to program beneficiaries.

When a medical service is approved, the patient receives

---

[3] Medicare is set forth in subchapter XVIII of the Social Security Act. 42 U.S.C. § 1395c. Medicaid is set forth in subchapter XIX of that Act. Id. §§ 1396-1, 1396a.

the service from the provider, and the provider then submits the bill to the payor, and the payor pays for the service. In the case of Medicare Advantage and Medicaid Plans, the ultimate payor is the Government. Under Medicare Part C, or "Medicare Advantage," CMS pays MCOs an amount calculated based on the number of beneficiaries enrolled, rather than the number or cost of services provided. This amount is adjusted based on the beneficiaries' health status and other factors. As a joint program, Medicaid is funded by both the federal government and the states. The federal portion is known as the Federal Medical Assistance Percentage ("FMAP"). FMAP is calculated based on a state's per capita income as compared to the national average, and, like Medicare Advantage, is not reimbursed on a per-service basis.

2.   <u>EviCore's Role</u>

EviCore is not an MCO. Rather, eviCore contracts with MCOs to provide utilization management and prior authorization services. "Utilization management" and "prior authorization" are terms of art in the healthcare industry that describe the review of claims for payment and the provision of reimbursement determinations for services ordered by doctors and other health professionals. The SAC does not define these terms but broadly alleges that by contracting to provide utilization management and prior

4

authorization, eviCore agreed to review requests submitted by doctors and other providers to determine whether the proposed medical procedures were covered under the plans.

Whether a procedure is covered depends on a particular MCO's internal rules, which in turn are subject to federal, and in some cases state, law. Relators have not identified any specific MCO contracts at issue here that governed eviCore's utilization management or prior authorization services. Instead, Relators assert that, by contracting with MCOs to provide these "core" functions in the administration of Medicare Advantage and Medicaid plans, "eviCore has agreed to comply with all applicable Medicare and Medicaid laws, regulations, and CMS instructions." (SAC ¶ 11.)

Under these guidelines, according to Relators, requests for payment for Medicare Advantage beneficiaries should be approved only when the requested services are "reasonable and necessary." (SAC ¶ 66.) For Medicaid, Relators acknowledge that "medical necessity" is not explicitly defined in the Medicaid Act, but the law does require states to maintain procedures to safeguard against unnecessary utilization and empowers states to limit reimbursable services based on criteria such as "medical necessity."

3.  <u>EviCore's Alleged Auto-Approval Scheme</u>

In instances involving eviCore, when a physician or

other provider determines that a Medicare Advantage or Medicaid beneficiary requires a medical service for which prior authorization is required, the provider submits a request to eviCore. When a request is submitted, eviCore enters the information into one of two request management systems -- either "Image One" or "ISAAC" -- depending on the type of request. (SAC ¶ 89.) From there, the SAC's allegations regarding the typical practice are sparse. What is clear, however, is that some combination of human and machine review follows.

The humans involved in the process are healthcare professionals, called clinical reviewers, who are trained in the application of utilization review criteria and MCO rules. EviCore also uses, seemingly among other automation tools, a data analytics system, called CorePath, to automate prior authorization requests. Relators allege that, for each request, clinical reviewers are supposed determine whether the service is medically necessary before prior authorization will be approved. If after review there is insufficient information for clinical reviewers to make a determination, they are supposed to request the necessary additional documentation and place the case on hold pending investigation. Instead, however, Relators allege that the clinical reviewers do not review these automated

determinations because of "a variety of interlocking schemes" to ensure fast, low-cost review. (SAC ¶ 98.)

These "schemes" were designed, according to Relators, because MCOs' contracts with eviCore include a timing provision, requiring eviCore to review each request for prior authorization quickly, in many cases, within 24 to 48 hours. Failure to meet these timelines results in monetary penalties. Relators allege that eviCore did not hire enough staff to properly service its MCO subcontracts and meet these deadlines. Thus, Relators allege, "for certain cases eviCore created a swinging gate prior authorization approval process that approved anything and everything that passed before it," and in those instances, eviCore "provided worthless services in exchange for its contractual payment." (SAC ¶ 21.)

      a.   CorePath

Relators allege that the CorePath data analytics system involves automation that is "not based on valid and reliable clinical information and evidenced-based clinical guidelines, but rather on criteria that do not meaningfully determine the proper need and scope for services, such as the number of visits at issue." (SAC ¶ 91.) To support this allegation, Relators cite a handful of documents indicating not that CorePath was designed to auto-approve all requests, but that its goal was to allow eviCore to handle a high volume of

requests efficiently.

For example, the SAC references a September 14, 2017 phone call in which eviCore's musculoskeletal product advisor indicated that eviCore's expansion would increase the number of requests, and it would be impossible for clinical reviewers to keep pace with the increased volume. Thus, this advisor worked on developing CorePath artificial intelligence for pediatric occupational and physical therapy, which would automatically approve the first and second such requests from a provider without clinical review. Similarly, an internal eviCore email dated October 26, 2017 described the CorePath system as requiring providers to respond to a "limited set of clinical question[s]" as part of their requests. (SAC ¶ 117.) The email described CorePath's "primary intention" as being "to resolve a high majority of episodes of care without requiring any practitioner review." (Id.) Likewise, in a September 15, 2018 phone call, eviCore Vice President for Clinical Content and Integration stated that the automated process was intended to make eviCore's utilization review scalable. Relators further allege that minutes from a July 23, 2019 meeting indicate that, during a time of high queue volume, senior leadership at eviCore adjusted CorePath to include auto-approvals of every second request for visits.

According to Relators, CorePath's automation processes

have allegedly been used at eviCore since March 2019 for certain providers across several states including at least Arkansas, Connecticut, Illinois, Kentucky, Louisiana, Maine, Missouri, Mississippi, New Mexico, New York, North Carolina, Oklahoma, South Carolina, Tennessee, and Texas.

b.   Image One

Relators allege that eviCore's Image One software also restricts clinical reviewers from meaningfully examining requests. In particular, Relators allege that Image One makes it impossible to deny certain categories of requests. As an example, Relators allege that on September 6, 2017, the manager of Musculoskeletal Specialized Therapy indicated that she had found a logic problem in the Image One system, by which certain cases were subject to an auto-approval directive but the Image One system did not prevent adverse determinations. The same manager indicated in a March 7, 2018 email that an IT update was required because the system prohibited denials.

c.   Auto-Approval Directives

Relators also allege that eviCore directed its clinical reviewers to auto-approve services requested in certain jurisdictions, among certain populations, for certain categories of services, or under certain healthcare plans. To support this allegation, Relators cite an October 27, 2017

9

email in which eviCore's Senior Vice President of Program Operations and its Chief Medical Director directed that Blue Cross Blue Shield Texas requests for pediatric treatment be auto-approved. At that time, Blue Cross Blue Shield Texas expected full medical-necessity review. Relators allege that at a meeting approximately one month after this email, however, an eviCore provider-relationships representative and Vice President at Blue Cross Blue Shield Texas *agreed* that pediatric developmental requests would be auto-approved for a six-month period to satisfy certain providers and mitigate complaints. According to Relators, eviCore never reimplemented full medical-necessity review after that six-month period.

Relators also cite two internal eviCore documents with the words "auto-approval" in the titles. One document, titled "Auto-Approvals (IO-CDP) 6-1-20," states "<u>[a]pprovals by QPID-sPA-PI-UPADS are not health plan directed approvals.</u> These are approvals based on survey responses and other data collected by the system." (SAC ¶ 105.) Relators allege that this same notation is located in another internal eviCore document titled "Auto Approvals (ISAAC) 5-11-20." (<u>Id.</u>)

An October 28, 2017 email from the manager of Musculoskeletal Specialized Therapy noted: "[A]ny Passport cases with a start date of 11/1/17 or later requires medical

10

necessity review. A start date of 10/31/17 or before remains auto approval." (Id. ¶ 109.) The following month, on November 8, 2017, the same manager described cases in which clinical reviewers were "auto approving . . . significantly more visits than we would approve." (Id. ¶ 111.) She subsequently requested egregious examples of such auto-approvals to use at an upcoming meeting and cited a case in which 200 visits for an ankle sprain had been approved.

Relators allege that over Labor Day Weekend in 2018, eviCore established a protocol to approve the first three requests for any course of care, and this protocol continued for 126 days while request volumes were high.

> d.   Additional Evidence

Relators allege that on March 23, 2018, the manager of Musculoskeletal Specialized Therapy directed pediatric physical therapy clinical reviewers to review occupational-therapy requests. According to Relators, staffing clinical reviewers to cases outside their expertise occurs because of the auto-approval scheme, in which requests are approved regardless of need. The SAC alleges that one medical reviewer, Jaimie Clodfelter, was regularly asked to approve or review surgical requests, despite the fact that she is not a surgeon and does not have the experience necessary to meaningfully review these requests.

As further evidence of the scheme, Relators allege that eviCore began to remove or obscure references to automatic approval beginning in early February 2019. However, eviCore maintained its auto-approval practices under different titles. Relators point to an October 3, 2019 WebEx meeting for a Texas Fair Hearing in which an eviCore employee allegedly misrepresented that an approval was based on a medical-necessity review. In a later telephone conversation, this employee allegedly asked one of the Relators to "help her craft a plausible medical necessity explanation for the auto-approval review decision." (SAC ¶ 128.)

Relators allege that the majority of services that resulted from eviCore's scheme were approved for payment, performed, and reimbursed, even though none of the requests had been properly reviewed for medical necessity. Thus, according to Relators, eviCore received millions of dollars to perform services which either never happened or were undertaken in a worthless fashion. Relators allege that the scheme cost CMS, the Qui Tam States and its MCOs significant amounts of money, and in some cases created the risk of patient harm.

4.   EviCore's Alleged Retaliation

Relators further allege that Jane Doe 1 and Jane Doe 2 tried to reform eviCore's auto-approval processes and were

retaliated against as a result. Jane Doe 1 was a clinical reviewer who was assigned to improve certain of eviCore's pediatric guidelines. Relators contend that because of her work, Jane Doe 1 was familiar with the authorization process at eviCore. The SAC alleges that Jane Doe 1 learned about the compliance whitewashing and auto-approvals while working on a project to update clinical review job aids and certain administrative algorithms between January 2018 and January 2020.

Jane Doe 1 emailed eviCore's Compliance Department on February 8, 2019, reporting her concerns with eviCore's auto-approval processes. On February 22, 2019, the Compliance Department directed the removal of "auto-approval" language from job aids but did not change the review process. The following month, Jane Doe 1 participated in meetings on March 13 and 15, 2019 between eviCore and WellCare senior management in which she voiced her concerns. According to Relators, shortly thereafter, her manager informed Jane Doe 1 that she was not permitted to accept meeting requests without first checking with her direct manager. Then, in May 2019, Jane Doe 1's role was limited to reviewing prior authorizations. Lastly, during the COVID-19 pandemic, a notice was sent to all employees stating that they were not expected to reach prior productivity levels; however, Jane Doe 1 allegedly

received a verbal warning from her manager that she needed to meet her productivity requirements. The SAC alleges that because of this, Jane Doe 1 was "forced" to resign in March 2020. (SAC ¶ 150.)

Jane Doe 2 was also a clinical reviewer at eviCore. In mid-September 2017, Jane Doe 1 and Jane Doe 2 worked together to develop a pediatric pathway for CorePath. On September 15, 2017, Jane Doe 2 expressed her concerns to eviCore Vice President for Clinical Content and Integration about whether the system could make the same evidence-based review decisions a clinical reviewer would in light of the complexity of pediatric decisions. The SAC alleges that Jane Doe 2 was removed from meetings with the team thereafter.

In September 2019, Jane Doe 2 notified an audit manager and the Manager of Clinical Review that a particular decision required additional information. On a December 27, 2019 phone call, Jane Doe 2 was reprimanded by her manager and eviCore's director of therapy for "directing care." (Id. ¶ 157.) After the call, Jane Doe 2 was removed from certain teams.

On March 29, 2020, Jane Doe 2 again reported concerns about eviCore's auto-approval processes to the Compliance Department. Jane Doe 2 also received an email during the COVID-19 pandemic that reprimanded her regarding her low productivity despite a company-wide reduction in productivity

expectations. The SAC alleges that Jane Doe 2, like Jane Doe 1, was "forced" to quit. (SAC ¶ 163.)

B.   <u>PROCEDURAL HISTORY</u>

The initial complaint in this action was filed under seal on March 20, 2019. (Dkt. No. 36.) The case remained under seal while the federal government and the Qui Tam States determined whether to intervene. <u>See</u> 31 U.S.C. § 3730(b)(2), (3). On January 21, 2020, the Government filed a declination notice on its own behalf and on behalf of the Qui Tam States, indicating that neither it nor the Qui Tam States intended to intervene in the action. (<u>See</u> Dkt. No. 35.) On May 21, 2020, Relators filed the first amended complaint under seal. (Dkt. No. 7.) The Court ordered the case unsealed in June 2020, and Relators moved to further amend the complaint on September 22, 2020. (Dkt. No. 11.) The Court granted the motion, and Relators filed the SAC on September 23, 2020. (Dkt. No. 15.)

The SAC charges eviCore with presenting a false claim, in violation of 31 U.S.C. § 3729(a)(1)(A) ("Count One"); making or using a false record or statement material to a false claim, in violation of <u>id.</u> § 3729(a)(1)(B) ("Count Two"); making or using a false record to avoid an obligation to pay the federal government (<u>i.e.</u>, a "reverse false claim"), in violation of <u>id.</u> § 3729(a)(1)(G) ("Count Three"); conspiring to violate the FCA, in violation of <u>id.</u>

§ 3729(a)(l)(C) ("Count Four"); violations of analogous state laws ("Counts Five through Twenty"); and two retaliation counts for the alleged constructive discharges of Jane Doe 1 and Jane Doe 2 in violation of id. § 3730(h) ("Counts Twenty-One through Twenty-Two").

The parties exchanged premotion letters pursuant to the Court's Individual Practices on November 12, 19, and 20, 2020. (Dkt. Nos. 17-19.) Defendant eviCore then moved to dismiss the SAC on November 23, 2020. (See Motion.) EviCore also filed a memorandum of law in support of the Motion. ("EviCore's Br.," Dkt. No. 22.) Relators opposed the Motion on January 22, 2021. ("Relators' Br.," Dkt. No. 31.) While the United States and the Qui Tam States declined to intervene in the action, the Government submitted a statement of interest on March 1, 2021 to clarify certain issues relevant to resolving the Motion. (See "SOI," Dkt. No. 39.) EviCore filed its reply memorandum of law in further support of the Motion on April 12, 2021. ("Reply," Dkt. No. 42.)

C.   THE PARTIES' ARGUMENTS

EviCore argues that Count One must be dismissed because the SAC "does not identify any specific false claims" approved by eviCore or any false claims that an MCO submitted to CMS because of an eviCore approval. (EviCore's Br. at 10-11.) Similarly, because MCOs do not submit "claims" to CMS for

eviCore-approved services, the SAC fails to allege that eviCore "caused MCOs to submit false claims to the government." (Id. at 11.) These pleading deficiencies, according to eviCore, also render the SAC fatally flawed under Federal Rule of Civil Procedure ("Rule") 9(b). EviCore additionally contends that under Rule 9(b), Relators are required to plead the FCA violations with specificity, but instead, Relators never identify a single service that eviCore erroneously approved, a claim for such service submitted to CMS, who submitted such claim when, or what payment MCO sought from CMS in connection with the allegedly false claim. Similarly, eviCore contends that the SAC does not identify any statute or contract term that eviCore allegedly violated. EviCore further argues that Relators failed to plausibly allege that, under Second Circuit precedent, the services eviCore provided were "worthless." (Id. at 15-16.)

EviCore contends that Count Two should be dismissed because Relators failed to identify any material, knowingly false statements made by eviCore. Count Three should be dismissed, according to eviCore, for the same reasons and because Relators have not alleged that eviCore avoided paying money owed to the Government. On Count Four, eviCore argues that Relators have failed to establish a conspiracy because the SAC does not identify anyone outside eviCore with whom

17

eviCore allegedly conspired. EviCore insists that the various state-law claims in Counts Five through Twenty must also fail for the same reasons as the federal claims. EviCore argues that the retaliation claims in Counts Twenty-One through Twenty-Two must be dismissed because Relators have failed to plausibly allege adverse action on eviCore's part or constructive discharge. EviCore additionally argues that the statute of limitations bars claims made before May 2014 because eviCore has no means of determining whether the SAC relates back to the initial complaint under Rule 15.

In response, Relators argue that they need not allege any false claims made directly to the Government and can instead rely on allegations of false claims made to MCOs, who receive and distribute federal funds. Relators insist that allegations of specific auto-approval protocols satisfy Rule 9(b) because they "lead to a strong inference that specific claims were indeed submitted." (Relators' Br. at 6 (quoting United States ex rel. Chorches for Bankr. Est. of Fabula v. Am. Med. Response, Inc., 865 F.3d 71, 86 (2d Cir. 2017)).) Relators challenge eviCore's argument that no specific breaches of either statutes or contracts are alleged, and they point out that they have sufficiently pleaded that eviCore entered contracts with MCOs. Relators further argue that the services eviCore provided were "worthless" under

18

Second Circuit precedent. Relators adequately pleaded knowledge, they insist, by alleging a noncompliant auto-approval scheme and eviCore's efforts to "whitewash this fraud." (Id. at 13.) The allegations of motive and opportunity, according to Relators, also meet the pleading requirements for scienter. Relators argue that the SAC plausibly alleges false statements by generally outlining the fraudulent scheme.

On Count Three, Relators argue that the SAC adequately pleads "reverse false claims" by alleging that eviCore decided to "retain, rather than return," funds it was paid for services it did not provide. (Id. at 16.) Relators argue that the state-law claims in Counts Five through Twenty are not identical to the federal claims, and point specifically to the Texas false claims statute, which Relators characterize as broader than the FCA. Relators contend that the remaining state-law claims have been plausibly alleged because the SAC makes out a "nationwide fraudulent scheme." (Id. at 20.) Regarding the SAC's retaliation claims, Relators contend that the allegations are sufficient, and no more specificity or detail is required.[4] Relators further argue that the statute of limitations does not bar claims after March 2013 -- not May 2014 -- because the SAC relates back to

---

[4] Relators do not address eviCore's arguments urging dismissal of the conspiracy charged in Count Four.

19

the initial complaint.

    While the Government declined to intervene in the action, it nevertheless submitted a statement of interest, arguing that claims made to contractors are "encompassed within the meaning of 'claim' under the FCA," and that it is not fatal that the submission of the allegedly false claims were not made directly to the Government. (SOI at 7.) The Government additionally clarifies that the approval of medically unnecessary treatment could give rise to false claims by causing the provider to bill for unnecessary treatment, billing for review services that were not provided, or indirectly affecting CMS's calculation of capitation rates.

## II.   LEGAL STANDARD

A.   RULE 12(b)(6)

    "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). This standard is met "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id. A complaint should be dismissed if the plaintiff has not offered factual allegations sufficient to render the claims facially

20

plausible. <u>See</u> <u>id.</u> However, a court should not dismiss a complaint for failure to state a claim if the factual allegations sufficiently "raise a right to relief about the speculative level." <u>Twombly</u>, 550 U.S. at 555.

In resolving a motion to dismiss, the Court's task is "to assess the legal feasibility of the complaint, not to assay the weight of the evidence which might be offered in support thereof." <u>In re Initial Pub. Offering Sec. Litig.</u>, 383 F. Supp. 2d 566, 574 (S.D.N.Y. 2005) (internal quotation marks omitted), <u>aff'd sub nom.</u> <u>Tenney v. Credit Suisse First Bos. Corp.</u>, No. 05 Civ. 3430, 2006 WL 1423785 (2d Cir. May 19, 2006). In this context, the Court must draw reasonable inferences in favor of the nonmoving party. <u>See</u> <u>Chambers v. TimeWarner, Inc.</u>, 282 F.3d 147, 152 (2d Cir. 2002). However, the requirement that a court accept the factual allegations in the complaint as true does not extend to legal conclusions. <u>See</u> <u>Iqbal</u>, 556 U.S. at 678.

B.   <u>RULE 9(b)</u>

"Qui tam complaints filed under the FCA, because they are claims of fraud, are subject to Rule 9(b)." <u>Chorches</u>, 865 F.3d at 81. Rule 9(b) requires that "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). To satisfy this Rule, a complaint alleging fraud must

"(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." <u>United States ex rel. Ladas v. Exelis, Inc.</u>, 824 F.3d 16, 25 (2d Cir. 2016) (citation omitted).

"Underlying schemes and other wrongful activities that result in the submission of fraudulent claims are included in the 'circumstances constituting fraud or mistake' that must be pled with particularity pursuant to Rule 9(b)." <u>United States ex rel. Polansky v. Pfizer, Inc.</u>, No. 04 Civ. 0704, 2009 WL 1456582, at *5 (E.D.N.Y. May 22, 2009) (citation omitted).

"Rule 9(b) also applies to claims brought under state analogues of the FCA in federal court." <u>United States v. Lab'y Corp. of Am. Holdings</u>, No. 107 Civ. 05696, 2015 WL 7292774, at *3 (S.D.N.Y. Nov. 17, 2015) (citations omitted). However, retaliation claims are not subject to Rule 9(b). <u>See</u> <u>Chorches</u>, 865 F.3d at 95 ("The particularity requirement of Rule 9(b) does not apply to retaliation claims under the FCA." (citations omitted)).

## III. DISCUSSION

As an initial matter, the Court is unpersuaded by eviCore's argument in a footnote that the Court lacks

jurisdiction over this action under Section 3730(e)(4) of the FCA. (See EviCore's Br. at 3 n.4.) Section 3730(e)(4)(A) provides that claims under this section shall be dismissed "if substantially the same allegations or transactions as alleged in the action or claim were publicly disclosed . . . unless. . . the person bringing the action is an original source of the information." 31 U.S.C. § 3730(e)(4)(A). The SAC alleges that Relators are indeed the "original source" of the allegations in the SAC. SAC ¶ 42; see J.S. ex rel. N.S. v. Attica Cent. Sch., 386 F.3d 107, 110 (2d Cir. 2004) (explaining that when deciding motions to dismiss for lack of subject-matter jurisdiction, courts "must accept as true all material factual allegations in the complaint"). Moreover, eviCore has not established that the "public disclosures" it cites are the "basis" of the claims here. While the action against eviCore's predecessor CareCore may have thematic overlap with this one (see SAC ¶ 53), the claims here relate to eviCore, *not* CareCore, and stem from alleged wrongdoing during a later, distinct time period. The Court declines, therefore, to dismiss the action under the "public disclosure" bar.

A.    COUNTS ONE AND TWO: FALSE CLAIMS

The Court dismisses Counts One and Two because Relators have failed to adequately plead falsity or plead their claims

with sufficient particularity to satisfy Rule 9(b).[5] Under
these two subsections of the FCA -- 31 U.S.C. §§ 3729(a)(1)(A)
and (B) -- an entity is liable when it either "knowingly
presents, or causes to be presented, a false or fraudulent
claim for payment or approval," or "knowingly makes, uses, or
causes to be made or used, a false record or statement
material to a false or fraudulent claim." United States v.
Strock, 982 F.3d 51, 58 (2d Cir. 2020) (quoting 31 U.S.C. §§
3729(a)(1)(A), (B)). "Claims arising under these two sections
are treated similarly, as the primary difference between the
two is whether the claim itself is false, § 3729(a)(1)(A), or
whether . . . a record or statement material to the claim was
false, § 3729(a)(1)(B)." United States v. Omnicare, Inc., No.
15 Civ. 4179, 2021 WL 1063784, at *8 (S.D.N.Y. Mar. 19, 2021).

## 1.   Falsity

Claims under both Sections 3729(a)(1)(A) and (B)
"require proof of a falsehood or fraudulent scheme that
renders the claim or statement in question 'false.'" United
States ex rel. Kester v. Novartis Pharms. Corp., No. 11 Civ.
8196, 2014 WL 2619014, at *4 (S.D.N.Y. June 10, 2014). "The

---

[5] The Court therefore does not address eviCore's additional
arguments for dismissal of these counts, including its arguments that the
SAC does not establish knowledge, scienter, or materiality. See, e.g.,
United States ex rel. Osmose, Inc. v. Chem. Specialties, Inc., 994 F.
Supp. 2d 353, 366 n.4 (W.D.N.Y. 2014) ("In light of this Court's
conclusions, Defendants' objective falsity and materiality arguments need
not be considered at this time.").

FCA recognizes two types of false claims: factually false claims and legally false claims." United States ex rel. Grubea v. Rosicki, Rosicki & Assocs., P.C., 318 F. Supp. 3d 680, 699 (S.D.N.Y. 2018).

Relators' claims here arise from the alleged provision of "worthless services." Worthless services claims are "effectively derivative" of factually false claims. Mikes v. Straus, 274 F.3d 687, 703 (2d Cir. 2001), abrogated by Universal Health Servs., Inc. v. United States, 136 S. Ct. 1989 (2016). These claims assert "the knowing request of federal reimbursement for a procedure with no medical value." Id. at 702; see also United States ex rel. Lee v. SmithKline Beecham, Inc., 245 F.3d 1048, 1053 (9th Cir. 2001) ("[K]nowingly billing for worthless services or recklessly doing so with deliberate ignorance may be actionable under § 3729."). Services are considered "worthless" when "the performance of the service is so deficient that for all practical purposes it is the equivalent of no performance at all." Mikes, 274 F.3d at 703.

Here, Relators assert that eviCore submitted claims "for worthless prior authorization services that were not properly undertaken." (SAC ¶ 170.) Relators likewise argue that the related requests MCOs submitted to the Government for such worthless services were false. (Id. ¶ 178.)

As a threshold matter, the Court rejects eviCore's argument that no "claims" have been alleged. (EviCore's Br. at 11.) The FCA defines a "claim" as "any request or demand . . . for money or property" that is presented, directly or indirectly, to the United States. 31 U.S.C. § 3729(b)(2)(A). Thus, "[f]raudulent claims are actionable not only when they are presented to an 'officer' or 'employee' of the United States, but also when they are presented . . . to a 'contractor, grantee, or other recipient.'" <u>United States v. Wells Fargo & Co.</u>, 943 F.3d 588, 595-96 (2d Cir. 2019) (quoting 31 U.S.C. § 3729(b)(2)(A)). The Court therefore rejects eviCore's argument that dismissal is warranted "because MCOs do not submit 'claims' to CMS." (EviCore's Br. at 11.)

Nevertheless, the Court finds that falsity has not been alleged here because the services eviCore provided were not so "worthless" that they were "the equivalent of no performance at all." <u>Mikes</u>, 274 F.3d at 703. In each instance of alleged auto-approval, Relators qualify the auto-approval as limited in one respect or another. For example, Relators allege that around Labor Day 2018, eviCore established "'approve as requested' protocols for *the first three requests* for any course of care." (SAC ¶ 26 (emphasis added).) This alleged policy was thus admittedly limited to only "the

26

first three requests." Similarly, Relators allege that
eviCore directly instructed clinical reviewers to auto-
approve "all requests relating to *certain providers,
therapies, and populations*." (SAC ¶ 99 (emphasis added).)
Likewise, Relators allege that eviCore directed auto-approval
for "*pediatric* treatment requests" from Blue Cross Blue
Shield Texas due to "provider noise." (SAC ¶ 102 (emphasis
added).) While these qualifications do not render eviCore's
approval process entirely satisfactory or appropriate, they
do undermine Relators' claim that the utilization management
and prior authorization services provided were entirely
"worthless." Insofar as eviCore provided *some* legitimate
prior authorization and utilization managements services,
those services were not "the equivalent of no performance at
all." <u>Mikes</u>, 274 F.3d at 703; <u>see also</u> <u>United States v.
Dialysis Clinic, Inc.</u>, No. 09 Civ. 00710, 2011 WL 167246, at
*21 (N.D.N.Y. Jan. 19, 2011) (dismissing a worthless services
claim because the allegations were not the "equivalent of no
performance at all" when plaintiff did not allege "that
defendant failed to provide *any* services to their patients");
<u>United States ex rel. Swan v. Covenant Care, Inc.</u>, 279 F.
Supp. 2d 1212, 1221 (E.D. Cal. 2002) (concluding that
"[b]ecause Swan does not allege that Covenant Care's neglect
of its patients was so severe that, for all practical purposes,

the patients were receiving no room and board services or routine care at all, her FCA claim does not fit within the worthless services category"); see also Sweeney v. ManorCare Health Servs., Inc., No. 03-5320, 2005 WL 4030950, at *6 (W.D. Wash. Mar. 4, 2005) (finding that the relator's "worthless services theory fails to state a claim" because it did "not allege that [the defendant] failed to provide any services at all," and explaining that "it would be impossible to determine whether particular services [the defendant] provided, and the United States paid for, were worthless without finding that the care as a whole was worthless").

2.   Particularity

Relators likewise fail to plead Counts One and Two with sufficient particularity to satisfy Rule 9(b) because the SAC fails "to specify the time, place, speaker, and . . . even the content of the alleged misrepresentations." Wood ex rel. U.S. v. Applied Rsch. Assocs., Inc., 328 F. App'x 744, 748 (2d Cir. 2009) (quoting Luce v. Edelstein, 802 F.2d 49, 54 (2d Cir. 1986)). In Count One, Relators allege that eviCore submitted claims for payment to the Government, via their client MCOs, which were false "because they were for worthless prior authorization services that were not properly undertaken." (SAC ¶ 170.) However, the SAC does not identify any records of requests for payment from eviCore to any MCOs

28

for utilization management or prior authorization services. In other words, Relators fail to "cite to a single identifiable record or billing submission they claim to be false, or give a single example of when a purportedly false claim was presented for payment by a particular defendant at a specific time." Wood, 328 F. App'x at 750.

Likewise, in Count Two, Relators allege that eviCore caused MCOs to submit false claims for "prior authorization services that eviCore either never rendered, or performed in a worthless fashion." (SAC ¶ 175.) But, again, Relators have not identified a single request for payment for prior authorization services, nor have Relators identified who made such requests, when, or where. Such allegations are "plainly insufficient" and fail to meet the "heightened pleading standard of Fed R. Civ. P. 9(b)." Wood, 328 F. App'x at 747, 750.

To the extent Relators' claims are premised on eviCore's alleged approvals of unnecessary medical treatments, these claims fare no better. Relators do not identify any approvals, much less do they allege who approved the unnecessary services, where, or when. While Relators identify a number of individuals involved in the alleged auto-approval scheme, none of these individuals allegedly submitted any of the "false claims" -- either requesting payment for prior

authorization or utilization management services, or
approving unnecessary medical treatment. The allegations are
therefore insufficient to "provide the defendant with enough
details to be able to reasonably discern which of the claims
it submitted are at issue." Lab'y Corp., 2015 WL 7292774, at
*3 (citation omitted).

Nor is the Court persuaded by Relators' argument that
the alleged scheme leads to "a strong inference that specific
claims were indeed submitted." (Relators' Br. at 6.) Unlike
the facts in Chorches, Relators here do not provide
allegations that "detail specific and plausible facts" from
which systematic falsification can be "easily" inferred.
Chorches, 865 F.3d at 84. To the contrary, the allegations
here are confused and contradictory. For example, the Manager
of Clinical Review is alleged to have, on the one hand,
encouraged and directed inaccurate auto-approvals (SAC ¶¶ 30,
108), and on the other, scrutinized and attempted to correct
the practice (id. ¶ 111).

Likewise, while the SAC alleges that the auto-approval
processes were designed to approve requests indiscriminately
(id. ¶ 21 (describing "swinging gate prior authorization
approval process")), it also alleges that the automation
software eviCore uses requires some "demographic and clinical
information" (id. ¶ 89), and suggests that the pathways were,

in at least some cases, developed by knowledgeable clinical reviewers (id. ¶ 142 ("Jane Doe 1 lead a team of pediatric reviewers to develop an authorization decision matrix, based on current medical evidence, literature, and guidelines.").) At best, the SAC alleges a discrete and haphazard set of auto-approval processes that existed at "various times" for "certain categories" of requests. (Id. ¶ 23.) These allegations fall short of alleging a "detailed scheme" from which fraudulent claims can be "easily" inferred. Chorches, 865 F.3d at 84.

Relators correctly point out that the Second Circuit has held that Rule 9(b) may be satisfied by allegations "based on information and belief when facts are peculiarly within the opposing party's knowledge." Boykin v. KeyCorp, 521 F.3d 202, 215 (2d Cir. 2008). However, the Second Circuit has also explained that "[t]his exception to the general rule must not be mistaken for license to base claims of fraud on speculation and conclusory allegations." Wexner, 902 F.2d at 172. Rule 9(b) may be relaxed "where information is only within the opposing party's knowledge." Lab'y Corp., 2015 WL 7292774, at *7 (quoting Yuhasz v. Brush Wellman, Inc., 341 F.3d 559, 566 (6th Cir. 2003)).

Here, Relators allege that they "possess personal knowledge and experience regarding eviCore's 'auto-approve'

activities, including personal contact with the employees and
executives of eviCore who have planned, initiated and
directed the violations of law alleged herein." (SAC ¶ 43.)
Thus, Relators do not credibly allege that all specific facts
regarding the scheme were exclusively known to eviCore. For
these reasons, Counts One and Two are dismissed.

B.   COUNT THREE: REVERSE FALSE CLAIMS

Section 3729(a)(1)(G) imposes liability on anyone who
"knowingly makes, uses, or causes to be made or used, a false
record or statement material to an obligation to pay or
transmit money or property to the Government, or knowingly
conceals or knowingly and improperly avoids or decreases an
obligation to pay or transmit money or property to the
Government." 31 U.S.C. § 3729(a)(1)(G). To establish a
violation of this subsection, "a plaintiff must show: (1)
'proof that the defendant made a false record or statement'
(2) at a time that the defendant had a presently-existing
'obligation' to the government -- a duty to pay money or
property." Kester, 2014 WL 2619014, at *10 (quoting
Chesbrough v. VPA, P.C., 655 F.3d 461, 473 (6th Cir. 2011));
citing Wood, 328 Fed. App'x at 748). Claims under this
subsection are known as "reverse false claims" because
Section 3729(a)(1)(G) imposes liability for failure to pay
money *owed to* the government, rather than for obtaining money

32

*from* the government. Omnicare, 2021 WL 1063784, at *2 (citing United States ex rel. Foreman v. AECOM, 454 F. Supp. 3d 254, 268 (S.D.N.Y. 2020)).

Like claims under Sections 3729(a)(1)(A) and (B), reverse false claims under Section 3729(a)(1)(G) require falsity or falsehood to be actionable. Thus, for the same reasons set forth above with respect to Counts One and Two, Count Three also fails. Moreover, the Court is unpersuaded that a reverse false claim may be predicated exclusively on a "decision to retain, rather than return, Government funds," as Relators allege here. (Relators' Br. at 16.)

Courts in this District have repeatedly held that, absent allegations of an independent obligation to pay the government, a reverse false claim is not sufficiently pleaded based only on allegations that a defendant "retain[ed] Government funds to which they were not entitled." Foreman, 454 F. Supp. 3d at 268; see also United States ex rel. Gelbman v. City of New York, No. 14 Civ. 771, 2018 WL 4761575, at *8 (S.D.N.Y. Sept. 30, 2018), aff'd, 790 F. App'x 244 (2d Cir. 2019) ("Relator's reverse false claim allegations -- which essentially boil down to various providers allegedly receiving payment on false claims and thus retaining Government funds to which they were not entitled -- are not an adequate basis on which to allege a reverse false claim.");

33

Wood, 328 F. App'x at 748 (affirming dismissal of reverse false claim when the complaint contained "no mention of any financial obligation . . . owed to the government, and moreover, d[id] not specifically reference any false records or statements used to decrease such an obligation").

C.    COUNT FOUR: CONSPIRACY

Relators do not address this argument in their opposition brief and thus the point is considered waived. See, e.g., Kao v. British Airways, PLC, No. 17 Civ. 0232, 2018 WL 501609, at *5 (S.D.N.Y. Jan. 19, 2018) ("Plaintiffs' failure to oppose Defendants' specific argument in a motion to dismiss is deemed waiver of that issue.").

Moreover, the Court is persuaded by eviCore's argument that Relators have not adequately pleaded a violation of Section 3729(a)(1)(C), which imposes liability on any person who "conspires to commit a violation of subparagraph (A), (B), (D), (E), (F), or (G)." 31 U.S.C. § 3729 (a)(1)(C). "To prove a claim under this subsection, a plaintiff must show: (1) an unlawful agreement by the defendant to violate the FCA, and (2) at least one overt act performed in furtherance of that agreement." Kester, 2014 WL 2619014, at *10 (citing United States ex rel. Grubbs v. Kanneganti, 565 F.3d 180, 193 (5th Cir. 2009); United States ex rel. Sterling v. Health Ins. Plan of Greater N.Y., Inc., No. 06 Civ. 1141, 2008 WL 4449448,

at *4 (S.D.N.Y. Sept. 30, 2008)). To adequately state a conspiracy claim, Relators "must at least allege that two or more people or organizations were involved in the fraud." Sterling, 2008 WL 4449448, at *4. Here, Relators "fail[] to meet the minimal standard to show a conspiracy . . . that more than one person was involved." Id.

D.   COUNTS TWENTY-ONE THROUGH TWENTY-TWO: RETALIATION

Under the FCA's anti-retaliation provision, "any employee" shall be entitled to relief who "is discharged, demoted, suspended, threatened, harassed, or in any other manner discriminated against in the terms and conditions of employment" in connection with his or her "efforts to stop 1 or more violations of [the FCA]." Chorches, 865 F.3d at 95 (citing 31 U.S.C. § 3730(h)(1)). To sufficiently plead a retaliation claim, a plaintiff must generally establish that "(1) he engaged in activity protected under the statute, (2) the employer was aware of such activity, and (3) the employer took adverse action against him because he engaged in the protected activity." Id.

A "constructive discharge," which Relators seek to allege here, arises when an employer, "rather than discharging [the employee] directly, intentionally creates a work atmosphere so intolerable that he is forced to quit involuntarily." Terry v. Ashcroft, 336 F.3d 128, 151–52 (2d

35

Cir. 2003) (citations omitted). Such conditions exist when "viewed as a whole, they are 'so difficult or unpleasant that a reasonable person in the employee's shoes would have felt compelled to resign.'" Id. (quoting Chertkova v. Conn. Gen. Life Ins. Co., 92 F.3d 81, 89 (2d Cir. 1996)). Plaintiffs alleging constructive-discharge claims must "show both (1) that there is evidence of the employer's intent to create an 'intolerable' environment that forces the employee to resign, and (2) that the evidence shows that a reasonable person would have found the work conditions so intolerable that he 'would have felt compelled to resign.'" Adams v. Festival Fun Parks, LLC, 560 F. App'x 47, 49–50 (2d Cir. 2014) (citing Petrosino v. Bell Atl., 385 F.3d 210, 229 (2d Cir. 2004)).

Relators here fail to adequately plead constructive discharge. Relators allege that both Jane Doe 1 and Jane Doe 2 were held to their original productivity goals, despite a company-wide reduction for all employees during the COVID-19 pandemic. (See SAC ¶¶ 149, 162.) Likewise, Relators allege that both Jane Doe 1 and Jane Doe 2 were discouraged, or prevented, from attending meetings, and were relieved of certain higher-level responsibilities. As a result, according to Relators, Jane Doe 1 and Jane Doe 2 were "forced to resign." (See id. ¶¶ 150, 163.)

The Court finds that these allegations are not enough to

plausibly allege that eviCore maintained an intentionally intolerable workplace. Relators have not established that the original productivity requirements eviCore allegedly imposed during the pandemic, or their exclusion from certain meetings, were "so difficult or unpleasant that a reasonable person in the employee's shoes would have felt compelled to resign." Adams, 560 F. App'x at 49. Nor, fatally, have the Relators adduced facts supporting the claim that such conditions were created by eviCore with the *intent* of causing either Jane Doe 1 or Jane Doe 2 to resign. E.g., Kader v. Paper Software, Inc., 111 F.3d 337, 341 (2d Cir. 1997) ("[Plaintiff] has demonstrated that an uneasy and stressful environment existed, but he has adduced no evidence to support an inference that his employer intentionally created an intolerable workplace."). Thus, the retaliation claims are also dismissed.[6]

E.   COUNTS FIVE THROUGH TWENTY: STATE LAW CLAIMS

The Court declines to exercise supplemental jurisdiction over the state law claims, which it may do under the FCA if

---

[6] The Court finds persuasive eviCore's argument that the SAC may not allege sufficient facts supporting anonymity. See EviCore's Br. at 23; see also United States v. Pilcher, 950 F.3d 39, 45 (2d Cir. 2020) (explaining that anonymity is "the exception and not the rule, and in order to receive the protections of anonymity, a party must make a case rebutting th[e] presumption [of disclosure]"). Nevertheless, having dismissed the retaliation claims on the grounds set forth herein, the Court will not address eviCore's argument that the SAC should be dismissed on the grounds that Jane Doe 1 and Jane Doe 2 remain anonymous inappropriately.

it "has dismissed all claims over which it has original jurisdiction." 28 U.S.C. § 1367(c)(3). Here, "[h]aving dismissed the federal claims over which the Court has original jurisdiction, the Court declines to exercise its supplemental jurisdiction over any state-law claims Plaintiff may be asserting." Mercer v. Westchester Med. Ctr., No. 21 Civ. 2961, 2021 WL 1864326, at *2 (S.D.N.Y. May 7, 2021) (citing Kolari v. N.Y.-Presbyterian Hosp., 455 F.3d 118, 122 (2d Cir. 2006) ("Subsection (c) of § 1367 'confirms the discretionary nature of supplemental jurisdiction.'") (quoting City of Chicago v. Int'l Coll. of Surgeons, 522 U.S. 156, 173 (1997)). Moreover, "[w]here Relator has not sufficiently pled its allegations in any state, it would be illogical to allow those deficient allegations to support state-law claims." Lab'y Corp., 2015 WL 7292774, at *7.

F.   STATUTE OF LIMITATIONS

The Court rejects eviCore's argument that because the initial complaint was filed under seal, eviCore "ha[d] no basis to determine if the SAC relates back to the allegations in the initial complaint under Rule 15(c)(1)(B)," and therefore all claims "six years before the FAC was filed in this matter are barred." (EviCore's Br. at 23.) The initial complaint was unsealed on June 10, 2020 (see Dkt. No. 36), months before eviCore filed the instant Motion. The Court is

38

therefore not persuaded that eviCore has been denied the opportunity to determinate whether the SAC relates back to the initial complaint under Rule 15. Nor would the Court find claims time-barred on the sole ground that the initial complaint in an action was sealed. See, e.g., Hayes v. Dep't of Educ., 20 F. Supp. 3d 438, 444 (S.D.N.Y. 2014) (explaining that "[a] relator may commence a qui tam action unilaterally, but after the action is brought cannot influence when the complaint is ultimately unsealed," and "[t]here is no valid reason to punish an otherwise diligent relator by stripping away claims when the Government, not the relator, is to blame for preventing the defendant from receiving notice of the action against it" (internal citations omitted)).

G.   LEAVE TO AMEND

The Court grants Relators leave to amend the SAC. Leave to amend should be given freely "when justice so requires." Fed. R. Civ. P. 15(a)(2). Leave should be denied "in instances of futility, undue delay, bad faith or dilatory motive, repeated failure to cure deficiencies by amendments previously allowed, or undue prejudice to the non-moving party." Burch v. Pioneer Credit Recovery, Inc., 551 F.3d 122, 126 (2d Cir. 2008) (citing Foman v. Davis, 371 U.S. 178, 182 (1962)). "A district court has broad discretion in determining whether to grant leave to amend." Gurary v.

<u>Winehouse</u>, 235 F.3d 792, 801 (2d Cir. 2000), <u>cert.</u> <u>denied</u>, 534 U.S. 826 (2001).

Here, Relators have already amended the complaint twice, and have therefore had some opportunity to address the deficiencies therein. <u>See</u>, <u>e.g.</u>, <u>Ladas</u>, 824 F.3d at 28-29. Nevertheless, the previous amendments were not in response to motions to dismiss. <u>See</u>, <u>e.g.</u>, <u>Polansky</u>, 2009 WL 1456582, at *10 (granting leave to replead when "[the relator] has amended his complaint on three prior occasions, [but] it was not in response to a motion by Pfizer" and "[i]nstead, it occurred during the period when the complaint was sealed while the United States Attorney was making a judgment as to whether to intervene"). Now that Relators are apprised of their pleading failures, the Court grants leave to further amend the SAC.

## IV.  ORDER

For the reasons set forth above, it is hereby

**ORDERED** that the motion of defendant eviCore Healthcare MSI to dismiss the Second Amended Complaint of plaintiffs United States of America *ex rel*. SW Challenger, LLC ("Relators") (Dkt. No. 21) is **GRANTED** and Relators' claims are dismissed without prejudice.

**SO ORDERED.**

Dated:    New York, New York
          13 August 2021

_____
Victor Marrero
U.S.D.J.

40